**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SIDNEY REID and ANGEL LAKE, on Behalf of Themselves and all Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNILEVER UNITED STATES, INC.,<br><br>Defendant. | No. |

## CLASS ACTION COMPLAINT

Plaintiffs, Sidney Reid and Angel Lake ("Plaintiffs"), individually and on behalf of all others similarly situated, allege the following upon personal knowledge as to their own acts and, as to all other allegations, upon information and belief, and upon investigation by counsel.

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action to seek redress for themselves and all others who purchased Suave® Professionals Keratin Infusion 30 Day Smoothing Kit (the "Treatment" or "Product") from the date in 2011 that the Treatment was made available to consumers through the present. The Product is still available despite Defendant's so-called May 2012 "recall" of the Product. Plaintiffs purchased the Treatment because of Defendant's uniform false representation that

it would smooth their hair and coat it with Keratin, a protein found naturally in hair. Undisclosed by Defendant to Plaintiffs and the Class and therefore unknown to Plaintiffs and the Class, the Treatment contains an ingredient or combination of ingredients that causes significant hair loss upon proper application. Defendant's uniform acts and omissions in connection with the development, marketing, sale and delivery of the Treatment, and its belated and incomplete "recall" of this hazardous Product violates the consumer protection laws of the states of residence of Plaintiffs and other members of the Class, breaches Defendant's express and implied warranties to Plaintiffs and the Class, and constitutes unjust enrichment.

2. Unilever United States, Inc. ("Unilever") labeled, advertised, promoted and sold the Treatment targeting women who wanted smooth, shiny, manageable hair with no frizz. Through an extensive marketing campaign and *via* its website and packaging, Defendant made a number of express warranties: that the Treatment was a Keratin-based smoothing treatment and not a toxic chemical relaxer, that its effects would last no longer than 30 days, that it contained No Formaldehyde, and that it was safe.

3. The Treatment was marketed as a Keratin product although Keratin, which is a natural protein, is the last-listed ingredient in the Smoothing Cream and Cuticle Seal Cream. It was sold among other hair conditioning products although it is not a conditioner but is a chemical hair straightener.

4. In addition, the Defendant falsely claimed that the Treatment contained "No Formaldehyde," in all capital letters on the box cover, although the Treatment contains a chemical ingredient that is known to release Formaldehyde upon its use or application.

5. In order to create an impression of the Product as a gentle, natural Keratin-based hair "smoothing" treatment, Defendant falsely promoted the Product's effects as lasting no longer than 30 days. Unlike chemical hair

2

straighteners, whose effects are expected to last for many months, the positive attributes to be provided by the Treatment were touted as short-term.

6.     Although it is not yet known what ingredient or combination of ingredients in the Treatment caused significant hair loss to Plaintiffs and members of the Class, what is clear is that nowhere on the package labeling or on Defendant's websites or other marketing materials did Defendant warn Plaintiffs and members of the Class that they were at risk of significant hair loss upon proper application of the Treatment.

7.     Defendant failed to do so even though Defendant knew, before or almost immediately upon introduction of the Product in late 2011, that consumers were complaining that the Treatment caused significant hair loss (among other adverse effects, such as chemical burns, hair breakage and hair discoloration).

8.     Not only did Defendant fail properly to warn consumers before they purchased the Product, but when it finally chose to "recall" the Product in May 2012, it told consumers the Product was being "discontinued" and was still safe to use, while it told retailers the Product was to be immediately removed from the shelves and sent back to Defendant.

9.     Up to the date of filing of this Complaint, Defendant has never fully and appropriately recalled the Product; Defendant continues to falsely claim – to consumers – that the Product is safe, and continues to fail to warn consumers of the dangers of proper application and/or misapplication of the Treatment. Defendant's efforts to conceal and downplay the hundreds if not thousands of complaints of Class members who have lost their hair as a result of using this Product has resulted in a pointed attack on consumers – Defendant blames consumers for the defect in the Product and its own failure to warn consumers, falsely claiming that it is the consumers'  "misunderstanding" of the appropriate use and application of the Treatment that has resulted in the Product's failure.

3

10.     U.S. consumers reasonably expect that their hair care products will not cause significant hair loss due to defective design and manufacturing and U.S. consumers had no expectation that the Treatment would cause their hair to fall out.

11.     Further, consumers reasonably expect that if Defendant knew that the Treatment was causing hair loss (whether by proper application or by misapplication) that a manufacturer such as Unilever would make a disclosure to consumers once it determined there was a widespread problem -- and would not quietly discontinue the Product and attempt to conceal or diminish Class members' legitimate complaints.

<u>JURISDICTION AND VENUE</u>

12.     The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(d), because this is a nationwide class action lawsuit in which over $5,000,000 is at issue, there are more than 100 putative class members, and at least one Class Member is a citizen of a state other than Defendant's state of citizenship.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of its products in this District.

<u>THE PARTIES</u>

14.     Plaintiff, Sidney Reid, is citizen of Illinois, residing in Chicago, Illinois.

15.     Plaintiff, Angel Lake, is a citizen of Alabama, residing in Foley, Alabama.

16.     Defendant, Unilever United States, Inc., is a subsidiary of the dual-listed company consisting of Unilever N.V. in Rotterdam, Netherlands and Unilever PLC in London, United Kingdom.   Unilever United States, Inc., which includes the Suave brand, is located at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.  Unilever manufactured, marketed and distributed the Treatment.

FACTUAL ALLEGATIONS

The Product and Defendant's Warranties

17.     Unilever released Suave® Keratin Infusion 30-day Treatment on or about December 9, 2011.  The Treatment was sold by Defendant directly and through retail shops to consumers nationwide.

18.     In promoting its new Treatment, for example on Walmart.com, Unilever stated: "Suave Professionals Keratin Infusion 30 Day Smoothing Kit is a simple, at-home alternative to expensive salon keratin treatments. This revolutionary system, formulated with keralock technology, infuses hair with keratin protein and leaves it smooth, shiny and manageable for up to 30 days." The description continues by pointing out that the Product contains "No Formaldehyde."

19.     The Walmart ad describes how the Product works: "Step 1: Smoothing Cream with keratin loosens, smoothens, and detangles curls. And waves. Step 2: Cuticle Seal Cream with Keralock Technology reforms keratin bonds inside the hair fiber and eliminates frizz for long lasting smoothness. And manageability. Step 3: Heat Defense Leave-In Conditioner provides ultimate moisturization to protect hair while heat styling. Formulated for use with blow dryers or flat irons for optimal shine and smoothness. Also, sold outside for continued use."

20.     A copy of the Walmart ad is attached hereto as EXHIBIT A and can be found at http://www.walmart.com/ip/TO-BE-DELETED-Suave-Professionals-Keratin-Infusion-30-Day-Smoothing-Kit/20461380.

21.     The product states, on the front of the box, that the Treatment "Smoothes Your Style as Well as a Keratin Treatment."  Below that statement is printed in all caps: "No Formaldehyde."  The package instructions state: "Your hair will continue to be smoother and easier to style for up to 30 days !"  The package instructions further advise: "To complete the process, apply the Heat Defense Leave-In Conditioner and blow dry your hair into a smooth, straight style. Flat iron if desired." A copy of the box labeling and instructions are attached hereto as EXHIBIT B.

22.     Keratin is a protein found naturally in hair.  By promoting the Treatment as a treatment that "infuses hair with keratin protein" and did not contain Formaldehyde, Defendant warranted the Product as a safe, non-toxic hair smoothing solution that could be purchased at a fraction of the price of a salon treatment.

23.     However, despite the express representation that the Treatment contains no Formaldehyde, the Treatment does contain DMDM Hydantoin, a chemical that is known as a "Formaldehyde-releaser."  *See* http://www.safecosmetics.org/article.php?id=599. Formaldehyde releasers are sometimes used in cosmetics in place of formaldehyde and release small amounts of Formaldehyde over time. Formaldehyde is a known human carcinogen.

24.     An investigation by the non-profit Environmental Working Group reported that some cosmetic companies disguise the Formaldehyde in their products by using, among other things, Formaldehyde releasers instead of Formaldehyde.     *See*     http://www.ewg.org/hair-straighteners/our-report/hair-straighteners-that-hide-formaldehyde.

6

25.     An average consumer reviewing the representation that the Treatment contains "No Formaldehyde" would not expect that it would contain a chemical known to release Formaldehyde.

26.     Plaintiffs and the Class would also not expect that application of the Treatment would cause hair loss upon proper application.

27.     Plaintiffs and the Class would reasonably expect a warning regarding any potential hazard to consumers, especially because the Food, Drug and Cosmetic Act regulations provide that cosmetics that may be hazardous to consumers must bear appropriate warnings. *See* http://www.fda.gov/Cosmetics/CosmeticLabelingLabelClaims/default.htm.

28.     Contrary to the Food, Drug and Cosmetic Act regulations the Product also failed to provide adequate directions for safe use, although Defendant knew or should have known the Product could be unsafe if used incorrectly. In fact, Defendant's website affirmatively represents that it complies with all applicable labeling laws. *See* Unilever's Code of Business Principles, available on its website http://www.unilever.com/images/Code-of-Business-Principles_tcm13-274232.pdf.

29.     Defendant's representations that the Product is safe, contains "No Formaldehyde", and would smooth hair for no longer than 30 days, was plainly incorrect.

30.     In response to the damage customers have suffered after using this Product, consumers created a Facebook page entitle "Suave-Keratin-Infusion-Kit-Destroyed-my-Hair."

31.     The page describes:

NIGHTMARES & HORROR Stories shared by VICTIMS of this product. Even if you haven't been affected, but can sympathize, please "LIKE" this page as it would be very helpful to those who have & continue to suffer as a result of Suave's negligence! THANK YOU!

**Mission**

The intent of this group is to, first and foremost WARN others about the potential damage and danger (yes, danger), but also in hopes to get the attention of Unilever (Suave)!

PLEASE feel free to tell your stories in as much detail as you can. Pictures and videos will also be very helpful in garnering attention!

Many, including myself, strongly believe that this product is falsely advertised, misleading, devoid of proper warnings, not safe for over-the-counter sales, should be reviewed by the FDA, and pulled from the market immediately.

**ENDGAME:***

GETTING THIS DANGEROUS PRODUCT DISCONTINUED OR RECALLED, AND *RECOMPENSE* FOR ALL THOSE WHO HAVE SUFFERED INJURIES, TRAUMA, AND THE LOSS OF THOUSANDS OF DOLLARS SPENT ON REPAIRS - A DIRECT RESULT OF BEING INTENTIONALLY MISLEAD BY UNILEVER, AND THEIR NEGLIGENCE.

**Description**

This group was created for people who have had horrible experiences with the "Suave Professionals Keratin Infusion 30 Day Smoothing Kit," and who need a place to tell their stories, vent, cry, scream, or receive support and empathy from others who have been likewise traumatized.

32.     There are hundreds of posts highlighting the "horror stories" of women who used the Treatment. These stories are strikingly similar to Plaintiffs' experiences.  These consumers describe how they were misled by Defendant's representations about the Product, expecting a Keratin-based smoothing Treatment whose effects would last no longer than 30 days – and ending up with a toxic hair straightener that caused hair loss and other adverse effects.

33.     As early as December 2011, consumer complaints appeared on the internet concerning serious adverse effects such as hair loss and chemical burns resulting from use of the now-recalled/discontinued Treatment. As more and more reports came to light, Defendant remained silent. The Defendant did not do anything to warn distributors or the public of the problems. Instead, Defendant

kept selling the Treatment with the same express warranties and no appropriate warnings.

34.     On the day the Product was "recalled", Unilever explained on a website listing numerous recalled products, that the Treatment was taken off the market "because of potential consumer misunderstanding of the product's suitability for certain hair conditions."   Unilever admitted that consumers "misunderstood" the Treatment, which misunderstanding was caused by Unilever's false marketing of the Treatment as, among other things, a temporary hair smoothing Product, not a long-lasting toxic chemical relaxer that could cause hair loss.

35.     The Food and Drug Administration (FDA), on its website at http://www.fda.gov/Safety/Recalls/Enforcement Reports/ucm307229.htm indicates that the Treatment was recalled by Unilever by letter dated May 8, 2012.  The FDA website notes that there were 381,288 kits in commerce nationwide that were recalled.

36.     Retailers were advised by Defendant to cease immediately distribution of the Product and were advised to send the Product back to Unilever.

37.     On information and belief, some retailers continued to market the Product after the recall.

38.     In recalling the Product, Defendant did not make any public announcement and did not publicly respond to the numerous complaints of adverse incidents associated with its use. Instead, Defendant posted a simple notice on its website indicating that the Treatment had been "discontinued" and requested that customers call for additional information.

39.     Unilever continues to advise customers that the Product is safe to use as directed - without providing any disclosure concerning the complaints of hair

loss and no warnings regarding the hair loss that may result from its continued use. *See* http://keratininfusion.suave.com/us/base/howto#productFaqs.

40.    Unilever actively and intentionally misled consumers by telling consumers the Product was safe to use while telling retailers to immediately recall the Product and bar sales of the Product sitting on its shelves.

41.    Unilever's Code of Business Principles, available on its website (http://www.unilever.com/images/Code-of-Business-Principles_tcm13-274232.pdf) states that Unilever "complies with laws and regulations of the countries in which they operate." It further provides that Unilever is "committed to providing products which are safe for their intended use. Products and services will be accurately and properly labeled, advertised and communicated."

42.    Defendant also makes the following representation on its website: "Consumers trust us to provide them and their families with products that are safe." Defendant also states: "Protecting consumers' safety is our number one priority."

43.    Defendant further explains: "We realize innovation is key to our progress, and through cutting-edge science we're constantly enhancing our brands, improving their nutritional properties, taste, fragrance, or functionality. We invest nearly 1 billion every year in research and development, and have established laboratories around the world where our scientists explore new thinking and techniques, applying their expertise to our products. Consumer research plays a vital role in this process. Our unrivalled global reach allows us to get closer to consumers in local markets, ensuring we understand their diverse needs and priorities."

44.    Defendant also claims: "On any given day, two billion people use Unilever products to look good, feel good and get more out of life." A copy of

10

Unilever's representations on its website and its Code of Business Principles are attached hereto as EXHIBIT C.

Defendant's Conduct With Respect to the Hazard Posed By its Product

45.    Prior to Plaintiffs' purchase of the Product, Defendant was aware or should have been aware that the Treatment contained an inherent defect that caused significant hair loss upon proper application and that any instructions and warnings provided with the Product were wholly insufficient.

46.    Defendant knew (or but for its reckless indifference would have known) prior to Plaintiffs' purchase of the Product that it was going to continue to receive complaints of hair loss attributed to its Product. Based on its experience, Defendant knew that even if it diligently investigated the problem, it would be difficult if not impossible to remediate the problem.

47.    Thus, Defendant knew (or but for its reckless indifference would have known) that: (a) the risk of hair loss was substantial, (b) Defendant's customers were unaware of that substantial risk, and (c) those customers had a reasonable expectation that Defendant would disclose that risk and fully and appropriately issue a recall of the Product.

48.    Despite such knowledge, Defendant did not disclose to prospective purchasers (before or after the so-called recall) that there was a substantial risk of hair loss associated with use of the Product, and instead continued – even after the so-called recall -- to claim the Product was safe, while concealing all the adverse reports filed by consumers. Defendant told consumers that the Product was discontinued because of consumer "confusion," not because users of the Product were losing their hair.

11

## FACTS RELATING TO NAMED PLAINTIFFS

49.     Sidney Reid purchased the Treatment in or about early March 2012. Reid was familiar with Keratin-based hair treatments and was exposed to and familiar with Defendant's claims about the Treatment not containing Formaldehyde and being a "smoothing" Product whose effects would last no longer than 30 days. She paid approximately $11 for the Treatment which she purchased at a nearby Target in Chicago.

50.     She purchased the Product for its temporary "smoothing" effects to help her control the curl and frizz in her hair.  Immediately upon proper application of the Treatment, her hair loosened from its natural tight curls to being completely straight. The next time she washed her hair after applying the Product, her hair began thinning and falling out. Her hair became progressively thinner at the top of her crown until there were visible bald spots.

51.     Angel Lake purchased the Treatment in or about early May 2012. Lake was familiar with Keratin-based hair treatments and was exposed to and familiar with Defendant's claims about the Treatment not containing Formaldehyde and being a "smoothing" Product whose effects would last no longer than 30 days. She paid approximately $10 for the Treatment which she purchased in Alabama at a nearby Winn-Dixie retail store. Upon information and belief, the Treatment had a suggested retail price of $14.99 in her area.

52.     Angel Lake carefully reviewed the Product instructions and a survey provided by Unilever on its website to confirm that the Product was intended for her hair type before using the Treatment.  Lake followed the instructions provided with the Product. After correctly applying the Product, within minutes of use, her hair began melting together and falling out in clumps.

53.     Lake immediately contacted her hair dresser and began to take steps to remediate the damage caused by the Product.  She also contacted Defendant and

sent Defendant a letter setting forth her experience with the Product, including the fact that it was recommended for her hair type by a survey she had taken on Unilever's website. She explained how her hair began "melting" and falling out almost immediately upon application of the Treatment.

54. In a letter dated May 4, 2012, upon receipt of Angel Lake's complaint, Defendant wrote back and asked for additional information in order to "investigate" the problem. Defendant reiterated in the letter its false representation that the Treatment was a "safe, at-home alternative to expensive salon treatments." Defendant refunded Lake $15 for the purchase of the Product, however she has unreimbursed expenses that she has incurred and that she continues to incur in repairing the damage caused by the Product.

55. Plaintiffs purchased the Treatment due to Defendant's false representations about what the Product offered them, and because they were unaware that the Treatment was unsafe and would cause hair loss, among other effects. Plaintiffs would not have purchased the Treatment but for the Defendant's false and fraudulent marketing that promoted the Product as a safe "smoothing" product whose effects would last no longer than 30 days, its false statement that the Product does not contain Formaldehyde, and its misleading claim that it was Keratin-based.

56. The Treatment, unknown to Plaintiffs, was defective in that it caused hair loss and other adverse effects upon proper application, and was defective because Defendant failed to appropriately warn of the risk of hair loss associated with its use.

57. Sidney Reid had to have all but half an inch of her hair cut off as a result of the damage to her hair caused by the Product. She also went to her family doctor after she noticed the bald spots on her scalp. She incurred in excess of $100

dollars in expenses to date relating to her attempts to restore or salvage what was left of her hair and those expenses are continuing.

58.     Reid wrote to Defendant on its website in April 2012 advising them of the hair loss that was caused by her use of the Product and did not receive any response. She wrote to Defendant again on July 23, 2012, asking what Defendant intended to do as a result of this damage.  Defendant sent her a standard email response advising her that someone will contact her.  As of the date this Complaint was filed, Reid has not received an follow-up communication from Defendant.

59.     Angel Lake expended hundreds of dollars to attempt (albeit unsuccessfully) to repair the damage caused by use of the Treatment and by Defendant's actions.  Months after using the Product, and after being forced to cut approximately 12 inches off the length of her hair, her remaining hair is still falling out and is no longer in the good condition it was in prior to her use of the Treatment, requiring continued treatment to repair the damage caused by the Product.

60.     Plaintiffs provided pre-suit notice to Defendant of their warranty claims and Defendant had actual notice of the alleged defect and harm caused by its Product.

<u>CLASS ALLEGATIONS</u>

61.     Plaintiffs bring this action on their own behalves pursuant to Fed. R. Civ. P. 23 (a), 23(b)(2) and 23(b)(3) and as a Class Action on behalf of the following classes of purchasers (each a "Class Member" of the "Class"): (a) The "Multistate Class": all persons who purchased the Treatment in the United States from the date in 2011 that it was first made available to consumers through the present; or alternatively, (b) the "Illinois Class": all persons who reside in Illinois and purchased the Treatment from the date in 2011 that it was first made available to consumers through the present, and (c) the "Alabama Class":  all persons who

reside in Alabama and purchased the Treatment from the date in 2011 that it was first made available to consumers through the present.

62.    Excluded from the Class are: Defendant, any entities in which Defendant has a controlling interest, any of its parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, the presiding judge(s) in this case and his, her or their immediate family, and those who purchased the Treatment for resale. Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

63.    Plaintiffs and the members of the Class are so numerous and geographically disperse that joinder of all members individually, in one action or otherwise, is impractical.   Defendant's national marketing and advertising campaigns target consumers across the country.   The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication.

64.    This action involves questions of law and fact common to Plaintiffs and all members of the Class, which include the following:

(a)    Whether the Treatment contains the defect alleged herein;

(b)    Whether Defendant failed to appropriately warn Class members of the damage that could result from use of the Product;

(c)    Whether Defendant had actual or imputed knowledge of the defect but did not disclose it to Plaintiffs or the Class;

(d)    Whether Defendants promoted the Product with false and misleading statements of fact and material omissions;

(e)     Whether the alleged conduct constitutes violation of the laws asserted herein;

(f)     Whether Plaintiffs and Class Members sustained damages resulting from Defendant's conduct and, if so, the proper measure of damages or other relief.

65.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

66.     The claims of the named Plaintiffs are typical of the claims of the proposed Class, and Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which directly conflict with, the interests of the other members of the Class.

67.      Plaintiffs have engaged the services of counsel who are experienced in complex class litigation, who will adequately prosecute this action, and who will assert and protect the rights of and otherwise represent Plaintiffs and the absent Class Members.

68.     Plaintiffs' claims are typical of those of the absent Class Members because Plaintiffs and the Class Members each sustained damages arising from Defendant's wrongful conduct, as alleged more fully herein.

69.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable for proposed Class members to prosecute their claims individually.

70.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude maintenance as a class action.

## COUNT I
## Breach of Express Warranty

71.     Plaintiffs hereby incorporate the above allegations by reference as though fully set forth herein.

72.     Plaintiffs bring this claim individually and on behalf of the Class.

73.     Plaintiffs, and each member of the Class formed a contract with Defendant at the time Plaintiffs and the other Class Members purchased the Treatment.  The terms of that contract include the promises and affirmations of fact made by Defendant on the Treatment's packaging and through marketing and advertising, as described above.  This marketing and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiffs and the members of the Class and Defendant.

74.     Defendant purports through its advertising and packaging to create express warranties that the Treatment was a hair "Smoothing" Product and not a chemical relaxer, that the effects of the Treatment would last no more than 30 days, and that it contained No Formaldehyde and was safe.

75.     All conditions precedent to Defendant's liability under this contract were performed by Plaintiffs and the Class when they purchased the product and used it as directed.

76.     Defendant breached express warranties about the Treatment and its qualities because Defendant's statements about the Product were false and the Product does not conform to Defendant's affirmations and promises described above. Plaintiffs would not have purchased the Product had they known the true nature of the Treatment and the mis-statements regarding what the Product was and what it contained.

77.    As a result of Defendant's breach of warranty, Plaintiffs and the Class have been damaged in the amount of the purchase price of the Product and any consequential damages resulting from the purchases, including the cost to repair their hair loss.

## COUNT II
## Breach of Implied Warranty

78.    Plaintiffs hereby incorporate the allegations contained in paragraphs 1-70 by reference as though fully set forth herein.

79.    At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be reasonably fit for the purposes for which such products are used, and that product be acceptable in trade for the product description.

80.    Notwithstanding the aforementioned duty, at the time of delivery, the Treatment sold to Plaintiffs was not merchantable because it contained a defect that caused hair loss upon proper application and did not otherwise perform as represented.

81.    Defendant was notified that the Treatment was not merchantable within a reasonable time after the defect manifested to Plaintiffs and the Class.

82.    As a result of the non-merchantability of the Treatment, Plaintiffs and the Class sustained damages.

## COUNT III
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and Substantially Similar Laws of Alabama[1] and Other States

83.     Plaintiffs incorporate the above allegations contained in paragraphs 1-70 by reference as though fully set forth herein.

84.     Plaintiffs bring this claim individually and on behalf of the Class members.

85.     At all times relevant hereto there was in full force and effect the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et. seq.* (the "Act"). Similar statutes, identical in their material respects, are in effect in most other jurisdictions within the United States.[2]

86.     Section 2 of the Act provides in relevant part as follows:
> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deceptive, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

---

[1] An Alabama class may be maintained under Fed. R. Civ. P. 23 although class relief is not permitted under state law. *Shady Grove Orthopedic Associates v. Allstate Ins. Co.*, 1305 S. Ct. 1431 (2010).

[2] The consumer fraud claims of Plaintiff Reid and resident absent class members in Illinois are brought under the Act. The consumer fraud claims of Plaintiff Lake and resident absent class members in Alabama are brought under the Alabama Deceptive Trade Practices Act, Ala. Code 8-19-1 *et. seq.*. The consumer fraud claims of nonresident absent class members are brought under the consumer protection statute(s) of their respective states of residence.

815 ILCS 505/2 (footnotes omitted).

87.     Plaintiffs and other members of the Class, as purchasers of the Treatment, are consumers within the meaning of the Act and similar consumer fraud acts given that Defendant's business activities involve trade or commerce, are addressed to the market generally and otherwise implicate consumer protection concerns.

88.     As detailed above, Defendant, through its advertisements and packaging, used unconscionable commercial practices, deception, fraud, false promise and misrepresentation in violation of the Act in connection with the marketing of the Treatment, as alleged above.

89.     Defendant also knowingly concealed, suppressed and consciously omitted material facts to Plaintiffs and other members of the Class knowing that consumers would rely on the advertisements and packaging and Defendant's uniform representations to purchase the Product.

90.     Unilever misrepresented that the Product was a Keratin-based "smoothing" conditioner although Keratin was in fact the last listed ingredient in the Smoothing Cream and Cuticle Seal Cream.

91.     By placing "No Formaldehyde" in all capital letters on the front of the package, along with its claim that it would "infuse hair with Keratin," Unilever marketed the Product as a natural, safe conditioning treatment that would leave hair smooth, shiny and manageable. These claims were material and false in that the Treatment is really not a conditioner at all, but a long-lasting toxic chemical relaxer.

92.     Defendant intended that Plaintiffs and the other members of the  Class rely on Defendant's representations as set forth above.  It was reasonable for consumers to believe the Treatment was not a hair straightener but was a smoothing conditioner because Unilever misrepresented that the Treatment's

effects would last no longer than 30 days. The effects of a chemical hair straightener typically last far longer.

93.     Unilever's material misrepresentations set forth above constitute unconscionable commercial practices, deception, fraud, false promise, misrepresentation and/or omission of material facts as to the nature of the goods, in violation of the Act and similar consumer protection acts applicable to members of the Class.

94.     Once the defect in the Treatment and its tendency to cause hair loss despite proper application (or based upon foreseeable misapplication) became apparent to Defendant, consumers (such as Plaintiffs) were entitled to disclosure of that fact because a significant risk of hair loss would be a material fact in a consumer's decision-making process, and, without Defendant's disclosure consumers would not necessarily know that there is such a risk.

95.     Defendant intended that Plaintiffs and the other members of the Class would rely on the deception by purchasing the Treatment, unaware of the material facts and omissions described above. It knew that its customers would rely on its representations that the Product was safe when used as directed, that it was simply "discontinued" due to consumer confusion about its use, and knew that consumers would rely upon its silence as to any known risk of hair loss as evidence that the Product was safe.  This conduct constitutes consumer fraud within the meaning of the Act and other consumer protection statutes applicable to the Class.

96.     Plaintiffs and the other members of the Class suffered damages as a proximate result of the unfair acts or practices of Defendant alleged herein. Defendant's misrepresentations and/or omissions of material fact were done knowingly, intentionally, willfully or with reckless disregard for the consequences of its actions.

97.    Plaintiffs and other members of the Class would not have purchased the Treatment but for the promised benefits and concealment of any risk of harm because the Product as sold had no intrinsic value to them.

## COUNT IV
## Violation of the Uniform Deceptive Trade Practices Act

98.    Plaintiffs incorporate the above allegations contained in paragraphs 1-70 by reference as though fully set forth herein.

99.    Plaintiffs bring this claim individually and on behalf of the Class members.

100.   At all times relevant hereto there was in full force and effect the Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/1.  Similar statutes, identical in their material respects, are in effect in most other jurisdictions within the United States.

101.   The UDTPA prohibits, *inter alia*, representing that goods have characteristics, ingredients , uses or benefits that they do not have.

102.   Defendant has committed deceptive acts or practices within the meaning of UDTPA by engaging in the acts and practices alleged herein, including but not limited to the failure to disclose the defect in the Treatment and warn consumers of the risk of significant hair loss associated with its use.

103.   As a result of Defendant's violation of UDTPA, Plaintiffs and other members of the Class sustained a loss or damages.

## COUNT V
## Violation of Magnuson-Moss Act (15 U.S.C. § 2301 *et seq*.)

104.   Plaintiffs incorporate the above allegations contained in paragraphs 1-70 by reference as though fully set forth herein.

105.   Plaintiffs and the Class are consumers as defined in 15 U.S.C. § 2301(3).

22

106. Defendant is supplier and warrantor as defined in 15 U.S.C. § 2301(4)(5).

107. The Treatment is a consumer product as defined in 15 U.S.C. §2301(6).

108. By reason of Defendant's breach of its implied warranties and express written warranties set forth above, Defendant has violated the statutory rights due the Plaintiffs and the Class pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., thereby damaging Plaintiffs and the Class.

## COUNT VI
### Unjust Enrichment

109. Plaintiffs incorporate the above allegations contained in paragraphs 1-70 by reference as though fully set forth herein.

110. Plaintiffs bring this claim individually and on behalf of the Class.

111. Plaintiffs and Class members conferred a benefit on Defendant by purchasing the Treatment.

112. Defendant has been unjustly enriched in retaining the revenues derived from Class members' purchases of the Treatment, which retention of such revenues under these circumstances is unjust and inequitable because Unilever misrepresented the nature of the Product, misrepresented its ingredients, and knowingly marketed and promoted a dangerous and defective Product, which caused injuries to Plaintiffs and the Class because they would not have purchased the Treatment based on the same representations if the true facts concerning the Product had been known.

113. Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiffs and the Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court.

23

WHEREFORE, Plaintiffs, individually and on behalf of the Class of persons described herein, themselves and all others similarly situated, pray for the following relief:

    A.    An Order certifying the Class as defined above;

    B.    Designating Plaintiffs as representatives of the Class and their counsel as Class counsel;

    C.    An award of actual damages and statutory and punitive damages as permitted by law;

    D.    An award of restitution and other appropriate equitable relief;

    E.    Reasonable attorney's fees and costs; and

    F.    Such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

DATED: August 1, 2012

By:    */s/ Marvin A. Miller*

MARVIN A. MILLER
LORI A. FANNING
ANDREW SZOT
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
Facsimile: (312) 676-2676
Email: mmiller@millerlawllc.com
Email: lfanning@millerlawllc.com
Email: aszot@millerlawllc.com

24

Peter Safirstein
Elizabeth S. Metcalf
**Morgan & Morgan, P.C.**
Five Penn Plaza, 23rd Fl.
New York, NY 10001
Telephone: (212) 564-1637
Facsimile: (212) 564-1807
Email: psafirstein@forthepeople.com
Email: emetcalf@forthepeople.com

Christopher S. Polaszek
**Morgan & Morgan, P.A.**
One Tampa City Center
201 N. Franklin St., 7th Fl.
Tampa, FL 33602
Telephone: (813) 314-6484
Facsimile: (813) 222-2406
Email: cpolaszek@forthepeople.com

Jana Eisinger
**Law Office of Jana Eisinger, PLLC**
11 West Prospect Avenue
Mount Vernon, New York 10550
Telephone: (914) 418-4111
Facsimile: (914) 455-0213
Email: Jana.Eisinger@gmail.com

# EXHIBIT A





### ***TO BE DELETED*** Suave Professionals Keratin Infusion 30 Day Smoothing Kit

| Buy from Walmart | Shipping & Pickup |
|---|---|
| **$10.**97 | Not Available at this time |
| In stores<br>Price may vary | Check store availability for this product. |

Product availability, styles, promotions and prices may vary between stores and online.

#### Item Description

Suave Professionals Keratin Infusion 30 Day Smoothing Kit is a simple, at-home alternative to expensive salon keratin treatments. This revolutionary system, formulated with keralock technology, infuses hair with keratin protein and leaves it smooth, shiny, and manageable for up to 30 days.

**Suave Professionals Keratin Infusion 30 Day Smoothing Kit:**
* Smoothes your style as well as a keratin treatment
* One application
* No formaldehyde
* Smoothing kit contains: smoothing cream, cuticle seal cream, heat defense leave-in conditioner, comb, gloves, instructions for use

#### Specifications                                                Top of Page

| | |
|---|---|
| Model No.: | 19562 |
| Shipping Weight (in pounds): | 1.5 |
| Product in Inches (L x W x H): | 5.69 x 2.44 x 7.52 |
| Walmart No.: | 550161452 |

#### Ingredients

Smoothing Cream: Water (Aqua), Ammonium Thioglycolate, Diammonium Dithiodiglycolate, Cetyl Alcohol, Sodium Polyacrylate, C12-15 Alkyl Benzoate, Stearyl Alcohol, Hydrogenated Polydecene, Laureth-23, Ammonium Hydroxide, Fragrance (Parfum), Ceteareth-20, Steareth-2, Trideceth-6, Tetrasodium Edta, Hydrolyzed Keratin. Cuticle Seal Cream: Water (Aqua), Cetearyl Alcohol, Dimethicone, Hydrogen Peroxide, Stearamidopropyl Dimethylamine Hydrogenated Coconut Oil, Behetrimonium Chloride, Fragrance (Parfum), Mineral Oil, Lactic Acid, Dipropylene Glycol, Amodimethicone, Disodium Edta, Potassium Chloride, Phosphoric Acid, Peg-7 Propylheptyl Ether, Cetrimonium Chloride, Hydrolyzed Keratin. Heat Defense Leave-In Conditioner: Water (Aqua), Cetearyl Alcohol, Cyclopentasiloxane, Dimethiconol, Stearamidopropyl Dimethylamine, Glycerin, Fragrance (Parfum), Behetrimonium Chloride, Dipropylene Glycol, Mineral Oil, Lactic Acid, Potassium Chloride, Petrolatum, Dmdm Hydantoin, Hydrolyzed Keratin, Disodium Edta, Tea-Dodecylbenzenesulfonate, Prunus Amygdalus Dulcis (Sweet Almond) Oil, Hydrogenated Coconut Oil, Butylene Glycol, Iodopropynyl Butylcarbamate, Mica (Cl 77019), Titanium Dioxide (Cl 77891), Iron Oxide (Cl 77491).

#### Directions

* How does it work? Step 1: Smoothing Cream with keratin loosens, smoothens, And detangles curls And waves. Step 2: Cuticle Seal Cream with Keralock Technology reforms keratin bonds inside the hair fiber And eliminates frizz for long lasting smoothness And manageability. Step 3: Heat Defense Leave-In Conditioner provides ultimate moisturization to protect hair while heat styling. Formulated for use with blow dryers or flat irons for optimal shine And smoothness. Also, sold outside for continued use.

#### Warnings                                                Top of Page

This product contains thioglycolates, do not use if you have previously reacted to products containing thioglycolates, which are often found in hair perming products. Do not use this smoothing treatment if: Your scalp is irritated, sore or damaged. You hair is currently permed or chemically straightened with a perm type product, only a root touch up can be done. Your hair is highlighted or bleached. This treatment also must not be used with double processed or high lift color. This means any hair color substantially lighter than your natural color). If in doubt, ask your stylist or contact the hair color manufacturer. Use of this product on lightened hair (including highlights or high lift color processes) will result in hair breakage-- regardless of how long ago the hair was treated. Your hair is treated with henna's or color restores (metallic dyes). You have chemically relaxed or straightened your hair with relaxers containing lye (sodium hydroxide) or hydroxides of lithium, potassium, or guanidine. You hair is highly damaged, extremely dry, brittle, or breaking. Keep out of reach of children. May be harmful if swallowed. If ingested accidentally, drink several glasses of water to dilute the material. Contact a physician or Poison Control Center immediately. Do not induce vomiting. Avoid getting in eyes or on skin. If contact with the eyes or skin

occurs, immediately flush area with large amounts of cool water for at least 15 minutes. If irritation
persists, consult a physician.

# EXHIBIT B



**Suave®**
PROFESSIONALS

**NEW**

# KERATIN INFUSION

 SMOOTHING CREAM

3.2 FL OZ (94 mL)



3.2 OZ (90 g)

## 30 DAY SMOOTHING KIT
### KIT PARA SUAVIZAR POR 30 DÍAS
**SMOOTHES YOUR STYLE AS WELL AS A KERATIN TREATMENT***

### NO FORMALDEHYDE. SIN FORMALDEHIDOS.
ONE APPLICATION. UNA APLICACION.

IMPORTANT: READ SAFETY WARNINGS IMPORTANTE: LEA LAS ADVERTENCIAS DE SEGURIDAD



NEW Suave Professionals®*
# KERATIN INFUSION
30 Day Smoothing Kit
**NO FORMALDEHYDE**

## WHY SHOULD YOU USE IT?



**KERATIN INFUSION** 30 Day Smoothing Kit is a simple, at-home alternative to expensive salon Keratin Treatments. The new revolutionary system by Suave Professionals®, formulated with **KERALOCK™ TECHNOLOGY**, infuses hair with keratin protein and leaves it smooth, shiny, and manageable for up to 30 days.

El kit **KERATIN INFUSION** para suavizar el cabello por 30 días es una opción simple y casera en lugar de los costosos tratamientos de queratina de los salones. El nuevo sistema revolucionario de Suave Professionals®, formulado con la TECENOLOGIA KERALOCK™, impregna el cabello de queratina y lo deja suave, brillante y manejable hasta por 30 días.

## HOW DOES IT WORK?

**Step 1:** Smoothing Cream with keratin loosens, smoothens, and detangles curls and waves.

**Step 2:** Cuticle Seal Cream with **KERALOCK™ TECHNOLOGY** reforms keratin bonds inside the hair fiber and eliminates frizz for long lasting smoothness and manageability.

**Step 3:** Heat Defense Leave-In Conditioner provides ultimate moisturization to protect hair while heat styling. Formulated for use with blow dryers or flat irons for optimal shine and smoothness. Also, sold outside for continued use.

## WHAT SHOULD YOU EXPECT?


Before

After


30 Days After

Appropriate for curly, wavy, frizzy hair. Results may vary depending on hair type. Hair will begin to return to its normal texture and shape over time but will continue to be smoother up to 30 days.

See side panels for safety warnings. Step-by-step instructions included inside. For full product instructions log onto www.suave.com/keratininfusion

This product contains thioglycolates; do not use if you have previously reacted to products containing thioglycolates, which are often found in hair perming products.

## DO NOT USE THIS SMOOTHING TREATMENT IF:

- Your scalp is irritated, sore or damaged.
- Your hair is currently permed or chemically straightened with a perm type product, only a root touch up can be done.
- Your hair is highlighted or bleached. This treatment also must not be used with double process or high lift color. This means any hair color outstandingly lighter than your natural shade, or certain red shades (even if darker than your natural color). If in doubt, ask your stylist or contact the hair color manufacturer. Use of this product on lightened hair (including highlights or both lift color processes) will result in hair breakage - regardless of how long ago the hair was treated.
- Your hair is treated with henna's or color restorers (metallic dyes). You have chemically relaxed or straightened your hair with relaxers containing lye (sodium hydroxide) or hydroxides of lithium, potassium, or guanidine.
- Your hair is highly damaged, extremely dry, bristle, or breaking.

**Leer este aviso antes de comprar el producto.**
Este producto contiene ácido tioglicólico. No lo utilice si ha tenido anteriormente una reacción a los productos que contienen ácidos tioglicólicos, los que se encuentran comúnmente en los productos para la permanente del cabello.

## NO UTILIZAR SI

- Su cuero cabelludo está irritado, ulcerado o lastimado.
- Su cabello tiene una permanente o está alisado químicamente con un producto similar a los utilizados para permanente. Utilícelo solamente para retocarse las raíces.
- Su cabello tiene rayitos o está decolorado. Este tratamiento no debe utilizarse con la tintura que requiere un doble proceso o una decoloración, es decir cualquier tono de cabello considerablemente más claro que su tono natural, o algunos tonos de colorado (incluso si son más oscuros que su tono natural). Si tiene dudas, consulte con su estilista o comuníquese con el fabricante de la tintura para el cabello. La utilización de este producto en cabello aclarado (incluidos reflejos y procesos de decoloración) causará daño al cabello, independientemente de cuándo lo hizo. Usted trata su cabello con henna o restauradores de color (tinturas metálicas).
- Su cabello ha sido alisado o alisadores que contienen lejía (hidróxido de sodio o hidróxidos de litio, potasio o guanidina).
- Su cabello está muy dañado, es muy seco o quebradizo.

**CAUTION:** Keep Out Of Reach Of Children. May be harmful if swallowed. If ingested accidentally, drink several glasses of water to dilute the material. Contact a physician or poison control center immediately. Do not induce vomiting. Avoid getting in eyes or on skin. If contact with the eyes or skin occurs, immediately flush area with large amounts of cool water for at least 15 minutes. If irritation persists, consult a physician.

**PRECAUCIÓN:** Mantener fuera del alcance de los niños. Puede ser nocivo si se ingiere. Si se ingiere por accidente, beber varios vasos de agua para diluir el producto. Llamar inmediatamente a un médico o al centro de toxicología. No inducir el vómito. Evitar el contacto con los ojos o la piel. Si entro en contacto con los ojos o la piel, enjuagar inmediatamente el área afectada con abundante agua fría durante por los menos 15 minutos. Si la irritación persiste, consultar a un médico.

**DISCLAIMERS**
* when tested in salon Vs. Bio Ionic® KeraSmooth® Keratin Treatment. Bio Ionic® and KeraSmooth® are registered trademarks of Eurasia Concepts, Inc. (in Los Angeles, CA)
**Vs. current Suave Professionals® Shampoos

**Questions or Comments:**
Visit www.suave.com or call 1-900-782-9301.

## KERATIN INFUSION

### SMOOTHING KIT CONTAINS

- Smoothing Cream
- Cuticle Seal Cream
- Heat Defense Leave-In Conditioner
- Comb
- Gloves
- Instructions for use



Maintain your silky smooth hair with lower** sulfate Keratin Infusion Shampoos and Conditioners. To enhance smoothness also try Keratin Infusion Smooth & Shine Serum.

### SMOOTHING CREAM

**Ingredients/Ingredientes:**
Water (Aqua), Ammonium Thioglycolate, Diammonium Dithiodiglycolate, Cetyl Alcohol, Sodium Polyacrylate, C12-15 Alkyl Benzoate, Stearyl Alcohol, Hydrogenated Polydecene, Laureth-23, Ammonium Hydroxide, Fragrance (Parfum), Ceteareth-20, Steareth-2, Trideceth-6, Tetrasodium EDTA, Hydrolyzed Keratin.

### CUTICLE SEAL CREAM

**Ingredients/Ingredientes:**
Water (Aqua), Cetearyl Alcohol, Dimethicone, Hydrogen Peroxide, Stearamidopropyl Dimethylamine Hydrogenated Coconut Oil, Behentrimonium Chloride, Fragrance (Parfum), Mineral Oil, Lactic Acid, Dipropylene Glycol, Amodimethicone, Disodium EDTA, Potassium Chloride, Phosphoric Acid, PEG-7 Propylheptyl Ether, Cetrimonium Chloride, Hydrolyzed Keratin.

### HEAT DEFENSE LEAVE-IN CONDITIONER

**Ingredients/Ingredientes:**
Water (Aqua), Cetearyl Alcohol, Cyclopentasiloxane, Dimethiconol, Stearamidopropyl Dimethylamine, Glycerin, Fragrance (Parfum), Behentrimonium Chloride, Dipropylene Glycol, Mineral Oil, Lactic Acid, Potassium Chloride, Petrolatum, DMDM Hydantoin, Hydrolyzed Keratin, Disodium EDTA, TEA-Dodecylbenzenesulfonate, Prunus Amygdalus Dulcis (Sweet Almond) Oil, Hydrogenated Coconut Oil, Butylene Glycol, Iodopropynyl Butylcarbamate, Mica (CI 77019), Titanium Dioxide (CI 77891), Iron Oxides (CI 77491).





# KERATIN INFUSION

## 30 DAY SMOOTHING KIT

## INSTRUCTIONS FOR USE

### What to expect after using Suave Professionals® Keratin Infusion 30 Day Smoothing Kit?

1. Results may vary depending on your hair type.

2. Your hair will begin to return to its original shape and texture over time - but it will continue to be smoother and easier to style for up to 30 days!

### KIT CONTENTS *REQUIRED ITEMS (PROVIDED IN KIT)*

    

STEP 1: Smoothing Cream | STEP 2: Cuticle Seal Cream | STEP 3: Heat Defense Leave-In Conditioner | A Pair of Gloves | A Comb

### REQUIRED ITEMS (NOT PROVIDED IN KIT)

- A Clock or Timer
- A Towel or Old T-shirt to Cover Your Shoulders
- Blow Dryer
- Petroleum Jelly

---

### READ INSTRUCTIONS COMPLETELY BEFORE BEGINNING.

### DO NOT USE THIS SMOOTHING TREATMENT IF:

- You suspect or know you are allergic to thioglycolic acid (commonly used in hair perming products).
- You have previously had a reaction to, or shown sensitivity to a perm or other cosmetic product.
- Your hair has been colored in the past week – wait at least one week after coloring to use.
- Your hair is highlighted or bleached. This treatment also must not be used with double processed or high lift color. This means any hair color substantially lighter than your natural shade, or certain red shades (even if darker than your natural color). If in doubt, ask your stylist or contact the hair color manufacturer. Use of this product on lightened hair (including highlights or high lift color processing) will result in hair breakage – regardless of how long ago the hair was treated.
- Your hair is treated with henna's or color restorers (metallic dyes).
- You have chemically relaxed or straightened your hair with relaxers containing lye (sodium hydroxide) or hydroxides of lithium, potassium, or guanidine.
- Your hair has been permed or chemically straightened with a perm type within the past 12 weeks – after which treatment should ONLY be performed as a root touch up.
- Your hair is highly damaged, extremely dry, brittle, or breaking.

### OTHER IMPORTANT THINGS TO KNOW

- Use in a well ventilated area.
- Avoid contact with eyes – if this happens flush thoroughly with water for 15 minutes. Seek medical attention if discomfort persists.
- Use only plastic clips/combs. Remove rings and other jewelry – avoid product contact with metal.
- Please wear protective gloves (included) when using this product. Discard any unused product and wash hands after use.
- To avoid irritation, do not apply directly to scalp or skin. Use petroleum jelly to protect the forehead, ears and neck. Product which accidentally contacts the skin must be rinsed off or removed using a damp towel.
- This product may discolor clothing and other fabrics.
- If your hair is colored: Since this product may lighten hair color, we suggest that this product be used 1 to 2 weeks before coloring.

### CAUTION:

**Keep Out Of Reach Of Children.**
May be harmful if swallowed. If ingested accidentally, drink several glasses of water to dilute the material. Contact a physician or poison control center immediately. **DO NOT** induce vomiting. If contact with the eyes or skin occurs, immediately flush area with large amounts of cool water for at least 15 minutes. If irritation persists, consult a physician.

---

### PREPARATION

Immediately before treatment, shampoo hair as usual. Lightly condition. Towel dry well (hair should be just damp). Comb and detangle hair. Apply a light film of petroleum jelly around hairline, ears, and nape of neck. Drape a towel on your shoulders. Wear gloves provided in the kit.

### STEP 1 – Smoothing Cream

**APPLICATION:** Do not spend more than 10 minutes applying the product. Use in a well ventilated area – an odor is expected.

1. Beginning where the texture is the coarsest (usually at the nape of the neck), evenly apply a generous amount of the **Smoothing Cream (Step 1)**. Most people will require all of the contents of the tube. People with short hair may need less.

2. Apply from root to tip, smoothing and gently combing the hair straight as you work (Do NOT massage into scalp).

**TIP:** Even and thorough application is the key to good results! To aid application, you can divide hair into sections. Saturate each section with product. Missing sections of hair will leave those sections un-smoothened.

### PROCESSING:

1. **NOW** – Set timer for the time shown below for your hair type. Never exceed the time specified for your hair type.

| Fine/sparse/light waves | | Light waves to tight curls | | Tight, coarse curls | |
|---|---|---|---|---|---|
| Colored | Not colored | Colored | Not colored | Colored | Not colored |
| 15 minutes | 20 minutes | 20 minutes | 20 minutes | 20 minutes | 25 minutes |



2. Comb and smooth every few minutes during processing, keeping hair straight.

**TIP:** To maintain body at the crown, comb up and back (away from face). Smooth any product picked up on comb back onto hair. More product can be added as needed to keep hair fully coated during processing.

3. At the end of your specified time, **RINSE** hair thoroughly with warm water, still keeping hair straight. Rinse for a minimum of 5 minutes, or until all product is removed (DO NOT SHAMPOO). Rinse comb. Discard tube.

### STEP 2 – Cuticle Seal Cream

1. Lightly towel dry hair to remove moisture from hair (DO NOT RUB OR COMB).
2. Apply **Cuticle Seal Cream (Step 2)** throughout the hair using all or most of the contents of the bottle.
3. Leave in hair for 7 minutes irrespective of hair types. Gently comb 2-3 times while you wait, keeping hair straight.
4. Rinse hair thoroughly with warm water for 4 to 5 minutes or until all product is removed (DO NOT SHAMPOO). Rinse comb. Discard bottle.



### STEP 3 – Heat Defense Leave-In Conditioner

To complete the process, apply a dime sized amount of the **Heat Defense Leave-In Conditioner** (provided in kit), and blow dry your hair into a smooth straight style. Flat iron if desired.

**TIP:** You do not have to use all the product in the tube. Save for use later: Suave Professionals® Keratin Infusion Heat Defense Leave-In is also sold separately for continued use.

### NOTE:

- DO NOT USE SHAMPOO FOR 48 HOURS after treatment.
- Throw away the Step 1 and Step 2 product. They are only meant for one application.
- Do not color or highlight hair for 1 week after this treatment
- Do not use within 3 months. You can touch up your style every 3 months. View touch up instructions on www.suave.com/keratininfusion
- Extend the life of your smoothing treatment by washing less often. Use *Keratin Infusion Dry Shampoo* to refresh between washes.
- Maintain the benefits with Keratin Infusion Lower* Sulfate Shampoos and Conditioners.
- * vs. current Suave® Professionals shampoos










© UNILEVER, TRUMBULL, CT 06611
QUESTIONS & COMMENTS?
CALL 1-800-782-8301
83175239

Unilever



# KERATIN INFUSION

## MODO DE EMPLEO

**KIT PARA SUAVIZAR POR 30 DÍAS**

---

**¿Qué puede suceder después de usar el kit Suave Professionals® Keratin Infusion para suavizar el cabello por 30 días?**

1. Los resultados pueden variar dependiendo de su tipo de cabello.

2. Con el tiempo, su cabello comenzará a regresar a su forma y textura original; sin embargo, seguirá estando más suave y será fácil de peinar hasta por 30 días.

---

### EL CONTENIDO DEL JUEGO
*ARTÍCULOS NECESARIOS (PROPORCIONÓ EN EL JUEGO)*


**PASO 1:** Smoothing Cream


**PASO 2:** Cuticle Seal Cream


**PASO 3:** Acondicionador para Dejar en el Cabello con Defensa de Color


Un par de guantes


Un peine

---

### ELEMENTOS NECESARIOS
*(NO INCLUIDOS EN EL KIT)*

- Un reloj o temporizador
- Una toalla o camiseta vieja para cubrir los hombros
- Secador de pelo
- Vaselina

---

## LEER LAS INSTRUCCIONES COMPLETAS ANTES DE COMENZAR.

### NO UTILICE ESTE TRATAMIENTO PARA SUAVIZAR EL CABELLO SI:

- Usted a o cree ser alérgico al ácido tioglicólico (utilizado comúnmente en los productos para la permanente del cabello).
- Ha tenido anteriormente una reacción o ha manifestado sensibilidad a un producto para permanente u otro producto cosmético.
- Usted se ha teñido el cabello en la última semana. En ese caso, espere por lo menos una semana después de la coloración para usar el producto.
- Su cabello tiene reflejos o está decolorado. Este tratamiento no debe utilizarse con la tintura que requiere un doble proceso o una decoloración, es decir cualquier tono de cabello considerablemente más claro que su tono natural, o algunos tonos de colorado (incluso si son más oscuros que su tono natural). Si tiene dudas, consulte con su estilista o comuníquese con el fabricante de la tintura para el cabello. La utilización de este producto en cabello aclarado (incluidos reflejos y procesos de decoloración) causará daño al cabello, independientemente de cuándo lo hizo.
- Usted trata su cabello con henna o restauradores del color (tinturas metálicas).
- Su cabello ha sido alisado con alisados que contienen lejía (hidróxido de sodio) o hidróxido de litio, potasio o guanidina.
- Se ha hecho una permanente o se ha alisado el cabello químicamente con un producto similar a los utilizados para permanentes en las últimas 12 semanas, algunas de las cuales el tratamiento puede utilizarse solamente para retocar las raíces (ver instrucciones).
- Su cabello está muy dañado, es muy seco o quebradizo.

### MÁS INFORMACIÓN IMPORTANTE

- Utilizar en un área bien ventilada.
- Evitar el contacto con los ojos. Si el producto entra en contacto con los ojos, enjuagar bien con abundante agua durante 15 minutos. Buscar atención médica si la molestia persiste.
- Utilizar solamente clips o cepillos plásticos. Quitarse los anillos y demás alhajas. Evitar que el producto entre en contacto con el metal.
- Utilizar guantes protectores (incluidos) al usar este producto. Después de su uso, desechar el producto restante y lavarse las manos.
- Para evitar la irritación, no aplicar directamente sobre el cuero cabelludo ni la piel. Proteger la frente, las orejas y el cuello con vaselina. Si el producto entra en contacto con la piel, enjuagar o quitar con una toalla humedecida.
- Este producto puede decolorar la ropa y demás telas.
- **Si su cabello está teñido:** Ya que este producto puede aclarar el cabello, sugerimos utilizar este producto 1-2 semanas antes de la tintura.

### PRECAUCIÓN:

**Manténgalo fuera del alcance de los niños.** Puede ser nocivo si se ingiere. Si se ingiere por accidente, beba varios vasos de agua pero no el material. Contacte inmediatamente a un médico o al centro de toxicología. **No induzca al vómito.** Evite el contacto con los ojos o la piel. En caso de contacto con los ojos o la piel, limpie inmediatamente el área con abundante agua fría durante al menos 15 minutos. Si la irritación persiste, consulte a un médico.

---

### PREPARACIÓN

Inmediatamente antes del tratamiento, lávese el cabello con shampoo como de costumbre. Use un poco de acondicionador. Séquelo bien con toalla. El cabello debe estar un poco húmedo. Peine y desenrede el cabello. Aplique una capa fina de vaselina alrededor del nacimiento del cabello, las orejas y la nuca. Coloque una toalla sobre sus hombros. Use los guantes del kit.


### PASO 1 – Crema Suavizante

**APLICACIÓN:** *No pase más de 10 minutos aplicando el producto. Úselo en un área bien ventilada; es normal que despida olor.*

1. Empezando donde la textura es más áspera (por lo general en la nuca), aplique uniformemente una cantidad generosa de **Crema Suavizante (Paso 1)**. La mayoría de las personas necesitarán todo el tubo. Es posible que las personas con cabello corto necesiten menos.

2. Aplique de la raíz a la punta, alisando y peinando con cuidado de manera recta. [NO masajee el cuero cabelludo].

*CONSEJO PRÁCTICO: Una aplicación uniforme y completa es clave para obtener buenos resultados. Para facilitar la aplicación, puede dividir el cabello en secciones. Sature cada sección con el producto. Las secciones de cabello no tratadas quedarán sin suavizar.*

**TRATAMIENTO:**

1. **AHORA** – ajuste el temporizador con el tiempo que se muestra a continuación para su tipo de cabello. Nunca exceda el tiempo especificado para su tipo de cabello.

| Fino/ralo/ligeramente ondulado | | Ligeramente ondulado a muy rizado | | Muy rizado y áspero | |
|---|---|---|---|---|---|
| Teñido | Sin teñir | Teñido | Sin teñir | Teñido | Sin teñir |
| 15 minutos | 20 minutos | 20 minutos | 20 minutos | 20 minutos | 25 minutos |

2. Durante el tratamiento, peine y alise el cabello a menudo para mantenerlo liso.

*CONSEJO PRÁCTICO: Para mantener el volumen en la parte superior de la cabeza, peine hacia arriba y hacia atrás (lejos de la cara). Unte el producto recogido por el peine de nuevo en la cabeza. Según sea necesario, se puede agregar más producto para mantener el cabello totalmente cubierto durante el tratamiento.*

3. Al final del periodo de tiempo determinado, ENJUAGUE bien el cabello con agua tibia, manteniendo el cabello liso. Enjuague por un mínimo de 5 minutos o hasta retirar todo el producto. NO USE SHAMPOO. Enjuague el peine. Deseche el tubo.


### PASO 2 – Crema para Sellar la Cutícula

1. Seque ligeramente el cabello con una toalla para eliminar la humedad. [NO FROTE NI PEINE].

2. Aplique la **Crema para Sellar la Cutícula (Paso 2)** en todo el cabello usando todo o la mayoría del botella.

3. Déjela actuar durante 7 minutos, independientemente del tipo de cabello. Suavemente peine 2 o 3 veces mientras espera, manteniéndolo liso.

4. Enjuague con agua tibia por 4 o 5 minutos o hasta retirar todo el producto. [NO USE SHAMPOO]. Enjuague el peine. Deseche la botella.


### PASO 3 – Acondicionador para Dejar en el Cabello con Defensa de Color

Para terminar el proceso, aplique una cantidad del tamaño de una moneda de diez centavos de **Acondicionador para Dejar en el Cabello con Defensa de Color** (incluido en el kit) en todo el cabello con secador para que quede lacio y suave. Use plancha de pelo si lo desea.

*CONSEJO PRÁCTICO: Usted no tiene que utilizar todo el producto del tubo. Guarde el sobrante para después. El producto Suave Professionals® Keratin Infusion Heat Defense Leave-In también se vende por separado para uso continuo.*

**NOTA:**

- Deseche los producto del Paso 1 y 2. Sólo sirven para una aplicación.
- No use el shampoo durante 48 horas después del tratamiento.
- No se tiña el cabello ni se haga rayos por una semana después de este tratamiento.
- Vuélvalo a usar después de 3 meses. Puede retocar su cabello cada 3 meses. Vea las instrucciones para retocar en www.suave.com/keratininfusion
- Alargue la vida de su tratamiento lavándose el cabello con menos frecuencia. Para refrescar su cabello entre lavadas, utilice *Keratin Infusion Dry Shampoo*.

* comparado con los shampoos Suave® Professionals actuales









© UNILEVER, TRUMBULL, CT 06611
¿PREGUNTAS O COMENTARIOS?
CALL 1-800-782-8301




Unilever

# EXHIBIT C

# Code of Business Principles (1 of 2)

## Standard of Conduct

We conduct our operations with honesty, integrity and openness, and with respect for the human rights and interests of our employees.

We shall similarly respect the legitimate interests of those with whom we have relationships.

## Obeying the Law

Unilever companies and employees are required to comply with the laws and regulations of the countries in which we operate.

## Employees

Unilever is committed to diversity in a working environment where there is mutual trust and respect and where everyone feels responsible for the performance and reputation of our company.

We will recruit, employ and promote employees on the sole basis of the qualifications and abilities needed for the work to be performed.

We are committed to safe and healthy working conditions for all employees. We will not use any form of forced, compulsory or child labour.

We are committed to working with employees to develop and enhance each individual's skills and capabilities.

We respect the dignity of the individual and the right of employees to freedom of association.

We will maintain good communications with employees through company based information and consultation procedures.

## Consumers

Unilever is committed to providing branded products and services which consistently offer value in terms of price and quality, and which are safe for their intended use. Products and services will be accurately and properly labelled, advertised and communicated.

## Shareholders

Unilever will conduct its operations in accordance with internationally accepted principles of good corporate governance. We will provide timely, regular and reliable information on our activities, structure, financial situation and performance to all shareholders.

## Business Partners

Unilever is committed to establishing mutually beneficial relations with our suppliers, customers and business partners. In our business dealings we expect our partners to adhere to business principles consistent with our own.

## Community Involvement

Unilever strives to be a trusted corporate citizen and, as an integral part of society, to fulfil our responsibilities to the societies and communities in which we operate.

## Public Activities

Unilever companies are encouraged to promote and defend their legitimate business interests.

Unilever will co-operate with governments and other organisations, both directly and through bodies such as trade associations, in the development of proposed legislation and other regulations which may affect legitimate business interests.

Unilever neither supports political parties nor contributes to the funds of groups whose activities are calculated to promote party interests.

## The Environment

Unilever is committed to making continuous improvements in the management of our environmental impact and to the longer-term goal of developing a sustainable business.

Unilever will work in partnership with others to promote environmental care, increase understanding of environmental issues and disseminate good practice.



# Code of Business Principles (2 of 2)

## Innovation

In our scientific innovation to meet consumer needs we will respect the concerns of our consumers and of society.

We will work on the basis of sound science, applying rigorous standards of product safety.

## Competition

Unilever believes in vigorous yet fair competition and supports the development of appropriate competition laws. Unilever companies and employees will conduct their operations in accordance with the principles of fair competition and all applicable regulations.

## Business Integrity

Unilever does not give or receive, whether directly or indirectly, bribes or other improper advantages for business or financial gain. No employee may offer, give or receive any gift or payment which is, or may be construed as being, a bribe. Any demand for, or offer of, a bribe must be rejected immediately and reported to management.

Unilever accounting records and supporting documents must accurately describe and reflect the nature of the underlying transactions. No undisclosed or unrecorded account, fund or asset will be established or maintained.

## Conflicts of Interests

All Unilever employees are expected to avoid personal activities and financial interests which could conflict with their responsibilities to the company.

Unilever employees must not seek gain for themselves or others through misuse of their positions.

## Compliance – Monitoring – Reporting

Compliance with these principles is an essential element in our business success. The Unilever Board is responsible for ensuring these principles are applied throughout Unilever. The Chief Executive Officer is responsible for implementing these principles and is supported in this by the Corporate Code Committee chaired by the Chief Legal Officer. Members of the Committee are the Group Secretary, the Chief Auditor, the SVP HR and the SVP Communications. The Global Code Officer is Secretary to the Committee. The Committee presents quarterly updates to the Corporate Responsibility and Reputation and the Audit Committee, half-yearly reports to the Unilever Executive and an annual report to the Board.

Day-to-day responsibility is delegated to all senior management of the regions, categories, functions, and operating companies. They are responsible for implementing these principles, if necessary through more detailed guidance tailored to local needs, and are supported in this by Regional Code Committees comprising the Regional General Counsel together with representatives from all relevant functions and categories.

Assurance of compliance is given and monitored each year. Compliance with the Code is subject to review by the Board supported by the Corporate Responsibility and Reputation Committee and for financial and accounting issues the Audit Committee.

Any breaches of the Code must be reported in accordance with the procedures specified by the Chief Legal Officer. The Board of Unilever will not criticise management for any loss of business resulting from adherence to these principles and other mandatory policies and instructions. The Board of Unilever expects employees to bring to their attention, or to that of senior management, any breach or suspected breach of these principles.

Provision has been made for employees to be able to report in confidence and no employee will suffer as a consequence of doing so.

**Note**

**In this Code the expressions 'Unilever' and 'Unilever companies' are used for convenience and mean the Unilever Group of companies comprising Unilever N.V., Unilever PLC and their respective subsidiary companies. The Board of Unilever means the Directors of Unilever N.V. and Unilever PLC.**


Unilever



ABOUT US     BRANDS IN ACTION     SUSTAINABLE LIVING     INNOVATION     Search



## SUSTAINABLE LIVING

ADDRESSING CONSUMER CONCERNS

PRODUCT SAFETY

DEVELOPING ALTERNATIVE APPROACHES TO ANIMAL TESTING

FARM ANIMAL WELFARE

ADVERTISING & MARKETING

GENETICALLY MODIFIED CROPS

# PRODUCT SAFETY

Consumers trust us to provide them and their families with products that are safe. Product safety is always considered at the design stage of a new product or process.

## SAFETY COMES FIRST

Sometimes a product that does not meet our high safety and quality design standards is accidentally released into the market. Such a product might, for example, have a quality defect, or a contamination of the raw materials or a mislabelling of ingredients.

If this happens, protecting consumers' safety is our number one priority. If necessary we will recall such products.

Our Safety & Environmental Assurance Centre plays a central role by carrying out risk assessments using rigorous scientific approaches to generate the evidence necessary for decisions on consumer safety.

During 2010 we had five public recalls (compared with 11 in 2009). The reduction of incidents was partly due to our renewed focus on quality as an integral part of our business agenda. We have been putting programmes in place to improve the rigour of our processes – from sourcing and manufacturing to customer and consumer satisfaction with our brands. Our Safety & Environmental Assurance Centre plays a central role in carrying out risk assessments to generate the evidence necessary for decisions on consumer safety.

Some consumers are concerned about the presence of particular chemicals in our products. We continue to work in partnership with research organisations, industry partners, NGOs and regulators to strengthen consumer confidence in our products, and with them we try to find alternative ingredients, where appropriate.

We continually review our safety findings and act on the side of caution if anything changes. To read more about our approach, see our principles of precaution and substitution.

### READ MORE

Code of Business Principles

Safety & environment

Unilever global company website     Sustainable living     Addressing consumer concerns     Product safety

**USEFUL LINKS**

Contact us

AGM & voting

Press releases

Share price

What's in our products?

**DOWNLOADS**

Annual Report & Accounts 2011 -    EN
5.0MB

Form 20-F 2011 - 907KB    EN

Q4 & full-year 2011 results    EN
highlights - 77KB

Unilever Quarterly Dividends
Background information - 26KB

Download Library

**UNILEVER ON FACEBOOK**

Unilever on Facebook is
about inspiring people to
take small, everyday
actions that add up to a
big difference.

**FOLLOW US ON FACEBOOK**

Follow us on facebook.

© Unilever 2012

RSS | Contact us | FAQs | Sitemap | Legal notice | Cookie Policy | Unilever privacy policy | Accessibility

Case: 1:12-cv-06058 Document #: 1 Filed: 08/01/12 Page 42 of 44 PageID #:42

Unilever GlobalChange location

About us

Brands in action
- Sustainable living
- Innovation

# Introduction to Unilever

Share    Like        765        4

On any given day, two billion people use Unilever products to look good, feel good and get more out of life.

## Life partners



With more than 400 brands focused on health and wellbeing, no company touches so many people's lives in so many different ways.

Our portfolio ranges from nutritionally balanced foods to indulgent ice creams, affordable soaps, luxurious shampoos and everyday household care products. We produce world-leading brands including Lipton, Knorr, Dove, Axe, Hellmann's and Omo, alongside trusted local names such as Blue Band, Pureit and Suave.

## Responsible business

Since Unilever was established in the 1890s, brands with a social mission have been at the core of our business, and now corporate responsibility underpins our strategy.

In 2010 we launched the Unilever Sustainable Living Plan – a set of targets designed to help us deliver our objective of growing our business while minimising our impact on the environment.

To embed sustainability into every stage of the life cycle of our products, we're working with our suppliers to support responsible approaches to agriculture. We're also learning from NGOs and other organisations, recognising that building a truly sustainable business is not something we can do without expert advice.

We believe that as a business we have a responsibility to our consumers and to the communities in which we have a presence. Around the world we invest in local economies and develop people's skills inside and outside of Unilever. And through our business and brands, we run a range of programmes to promote hygiene, nutrition, empowerment and environmental awareness.

## Impact & innovation

Case: 1:12-cv-06058 Document #: 1 Filed: 08/01/12 Page 43 of 44 PageID #:43

We realise innovation is key to our progress, and through cutting-edge science we're constantly enhancing our brands, improving their nutritional properties, taste, fragrance, or functionality.

We invest nearly €1 billion every year in research and development, and have established laboratories around the world where our scientists explore new thinking and techniques, applying their expertise to our products.

Consumer research plays a vital role in this process. Our unrivalled global reach allows us to get closer to consumers in local markets, ensuring we understand their diverse needs and priorities.

## About our brands

From long-established names like Lifebuoy, Sunlight and Pond's to new innovations such as the Pureit affordable water purifier, our range of brands is as diverse as our worldwide consumer base.

Unilever has more than 400 brands, 12 of which generate sales in excess of €1 billion a year.

Many of these brands have long-standing, strong social missions, including Lifebuoy's drive to promote hygiene through handwashing with soap, and Dove's campaign for real beauty.

We've also won a wealth of advertising industry honours at the prestigious Cannes Advertising Awards, including being named 2010's Advertiser of the Year.

Find out more about Unilever.

Share     Like     4            765

## Related links

View our Introduction to Unilever presentation

- Introduction to Unilever presentation (6.4 MB)

- Read the Unilever Sustainable Living Plan

## Foods

From mouth-watering mayonnaise to scrumptious sauces, our global food brands can satisfy even the most discerning palates.

- View our global food brands

## Home care

Whether you want fresh, soft clothes or sparklingly clean bathrooms, our global home care brands can help.

Case: 1:12-cv-06058 Document #: 1 Filed: 08/01/12 Page 44 of 44 PageID #:44

- View our global home care brands

## Personal care

In need of hair care heroics? Wanting to relax with sumptuous soaps? Our global personal care brands have answers to all these questions and more.

- View our global personal care brands

## Our logo

Each icon within our logo represents an aspect of our business and our commitment to helping people get more out of life.

- The story of our logo