# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SIDNEY REID and ANGEL LAKE,<br>on behalf of themselves and all others<br>similarly situated, | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 12 C 06058** |
| | ) | |
| **v.** | ) | **Judge Ruben Castillo** |
| | ) | |
| UNILEVER UNITED STATES, INC., | ) ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Sidney Reid and Angel Lake, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), bring this putative class action against Unilever United States, Inc. ("Unilever") asserting breaches of express and implied warranties, unjust enrichment, violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* (the "Magnuson-Moss Act"), and several state laws. Plaintiffs' action arises out of their purchase and use of a hair treatment sold as Suave Professionals Keratin Infusion 30 Day Smoothing Kit (the "Hair Treatment") that allegedly caused Plaintiffs to suffer hair loss and damage. (R. 1, Compl. ¶¶ 1, 6.) Presently before the Court are Unilever's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), (R. 23, Def.'s Mot.), Plaintiffs' motion to limit or supervise Unilever's communications with absent class members, (R. 30, Pls.' Mot. Limit Commc'ns), and Reid's motion for approval to serve discovery, (R. 41, Pls.' Mot. Disc.). For the reasons set forth below, each of the motions is granted in part and denied in part.

## RELEVANT FACTS

Unilever is a wholly owned subsidiary of Unilever NV and Unilever PLC, (R. 22, Def.'s Corp. Disclosure Statement), and is located in New Jersey, (R. 1, Compl. ¶ 16). Reid is a resident of Chicago, Illinois, and Lake is a resident of Foley, Alabama. (*Id.* ¶¶ 14, 15.) Plaintiffs allege that on or about December 9, 2011, Unilever made the Hair Treatment available for sale to consumers on a nationwide basis. (*Id.* ¶¶ 1, 17.) According to Plaintiffs, the Hair Treatment "contains an ingredient or combination of ingredients that causes significant hair loss upon proper application." (*Id.* ¶ 1.) Plaintiffs allege that as early as December 2011, consumers complained on the internet that use of the Hair Treatment was causing hair loss and chemical burns. (*Id.* ¶¶ 7, 33.) Despite these complaints, Plaintiffs aver that Unilever did not disclose the risk of hair loss on the Hair Treatment's packaging, "or on [Unilever's] websites or other marketing materials." (*Id.* ¶ 6.)

In early March 2012, Reid purchased the Hair Treatment for approximately eleven dollars from a retail store in Chicago, Illinois. (*Id.* ¶ 49.) Reid alleges that she applied the Hair Treatment properly and thereafter experienced hair loss. (*Id.*) According to Reid, "[h]er hair became progressively thinner at the top of her crown until there were visible bald spots." (*Id.* ¶ 50.) As a result of the damage that the Hair Treatment caused to her hair, Reid needed to "have all but half an inch of her hair cut off." (*Id.* ¶ 57.) She alleges that she "incurred in excess of $100 dollars in expenses to date relating to her attempts to restore or salvage what was left of her hair" and that her expenses continue to accrue. (*Id.*) In April 2012, Reid wrote to Unilever on its website informing them that use of the Hair Treatment caused her to experience hair loss, but she avers that she did not receive a response from Unilever. (*Id.* ¶ 58.) On July 23, 2012, Reid again wrote to Unilever, and Unilever sent her an e-mail response advising her that someone would

contact her. (*Id.*) According to Reid, as of August 1, 2012, she had not received any follow-up communication from Unilever. (*Id.*)

In early May 2012, Lake purchased the Hair Treatment for approximately ten dollars from a retail store in Alabama. (*Id.* ¶ 51.) Lake alleges that she applied the Hair Treatment properly, but "within minutes of use, her hair began melting together and falling out in clumps." (*Id.* ¶ 52.) Lake then sent Unilever a letter setting forth her experience with the Hair Treatment. (*Id.* ¶ 53.) Unilever responded to Lake's letter and asked for additional information to investigate the problem. (*Id.* ¶ 54.) Although Unilever also refunded Lake fifteen dollars for the purchase of the Hair Treatment, Lake contends that she incurred and continues to incur expenses in repairing the damage caused by the Hair Treatment. (*Id.*) Lake avers that she has spent hundreds of dollars attempting to repair the damage caused by the Hair Treatment. (*Id.* ¶ 59.) Lake also alleges that she has been "forced to cut approximately 12 inches off the length of her hair" and that her remaining hair continues to fall out and "is no longer in the good condition it was in prior to her use of the [Hair] Treatment." (*Id.*)

Plaintiffs allege that they "would not have purchased the [Hair] Treatment but for the Defendant's false and fraudulent marketing that promoted the [Hair Treatment] as a safe 'smoothing' product whose effects would last no longer than 30 days, its false statement that the [Hair Treatment] does not contain [f]ormaldehyde, and its misleading claim that it was Keratin-based." (*Id.* ¶ 55.) Plaintiffs further allege that Unilever was aware or should have been aware that the Hair Treatment contained an inherent defect that caused significant hair loss upon proper application, (*id.* ¶¶ 11, 45), but that despite such knowledge, Unilever did not disclose the risk of hair loss to consumers, (*id.* ¶ 48).

On May 2, 2012, Unilever recalled the Hair Treatment, (*id.* ¶ 35), in what Plaintiffs characterize as a belated and incomplete recall. (*Id.* ¶¶ 9, 34, 39, 48.) Unilever advised retailers to immediately cease the distribution of the Hair Treatment and asked retailers to send the Hair Treatment back to Unilever. (*Id.* ¶ 36.) On its website, Unilever explained that the Hair Treatment was recalled "because of potential consumer misunderstanding of the product's suitability for certain hair conditions." (*Id.* ¶ 34.) Nevertheless, Plaintiffs aver that Unilever did not make any public announcement and did not publicly respond to complaints stemming from the use of the Hair Treatment. (*Id.* ¶ 38.) Plaintiffs allege that despite the recall of the Hair Treatment, Unilever has continued to advise consumers that the Hair Treatment is safe and has not disclosed to consumers complaints of hair loss, or issued warnings about potential hair loss to consumers. (*Id.* ¶¶ 39-40.)

## MOTION TO DISMISS

### I.    Procedural History

On August 1, 2012, Plaintiffs filed their six-count complaint ("Complaint") with this Court in their individual capacities and on behalf of others similarly situated. (R. 1, Compl. at 1). That same day, Plaintiffs moved for class certification and a stay of briefing. (R. 4, Pls.' Class Cert. Mot.) On March 6, 2013, the Court granted a stay of briefing on the class certification motion pending the resolution of Unilever's motion to dismiss. (R. 45, Min. Entry.)

In Count I of the Complaint, brought individually and on behalf of all putative class members, Plaintiffs allege that they formed a contract with Unilever at the time they purchased the Hair Treatment, and that "[t]he terms of that contract include the promises and affirmations of fact" made by Unilever through its advertising, marketing and packaging. (R. 1, Compl. ¶ 73.) Specifically, Plaintiffs contend that Unilever expressly warranted that the Hair Treatment

4

"was a hair 'Smoothing' Product and not a chemical relaxer, that the effects of the [Hair]

Treatment would last no more than 30 days, and that it contained No Formaldehyde and was

safe." (*Id.* ¶ 74.) Plaintiffs further allege that Unilever breached these express warranties

because its statements were false. (*Id.* ¶ 76.) Plaintiffs contend that they would not have

purchased the Hair Treatment had they known its true nature. (*Id.* ¶ 76.) In Count II, Plaintiffs

allege that Unilever breached implied warranties because the Hair Treatment was defective and

therefore not merchantable. (*Id.* ¶ 80.) As a result of the non-merchantability of the Hair

Treatment, Plaintiffs allege that they sustained damages. (*Id.* ¶ 82.)

In Count III, Plaintiffs bring consumer fraud claims, individually and on behalf of all

putative class members, against Unilever. (*Id.* ¶¶ 83-97.) Reid brings her consumer fraud claims

pursuant to the Illinois Consumer Fraud and Deceptive Businesses Practices Act (the "ICFA"),

815 Ill. Comp. Stat. 505/1 *et seq.* (*Id.* ¶ 85 n.2.) Lake brings her consumer fraud claims

pursuant to the Alabama Deceptive Trade Practices Act (the "ADTPA"), Ala. Code § 8-19-1 *et

seq*. (*Id.* ¶¶ 84-85.) In a footnote, Plaintiffs note that pursuant to *Shady Grove Orthopedic

Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) (plurality opinion), although class relief is

not permitted under Alabama State law, an Alabama class may nonetheless be maintained in a

diversity suit under Federal Rule of Civil Procedure 23. (*Id.* at 19 n.1.) In a separate footnote,

Plaintiffs also note that the consumer fraud claims of nonresident absent class members are

brought under the consumer protection statutes of their respective states of residence. (*Id.* ¶ 85

n.2.) In support of their consumer fraud claims, Plaintiffs allege that Unilever knowingly

misrepresented and/or omitted material facts to consumers, such as Plaintiffs, and that these

material misrepresentations violate the consumer fraud laws at issue. (*Id.* at ¶¶ 87-96.)

Specifically, Plaintiffs allege that Unilever misrepresented that the Hair Treatment "was a

Keratin-based 'smoothing' conditioner" and that by placing "No Formaldehyde" in all capital

letters on the front of the Hair Treatment's packaging, along with a claim that the Hair Treatment

would "'infuse hair with Keratin,' Unilever marketed the [Hair Treatment] as a natural, safe

conditioning treatment." (*Id.* ¶¶ 90-91.)

In Count IV, brought individually and on behalf of all putative class members, Plaintiffs

allege that Unilever committed deceptive acts or practices within the meaning of the Illinois

Uniform Deceptive Trade Practices Act (the "Illinois UDTPA"), 815 Ill. Comp. Stat. 510/1 *et*

*seq.*, such as failing to disclose the defect in the Hair Treatment and failing to warn consumers of

the risk of significant hair loss associated with its use. (*Id.* ¶¶ 98-103.) In Count V, Plaintiffs

allege that Unilever violated the Magnuson-Moss Act by breaching the implied and express

warranties identified in Counts I and II.[1] (*Id.* ¶ 108.) In Count VI, brought individually and on

behalf of all putative class members, Plaintiffs allege that Unilever has been unjustly enriched by

retaining the revenues derived from the putative class members' purchase of the Hair Treatment.

(*Id.* ¶¶ 109-13.)

On September 10, 2012, Unilever moved to dismiss all counts of the Complaint for

failure to state a claim pursuant to Rule 12(b)(6). (R. 23, Def.'s Mot.) Unilever first argues that

the Hair Treatment's packaging and instructions, attached to the Complaint as exhibits,

contradict Plaintiffs' assertions in Count I that Unilever made false statements about the Hair

Treatment. (R. 25, Def.'s Mem. at 2, 7-9.) As to Count II, Unilever contends that Plaintiffs lack

standing to assert a cause of action for breach of an implied warranty because Plaintiffs are not in

privity with Unilever. (*Id.* at 2, 9.) Unilever also maintains that Count III fails to state a claim

---

[1]  The Court interprets Count V as being brought individually and on behalf of all putative class members, as Plaintiffs allege that they and the putative class members are consumers as defined by the Magnuson-Moss Act, 15 U.S.C. § 2301(3). (R. 1, Compl. ¶ 105.)

because Plaintiffs' claims are duplicative of their claimed breach of warranties which are not actionable under a consumer fraud act, and because Plaintiffs fail to allege that Unilever acted knowingly. (*Id.* at 11.) Unilever next contends that Count IV should be dismissed because an award of damages is not an available remedy under the Illinois UDTPA, and there is no need for injunctive relief because it has recalled the Hair Treatment. (*Id.* at 2, 12-13.) Unilever also maintains that, to the extent Count IV purports to assert a claim under the ADTPA, it is duplicative of Count III and should therefore be dismissed. (*Id.* at 2, 13.) The lack of viable state law causes of action for breaches of express and implied warranties, Unilever contends, renders the Magnuson-Moss Act claim asserted in Count V moot. (*Id.* at 2, 13-14.) Finally, Unilever argues that Count VI, the unjust enrichment claim, fails because the Complaint does not allege sufficient facts to support it and is otherwise moot as to Lake. (*Id.* at 2, 14-15.)

On November 28, 2012, Plaintiffs filed a response in opposition to Unilever's motion to dismiss. (R. 34, Pls.' Resp.) Plaintiffs first argue that they have sufficiently pleaded a claim for breach of express warranty in Count I. (*Id.* at 3-8.) Specifically, they argue that Unilever's representations that the Hair Treatment was a "smoothing" product, that its effects would last "up to 30 days," and that it contained "No Formaldehyde," are affirmations of fact or promises that are false and not mere puffery. (*Id.* at 3-8.) Plaintiffs next argue that lack of privity does not render Count II deficient because neither Illinois nor Alabama State laws require privity of contract for actions such as this one, where it is alleged that a defective product caused injury to property or persons beyond damage to the product itself. (*Id.* at 8) (citing *Berry v. G.D. Searle & Co.*, 309 N.E.2d 550, 556 (Ill. 1974)).

With respect to Count III, Plaintiffs argue that they have alleged that Unilever's representations concerning the Hair Treatment were deceptive acts with sufficient particularity,

as required by Federal Rule of Civil Procedure 9(b). (R. 34, Pls.' Resp. at 9.) According to Plaintiffs, Rule 9(b) only requires them to allege a "basic outline of the scheme," and not all "evidentiary details that will be used to support the claim." (*Id.* at 9) (citing *Mutuelle Generale Francaise Vie v. Life Assurance Co. of Pa.*, 688 F. Supp. 386 (N.D. Ill. 1988)). Plaintiffs further assert that the Hair Treatment's undisclosed corrosive nature clearly caused the damage reported by Plaintiffs. (R. 34, Pls.' Resp. at 12.)

In response to Unilever's assertion that Plaintiffs fail to seek an available remedy under the Illinois UDTPA in Count IV, they argue that the Complaint properly alleges a threat of future actions in violation of the Illinois UDTPA, namely, the full and appropriate recall of the Hair Treatment. (*Id.* at 13.) Plaintiffs also do not dispute that their ADTPA claim is duplicative of Count III, but argue that this is permitted under Federal Rule of Civil Procedure 8(d)(2).[2] (*Id.*)

With respect to Count V, Plaintiffs reiterate that they have adequately alleged viable state law claims for breaches of implied and express warranties as required under the Magnuson-Moss Act. (*Id.* at 14.) Finally, as to Count VI, Plaintiffs argue that Unilever's assertion that the "unjust enrichment claim is inapplicable because express warranties create a specific contract which would govern over an unjust enrichment claim" misapprehends the law. (*Id.*) According to Plaintiffs, express warranties do not create a specific contract and Plaintiffs have not alleged a breach of contract claim. (*Id.*) Plaintiffs further contend that the refund Unilever issued to Lake has not rendered her unjust enrichment claim moot because Plaintiffs are entitled to recover the purchase price as well as all interest, fees, and costs accrued. (*Id.* at 15.) Finally, in the

---

[2] Although Plaintiffs refer to the rule as Federal Rule of Civil Procedure 8(e)(2), the Court notes that "Rule 8 was revised in 2007 and the relevant rule is now codified as Rule 8(d)(2) and 8(d)(3)." *Noasha LLC v. Nordic Grp. of Cos.*, 630 F. Supp. 2d 544, 550 n.5 (E.D. Pa. 2009). Rule 8(d)(2) allows a party to pursue alternative claims for relief. Fed. R. Civ. P. 8(d)(2).

alternative, Plaintiffs request that they be granted leave to file an amended complaint should additional allegations be in order. (*Id.* at 15-16.)

On December 6, 2012, Unilever filed a reply in support of its motion to dismiss. (R. 38, Def.'s Reply.) Unilever argues that Plaintiffs are unable to point to specific factual allegations that support their claims and, instead, rely on conclusory allegations that lack factual support and are contradicted by the Hair Treatment's packaging and instructions. (*Id.* at 1.)

## II.     Legal standards

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). In ruling on a motion to dismiss under Rule 12(b)(6), the Court construes the complaint "in the light most favorable to the nonmoving party, accept[ing] well-pleaded facts as true, and draw[ing] all inferences in [their] favor." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010). To survive a motion to dismiss for failure to state a claim, the complaint must overcome "two easy-to-clear hurdles": (1) "the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which it rests"; and (2) "its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level[.]'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Plausibility in this context does not imply that a court "should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th

Cir. 2010). Rather, to survive a motion to dismiss under Rule 12(b)(6), "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Id.*

For claims that sound in fraud, Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Specifically, Rule 9(b) requires plaintiffs to plead the "who, what, when, where, and how: the first paragraph of any newspaper story," of the "circumstances constituting fraud." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990). While the circumstances constituting fraud must be pleaded with particularity, a defendant's "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also DiLeo,* 901 F.2d at 627. Furthermore, the heightened pleading requirement of Rule 9(b) applies to all civil cases brought in federal court, even those grounded on state law. *Ackerman v. Nw. Mut. Life. Ins. Co.,* 172 F.3d 467, 470 (7th Cir. 1999) (citing *Herman & McLean v. Huddleston,* 459 U.S. 375, 387-89 (1983)); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 441 (7th Cir. 2011) ("When a plaintiff in federal court alleges fraud under the ICFA, the heightened pleading standard of [Rule] 9(b) applies."). This heightened pleading requirement is a response to the "great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Grp., Inc.,* 477 F.3d 502, 507 (7th Cir. 2007) (quoting *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 184 F.3d 623, 627 (7th Cir. 1999). Thus, "[a] plaintiff claiming fraud or mistake must do more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate." *Id.* (quoting *Payton,* 184 F.3d at 627).

III.    **Whether plaintiffs have sufficiently pleaded claims for breach of express warranty**

In Count I, Plaintiffs bring claims for breach of express warranty under Illinois and Alabama law. (R. 1, Compl. ¶¶ 71-77.) Plaintiffs allege that they formed a contract with Unilever when they purchased the Hair Treatment and that "[t]he terms of that contract include the promises and affirmations of fact made by [Unilever] on the [Hair] Treatment's packaging and through marketing and advertising." (*Id.* ¶ 73.) Specifically, Plaintiffs aver that Unilever expressly warranted (1) that the Hair Treatment "was a hair 'Smoothing' Product and not a chemical relaxer;" (2) "that the effects of the [Hair] Treatment would last no more than 30 days;" and (3) that the Hair Treatment "contained No Formaldehyde and was safe." (*Id.* ¶ 74.) Plaintiffs further claim that Unilever breached these express warranties because its statements about the Hair Treatment were false. (*Id.* ¶ 75.) Finally, Plaintiffs allege that they would not have purchased the Hair Treatment "had they known the true nature of the [Hair] Treatment and the mis-statements regarding what the [Hair Treatment] was and what it contained." (*Id.* ¶ 76.)

Under Section 2-313 of the Uniform Commercial Code ("UCC") as adopted in both Illinois and Alabama, an express warranty is created where (1) the seller makes an affirmation of fact or promise; (2) that relates to the goods; and (3) becomes part of the basis of the bargain

between the parties.[3] *See Royal Bus. Mach., Inc. v. Lorraine Corp.*, 633 F.2d 34, 41 (7th Cir. 1980) (construing UCC § 2-313 as adopted in Indiana). "An affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."[4] 810 Ill. Comp. Stat. 5/2-313(2) (2012); Ala. Code § 7-2-313(2) (2002); *see also Weiss v. Rockwell Mfg. Co.*, 293 N.E.2d 375, 381 (Ill. App. Ct. 1st Dist.

---

[3] Illinois and Alabama have both adopted Section 2-313 of the Uniform Commercial Code on Express Warranties by Affirmation, Promise, Description, Sample. *Compare* 810 Ill. Comp. Stat. 5/2-313 (2012), *with* Ala. Code § 7-2-313 (2002). The Illinois and Alabama statutes are identical and provide:

(1) Express warranties by the seller are created as follows:
(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

810 Ill. Comp. Stat. 5/2-313 (2012); Ala. Code § 7-2-313 (2002). Because the Illinois and Alabama statutes are identical, the Court will address both States' laws simultaneously.

[4] The commentary to Section 2-313 of the UCC clarifies that it "deals with affirmations of fact by the seller, descriptions of the goods or exhibitions of samples, exactly as any other part of a negotiation which ends in a contract is dealt with." 810 Ill. Comp. Stat. 5/2-313, cmt. 3; Ala. Code § 7-2-313, cmt. 3. The commentary further provides,

No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof. The issue normally is one of fact.

810 Ill. Comp. Stat. 5/2-313, cmt. 3; Ala. Code § 7-2-313, cmt. 3.

1973) (holding that "to be actionable under the theory of express warranty the claim must be based on an affirmation of fact or promise which is not a statement representing the seller's opinion or commendation of the goods and which is false"). Thus, "[s]ales talk which relates only to the value of the goods or the seller's personal opinion or commendation of the goods is considered puffing and is not binding on the seller." *Redmac, Inc. v. Computerland of Peoria*, 489 N.E.2d 380, 382 (Ill. App. Ct. 3d Dist. 1986); *see also Russell v. Wilson*, 991 So. 2d 745, 749 (Ala. Civ. App. 2008) (holding that statements attributed to motorcycle seller that motorcycle was in "good shape" were statements of opinion and "sales talk, i.e., mere puffery, and [did] not rise to the level of a representation of material fact required to create an express warranty") (internal citations omitted). The question of whether a statement constitutes an express warranty or mere puffery is generally considered a question of fact. *Redmac, Inc.*, 489 N.E.2d at 382; 810 Ill. Comp. Stat. 5/2-313, cmt. 3; *Russell*, 991 So. 2d at 748 ("Whether a given representation is an expression of opinion or a statement of fact depends upon all the circumstances of the particular cases . . . in cases of question should be left to the jury") (internal quotation marks omitted) (quoting *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 846 (Ala. 1993)); Ala. Code § 7-2-313, cmt. 3.

The Seventh Circuit has noted that "[t]he decisive test for whether a given representation is a warranty or merely an expression of the seller's opinion is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment." *Royal Bus. Mach., Inc.*, 633 F.2d at 41 (referencing Illinois' test where claims arose under the UCC as adopted by Indiana) (citing *Weiss*, 293 N.E.2d at 381; *Gen.*

13

*Supply & Equip. Co. v. Phillips*, 490 S.W.2d 913, 917 (Tex. Civ. App. 1972)). In the first case there is a warranty, but in the second there is not. *Weiss*, 293 N.E.2d at 381.

Unilever argues that Count I fails to state a claim because Plaintiffs have not identified any affirmation of fact or promise by Unilever that was not true. (R. 25, Def.'s Mem. at 7.) Specifically, Unilever contends that the Hair Treatment's packaging, which Plaintiffs attached as exhibits to their Complaint, contradict Plaintiffs' claims.[5] (*Id.* at 7-9.)

### A. Allegations regarding use of the term "Smoothing"

As to Plaintiffs' first alleged express warranty that the Hair Treatment "was a hair 'Smoothing' [p]roduct and not a chemical relaxer," (R. 1, Compl. ¶ 74), Unilever argues that while it did use the term "smoothing" in the packaging, it also noted that the results of the Hair Treatment may vary. (R. 25, Def.'s Mem. at 7.) Unilever contends that, at most, this "language is akin to non-actionable puffery" and is not an affirmation of fact or promise. (*Id.* at 7) (citing *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926 (Ill. 1999)). In addition, Unilever argues that the packaging and instructions are "abundantly clear" that the Hair Treatment is a hair straightener that uses the same chemicals used in hair perming thereby contradicting Plaintiff's assertion that Unilever promised that the Hair Treatment was not a "chemical relaxer." (*Id.* at 8.)

---

[5] Pursuant to Federal Rule of Civil Procedure 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Thus, when reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6), district courts are entitled to consider any exhibits attached to the complaint. *Beam v. IPCO Corp.*, 838 F.2d 242, 244 (7th Cir. 1988); *see also Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002) ("The consideration of a 12(b)(6) motion is restricted solely to the pleadings, which consist generally of the complaint, any exhibits attached thereto, and supporting briefs."). Further, "[w]here an exhibit and the complaint conflict, the exhibit typically controls." *Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007) (citing *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 645 (7th Cir. 2006)). Thus, the Court considers the Hair Treatment's packaging and instructions, as Plaintiffs have attached these documents to their Complaint. (*See* R. 1, Compl., Ex. A at 26-28; R. 1, Compl., Ex. B at 29-36.)

In response, Plaintiffs contend that the language used in the packaging—"results may vary depending on hair type"—does not negate the smoothing promise. (R. 34, Pls.' Resp. at 6) (citing *Fed. Trade Comm'n v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006)). According to Plaintiffs, this language "merely warns that the [Hair Treatment] may be less effective on some hair types." (*Id.* at 6.) Plaintiffs also contend that Unilever's statements that the Hair Treatment would smooth hair were not mere puffery and that "[t]he critical question is whether marketing materials would be likely to mislead reasonable consumers." (*Id.* at 6-7) (internal quotation marks and alterations omitted) (citing *Speakers of Sport, Inc. v. Proserv. Inc.*, 178 F.3d 862, 866 (7th Cir. 1999)).

Puffing is generally defined as "[t]he expression of an exaggerated opinion—as opposed to a factual misrepresentation—with the intent to sell a good or service. Puffing involves expressing opinions, not asserting something as a fact." Black's Law Dictionary 1353 (9th ed. 2009). According to the Seventh Circuit, statements are puffing if they are "empty superlatives on which no reasonable person would rely." *All-Tech Telecom, Inc. v. Amway Corp.,* 174 F.3d 862, 868 (7th Cir. 1999); *see also Barbara's Sales, Inc.*, 879 N.E.2d at 926 ("Puffing denotes the exaggerations reasonably expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined."); *Russell*, 991 So. 2d at 748-49 (likening mere sales talk to puffery); *Hughes v. Hertz Corp.*, 670 So. 2d 882, 885 (Ala. 1995) ("This Court has held that statements of opinion amounting to sales talk, or 'puffery,' are not statements concerning a material fact upon which one has a right to act and, therefore, will not support a fraud claim."). Illinois courts have held that phrases such as, "high-quality," "expert workmanship," "custom quality," "perfect," "magnificent," "comfortable," "picture perfect," and the "best" are puffery. *Barbara's Sales, Inc.*, 879 N.E.2d at 926. Similarly, Alabama courts

have construed phrases such as "in good shape," "as good as [] new," *Gable v. Boles*, 718 So. 2d 68, 70-71 (Ala. Civ. App. 1998) (citing *Hughes*, 670 So. 2d at 885; *Young v. Serra Volkswagen, Inc.*, 579 So. 2d 1337, 1339 (Ala. 1991); *Pell City Wood, Inc. v. Forke Bros. Auctioneers, Inc.*, 474 So. 2d 694, 695 (Ala. 1985)), "as good or better," *Lucky Mfg. Co. v. Activation, Inc.*, 406 So. 2d 900, 905 (Ala. 1981), and "in good condition," *La Trace v. Webster*, 17 So. 3d 1210, 1217 (Ala. Civ. App. 2008) (citing *Pell City Wood, Inc.*, 474 So. 2d at 695), as mere puffery. Generally, statements that ascribe specific virtues to a product that it does not possess are not considered puffing. *See Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 7 (Ill. App. Ct. 1st Dist. 2001) (citing *Totz v. Cont'l Du Page Acura*, 602 N.E.2d 1374, 1383 (Ill. App. Ct. 2d Dist. 1992)); *La Trace*, 17 So. 3d at 1217 (noting that Alabama courts have held that a seller's statement that a boat was winterized, or that a trailer was a 2000 mode-year trailer were statements of fact) (citing *Gable*, 718 So. 2d at 70; *Terrell v. R & A Mfg. Partners, Ltd.*, 835 So. 2d 216, 226 (Ala. Civ. App. 2002)).

Here, the front of the Hair Treatment packaging unequivocally states (in bold, capital letters that are in a large font): "**30 DAY SMOOTHING KIT.**" (R. 1, Compl., Ex. B at 30.) Underneath this statement, the packaging reads (in bold, capital letters): "**SMOOTHES YOUR STYLE.**" (*Id.*) The back of the packaging provides that the Hair Treatment "leaves [hair] *smooth*, shiny, and manageable for up to 30 days." (*Id.* at 31) (emphasis added). The Court cannot conclude as a matter of law that Unilever's statements were mere puffery. The statements do not appear to be exaggerations of an opinion and are susceptible of being interpreted as factual statements. That is, the description of the Hair Treatment as a "smoothing" product may be viewed as a statement that "conjure[s] a specific, factual idea" about the Hair Treatment's effects in the mind of a typical consumer. *See Miller*, 762 N.E.2d at 7. In short, whether the

16

identification of the Hair Treatment as a "smoothing" product is an affirmation of fact or promise is a question of fact that cannot be resolved on a motion to dismiss. *Redmac, Inc.*, 489 N.E.2d at 382; 810 Ill. Comp. Stat. 5/2-313, cmt. 3; *Russell*, 991 So. 2d at 748; Ala. Code § 7-2-313, cmt. 3. Similarly, whether the Hair Treatment's packaging made it "abundantly clear" that it was a chemical hair straightener is a question of fact. Accordingly, the Court concludes that Plaintiffs have sufficiently pleaded that Unilever's assertion that the Hair Treatment was a "smoothing" product and not a chemical relaxer was an affirmation of fact or promise so as to survive the motion to dismiss.

### B.    Allegations regarding use of the phrase "Up to 30 days"

Plaintiffs also allege that Unilever's statement that the effects of the Hair Treatment "would last no more than 30 days," (R. 1, Compl. ¶ 74), constituted a second express warranty. The front and back of the Hair Treatment's packaging identify it as a "30 Day Smoothing Kit." (R. 1, Compl., Ex. B at 30-31.) In addition, the packaging provides that "Hair will begin to return to its normal texture and shape over time but will continue to be smoother *up to* 30 days." (*Id.* at 31) (emphasis added). Unilever argues that the latter statement "is not a warranty that the effects will not last longer than thirty days." (R. 25, Def.'s Mem. at 8.) In response, Plaintiffs argue that "the plain meaning of the words indicates that there is a limit of 30 days for the effects." (R. 34, Pls.' Resp. at 7.)

Again, whether a statement is merely the expression of an opinion or a statement of fact is a question of fact that cannot be decided on a motion to dismiss. *See Redmac, Inc.*, 489 N.E.2d at 382; 810 Ill. Comp. Stat. 5/2-313, cmt. 3; *Russell*, 991 So. 2d at 748; Ala. Code § 7-2-313, cmt. 3. Furthermore, courts have not hesitated to find that a warranty has been created when a seller uses language in product brochures to suggest that a product will perform up to

certain nominal values. *See Ricwil, Inc. v. S.L. Pappas and Co., Inc.*, 599 So. 2d 1126, 1131 (Ala. 1992) (concluding that where plaintiff's contract called for pipe that would withstand water temperatures of at least 240 degree Fahrenheit, and defendant's product brochures specified that its piping system was for "Domestic Hot Water and Condensate Lines *to* 250 degree Fahrenheit," such statements became part of the basis of the bargain and an express warranty as to temperature was made) (emphasis added and internal alterations omitted); *cf. McGowan v. Am. Pressed Tan-Bark Co.*, 121 U.S. 575, 581, 586, 608 (1887) (holding that where there was a written agreement for the construction of machinery which "would sustain and work *up to* a pressure of 1,500 tons" and the machinery was unable to sustain such pressure, plaintiffs could recover damages for breach of contract) (emphasis added). Thus, the Court finds that Plaintiffs have sufficiently pleaded that the description of the Hair Treatment as one that would "last up to 30 days" rose to the level of an affirmation of fact or promise so as to survive the motion to dismiss their breach of express warranty claim.

### C. Allegations regarding use of the phrase "No Formaldehyde"

Finally, Plaintiffs allege that Unilever's statement that the Hair Treatment "contained No Formaldehyde and was safe," (R. 1, Compl. ¶ 74), created a third express warranty. Unilever contends that even if the "No Formaldehyde" statement constitutes a warranty, Plaintiffs have failed to adequately plead that Unilever breached that warranty. According to Unilever, "Plaintiffs do not allege that the [Hair Treatment] in fact contains formaldehyde," (R. 25, Def.'s Mem. at 8), nor do Plaintiffs "allege that formaldehyde is in fact released during the specific use at issue . . . [or] any facts that would support such a conclusion." (*Id.* at 8-9.) Unilever also asserts that Plaintiffs' allegations that the Hair Treatment contains a chemical ingredient that is

known to release formaldehyde "does not make false the representation that the [Hair Treatment] itself does not contain formaldehyde." (*Id.* at 8.)

Contrary to Unilever's argument, Plaintiffs have alleged enough facts to state a plausible claim for relief on the basis that Unilever breached an express warranty that the Hair Treatment did not contain any formaldehyde. In their Complaint, Plaintiffs allege that the Hair Treatment contains "DMDM Hydantoin, a chemical that is known as a '[f]ormaldehyde-releaser.'" (R. 1, Compl. ¶ 23.) Plaintiffs further allege that formaldehyde releasers "release small amounts of [f]ormaldehyde over time" and that "[a]n average consumer reviewing the representation that the [Hair] Treatment contains 'No Formaldehyde' would not expect that it would contain a chemical known to release [f]ormaldehyde." (R. 1, Compl. ¶¶ 23, 25.) Placing language that indicates the absence of formaldehyde in bold, all capital letters, on the front and back of the Hair Treatment's packaging would suggest to the reasonable consumer the absence of the offending chemical during use of the Hair Treatment. *All-Tech Telecom, Inc.*, 174 F.3d at 862. Thus, the Court finds that Plaintiffs have sufficiently pleaded that the phrase "No Formaldehyde" rose to the level of an affirmation of fact or promise so as to survive the motion to dismiss their breach of express warranty claim. Accordingly, the Court declines to dismiss Plaintiffs' claims for breach of express warranty in Count I.

## IV.    Whether plaintiffs have sufficiently pleaded a claim for breach of implied warranty

In Count II, Plaintiffs bring a claim for breach of implied warranty of merchantability against Unilever under both Illinois and Alabama law.[6] (*See* R. 1, Compl. ¶¶ 78-82.) Plaintiffs allege that the Hair Treatment was "not merchantable because it contained a defect that caused hair loss upon proper application and did not otherwise perform as represented." (*Id.* ¶ 80.) Specifically, Plaintiffs allege that they both experienced hair loss upon using the Hair Treatment. (*Id.* ¶¶ 50, 52.) Unilever argues that Plaintiffs lack standing to assert a claim for breach of implied warranty because both Illinois and Alabama State law require privity as a prerequisite for asserting such a claim. (R. 25, Def.'s Mem. at 9.) Unilever also contends that Plaintiffs fail to state a claim because they "seek to assert a claim for purely economic loss." (R. 38, Def.'s Reply at 7.)

Under the UCC, as adopted by both Illinois and Alabama, "a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 810 Ill. Comp. Stat. 5/2-314; Ala. Code § 7-2-314. Where a plaintiff seeks to sue a manufacturer (as opposed to a seller) for breach of an implied warranty, both Illinois and Alabama require the plaintiff to establish privity of contract between the plaintiff and the

---

[6] Illinois and Alabama have both adopted the provision of the Uniform Commercial Code on Implied Warranty; Merchantability; Usage of Trade. *Compare* 810 Ill. Comp. Stat. 5/2-314 (2012), *with* Ala. Code § 7-2-314 (2002). The Illinois and Alabama statutes are identical and provide, in relevant part, that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 810 Ill. Comp. Stat. 5/2-314(1); Ala. Code § 7-2-314(1).

manufacturer.[7] *See Jensen v. Bayer*, 862 N.E.2d 1091, 1099 (Ill. App. Ct. 1st Dist. 2007) (noting

that under the UCC section on implied warranties, as adopted by Illinois, a plaintiff will only

have a cause of action for breach of an implied warranty of merchantability against the entity

from which the plaintiff purchased the good); *Rampey v. Novartis Consumer Health, Inc.*, 867

So. 2d 1079, 1087 (Ala. 2003) ("[A] claim for breach of an implied warranty is not available

against a manufacturer who was not involved in the transaction pursuant to which the [plaintiff]

purchased the product."). Nonetheless, where a plaintiff sues for personal injuries, as opposed to

economic losses, she is excepted from the privity requirement in both Illinois and Alabama. *See*

*Jensen*, 862 N.E.2d at 1099 ("[A] plaintiff may be excepted from the privity requirement by

suing for personal injury"); *Berry v. G.D. Searle & Co.*, 309 N.E.2d 550, 556 (Ill. 1974)

("[P]rivity is of no consequence when a buyer who purportedly has sustained personal injuries

predicates recovery against a remote manufacturer for breach of an implied waranty [sic]" under

the UCC.); *Rampey*, 867 So. 2d at 1089 (noting that § 318 of the UCC, as adopted by Alabama,

abolished the privity requirement for breach of implied warranty actions involving personal

injury to natural persons); *Bishop v. Faroy Sales*, 336 So. 2d 1340, 1341 (Ala. 1976).

The term "personal injury" may encompass "any harm caused to a person, such as a

broken bone, a cut, or a bruise; bodily injury," or "[a]ny invasion of a personal right, including

---

[7] In general, privity is "[t]he connection or relationship between two parties, each having a
legally recognized interest in the same subject matter (such as a transaction, proceeding, or piece
of property)." Black's Law Dictionary 1320 (9th ed. 2009). Horizontal privity is "[t]he legal
relationship between a party and a nonparty who is related to the party (such as a buyer and a
member of the buyer's family)." *Id.* Vertical privity is "[t]he legal relationship between parties
in a product's chain of distribution." *Id.* By way of example: A consumer seeking to sue a
product manufacturer who was not involved in the sale of the product to the consumer is said to
lack vertical privity with that manufacturer. *Reed v. City of Chi.*, 263 F. Supp. 2d 1123, 1124 n.1
(N.D. Ill. 2003) (citing *Thomas v. Bombardier–Rotax Motorenfabrik*, 869 F. Supp. 551, 557 n.7
(N.D. Ill. 1994)). In addition, when a user of a product, aside from the consumer, is injured, that
user is said to lack horizontal privity with the product manufacturer. *Id.*

mental suffering and false imprisonment." Black's Law Dictionary 857 (9th ed. 2009); *see also Volkswagen of Am., Inc. v. Dillard*, 579 So. 2d 1301, 1305-07 (Ala. 1991) (interpreting the meaning of the UCC's use of the words, "injury to person," as they related to an award of damages for breach of warranty broadly to allow recovery for mental anguish and declining to interpret "the UCC as restricting damages for breach of warranty for injury to the person solely to physical injury" ). Here, Plaintiffs allege that they suffered hair loss upon using the Hair Treatment. Such allegations clearly fall within the category of personal injuries and not pure economic losses. *See In re Von Volkmar*, 217 B.R. 561, 566 (N.D. Ill. 1998) (characterizing hair loss as one of several personal injuries alleged by the plaintiff); *see also Higbee v. Giant Food Shopping Ctr.*, 106 F. Supp. 586, 587 (E.D. Va. 1952) (affirming directed verdict against the seller of a hair product on a breach of implied warranty theory where the hair product caused the plaintiff to lose her hair, and noting that the warranty implied was that the hair product would not "injure the human body when correctly and normally administered"). Accepting all of the well-pleaded facts as true and drawing all inferences in Plaintiffs' favor, the Court concludes that Plaintiffs have sufficiently alleged that they seek to recover for personal injuries, which exempts them from the privity requirement. Accordingly, the Court declines to dismiss Plaintiffs' claim for breach of implied warranty.

V.      **Whether Plaintiffs have sufficiently pleaded a claim under the ICFA or the ADTPA**

In Count III, Plaintiffs allege violations of the ICFA, 815 Ill. Comp. Stat. 505/1 *et seq.*, and the ADTPA, Ala. Code § 8-19-1 *et seq.* (R. 1, Compl. ¶¶ 83-97.) Plaintiffs first allege that Unilever "used unconscionable commercial practices, deception, fraud, false promise and misrepresentation" in marketing the Hair Treatment." (*Id.* ¶¶ 88, 93.) Plaintiffs also allege that Unilever "knowingly concealed, suppressed and consciously omitted material facts to Plaintiffs

and other members of the Class knowing that consumers would rely on the advertisements and packaging and [Unilever]'s uniform representations to purchase the [Hair Treatment]." (*Id.* ¶¶ 89, 93.)

The ICFA "provides a remedy for 'unfair methods of competition and unfair or deceptive acts or practices' in specific commercial transactions." *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) (quoting 815 Ill. Comp. Stat. 505/2.) The ICFA declares unlawful "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact." 815 Ill. Comp. Stat. 505/2. To state a cause of action under the ICFA, Plaintiffs must allege: "(1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) such damages were proximately caused by the defendant's deception." *Dubey v. Pub. Storage, Inc.*, 918 N.E.2d 265, 277 (Ill. App. Ct. 1st Dist. 2009); *see also Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996).

The ADTPA provides a remedy for certain "unlawful trade practices."[8] Ala. Code § 8-19-5. The ADTPA identifies no less than 26 unlawful trade practices and makes it unlawful, *inter alia*, to represent "that goods or services have . . . characteristics, ingredients, uses, benefits,

---

[8] Notably, Alabama law differs significantly from Illinois law in that it expressly prohibits individuals from seeking class relief under the ADTPA. Ala. Code § 8-19-10(f); *see also Ex parte Exxon Corp.*, 725 So. 2d 930, 933 (Ala. 1998). The Supreme Court has held, however, that where a state law prohibiting class action suits conflicts with the Federal Rule of Civil Procedure governing class actions, federal courts sitting in diversity are not precluded from allowing a suit to proceed as a class action under Rule 23. *See Shady Grove Orthopedic Assocs.*, 559 U.S. 393, 130 S.Ct. at 1436-42 (holding that a New York State law prohibiting class actions in suits seeking penalties or statutory minimum damages was preempted by Federal Rules of Civil Procedure 23).

or qualities that they do not have," Ala. Code § 8-19-5(5); represent "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," Ala. Code § 8-19-5(7); or to engage "in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce," Ala. Code § 8-19-5(27).

Unilever posits several grounds for the dismissal of Plaintiffs' ICFA and ADTPA claims. First, Unilever argues that the Hair Treatment's packaging and instructions contradict Plaintiffs' allegations concerning Unilever's alleged misrepresentations, and that "[r]epresentations that were not made, or were not false, cannot constitute the 'deceptive' acts required to state a claim under the ICFA or ADTPA." (R. 25, Def.'s Mem. at 10-11.) Second, Unilever contends that Count III is a restatement of the claimed breach of warranties in Count I, and that "such a 'breach of contractual promise, without more, is not actionable under the [ICFA]." (*Id.* at 11.) (citing *Greenberger*, 631 F.3d at 399). Third, Unilever argues that Plaintiffs' claim for a violation of the ICFA based on an alleged concealment of material facts should be dismissed because "Plaintiffs fail to allege that Unilever knew that the [Hair Treatment] posed a risk of hair loss when properly used." (*Id.*) Finally, Unilever argues that Reid fails to allege "a causal connection between the alleged misrepresentation and her claimed damages." (*Id.*) The Court addresses each argument in turn.

### A.    Plaintiffs' misrepresentation allegations

In Count III, Plaintiffs allege that "Unilever misrepresented that the [Hair Treatment] was a Keratin-based 'smoothing' conditioner," and that by indicating that the Hair Treatment contained "No Formaldehyde," Unilever marketed the Hair Treatment as a safe hair conditioning treatment. (R. 1, Compl. ¶¶ 90-91.) As an initial matter, to the extent that Plaintiffs' allegations

in Count III are duplicative of their breach of express warranties action in Count I, they must be dismissed.[9]

Both the Illinois and Alabama Supreme Courts have recognized that an "action for breach of express warranty is an action *ex contractu*." *Collins Co., Ltd. v. Carboline Co.*, 532 N.E.2d 834, 838 (Ill. 1988) (citing *Paul Harris Furniture Co. v. Morse*, 139 N.E.2d 275, 282 (Ill. 1956)); *Simmons v. Clemco Indus.*, 368 So. 2d 509, 513 (Ala. 1979) ("actions for breach of warranty . . . are *ex contractu*) (italics added). Furthermore, the United States Supreme Court has recognized that while the basis for a breach of contract action lies in the parties' agreement, in order to succeed under a consumer protection law, a plaintiff "must show not necessarily an agreement, but in all cases, an unfair or deceptive practice." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 (1995) (holding that the ICFA "should not apply to simple breach of contract claims."). In other words, to set forth an action under a consumer protection law, a party must allege unfair or deceptive conduct that is distinct from a simple breach of contract. *See Greenberger*, 631 F.3d at 399-400 (affirming dismissal of statutory consumer-fraud claim where the plaintiff failed to allege any deceptive conduct that was distinct from an alleged breach of contract); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005) ("A breach of a contractual promise, without more, is not actionable under the [ICFA]."). Were it otherwise, a plaintiff "could convert any suit for breach of contract into a consumer fraud action," as all breach of contract actions involve a promise and a subsequent failure to perform. *Avery*, 835 N.E.2d at 844 (quoting *Zankle v. Queen Anne Landscaping*, 724 N.E.2d 988, 992-93 (Ill. App.

---

[9] Plaintiffs concede as much in their response, recognizing that "[t]o the extent that the breach of warranty claims can be considered to sound in contract and thus under the ICFA or the ADTPA, Plaintiffs must properly allege a misrepresentation in Count III that is not also identified as a purported 'express warranty' in Count I." (R. 34, Pls.' Resp. at 10.)

Ct. 2d Dist. 2000)). Therefore, to the extent that Plaintiffs seek to enforce a mere contractual promise through the ICFA and ADTPA, their claim is not actionable.

Here, the only allegation of misrepresentation that Plaintiffs allege in Count III that they do not also identify as an express warranty in Count I is the statement that the Hair Treatment is "Keratin-based." (*Compare* R. 1, Compl. ¶¶ 71-77, *with* R. 1, Compl. ¶¶ 83-97; *see also* R. 34, Pls.' Resp. at 10.) Plaintiffs' remaining misrepresentation allegations are mere restatements of the claimed breach of warranties in Count I as Plaintiffs have not alleged any distinct deceptive conduct. Thus, the Court focuses its analysis on whether Plaintiffs have sufficiently alleged that Unilever's statement that the Hair Treatment was "Keratin-based" constitutes a deceptive act or practice.

Unilever argues that Count III should be dismissed because the statements upon which Plaintiffs base their ICFA and ADTPA claims are, as a matter of law, not deceptive. (*See* R. 25, Def.'s Mem. at 10.) Both Illinois and Alabama State law direct that in construing whether conduct constitutes a deceptive act or practice, courts shall take into how the Federal Trade Commission and federal courts have interpreted Section 5(a) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45(a). 815 Ill. Comp. Stat. 505/2; Ala. Code § 8-19-6. Under Section 5(a) of the FTC Act, "the likelihood of deception or the capacity to deceive is the criterion by which advertising is judged." *Montgomery Ward & Co. v. Fed. Trade Comm'n*, 379 F.2d 666, 670 (7th Cir. 1967); *see also LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1200 (11th Cir. 2010) ("[I]n the FTC context, an act or practice is deceptive or unfair if it has the tendency or capacity to deceive.") (internal quotation marks and alterations omitted) (quoting *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1172 (11th Cir. 1985)). Similarly, the Seventh Circuit has explained that under the ICFA, "a statement is deceptive if it creates a likelihood of

deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938

(7th Cir. 2001) (citing *People ex rel. Hartigan v. Knecht Servs., Inc.*, 575 N.E.2d 1378, 1387 (Ill.

App. Ct. 2d Dist. 1991); *Graphic Sales, Inc. v. Sperry Univac Div., Sperry Corp.*, 824 F.2d 576,

580 (7th Cir. 1987)). Therefore, to determine whether the allegations in Plaintiffs' complaint

state a claim for relief that satisfies the requirements of Federal Rule of Civil Procedure 12(b)(6),

the Court asks whether the allegedly false and misleading statement on which Plaintiffs base

their ICFA and ADTPA claims can be read to create a likelihood of deception or to have the

capacity to deceive. *Bober*, 246 F.3d at 938.

Here, Plaintiffs allege that Unilever marketed the Hair Treatment as "Keratin-based." (R.

1, Compl. ¶ 90.) A review of the Hair Treatment's packaging and instructions reveals that no

such statement appears in these materials. Instead, the front of the packaging identifies the Hair

Treatment as a "Keratin Infusion" and describes it as a "Keratin Treatment," while the back of

the packaging and the instructions repeatedly refer to the Hair Treatment as a "Keratin Infusion

30 Day Smoothing Kit." (R. 1, Compl., Ex. B. at 30-31, 35.) In addition, the ingredient list on

the side of the Hair Treatment's packaging lists "Hydrolyzed Keratin" as an ingredient in all

three portions of the Hair Treatment. (*Id.* at 33.) Considering that Keratin is listed as an actual

ingredient in all three portions of the Hair Treatment, it cannot be said, as a matter of law, that

the statements on the Hair Treatment's packaging or instructions which describe the Hair

Treatment as a "Keratin Infusion" or "Keratin Treatment" were likely to deceive a consumer or

had the capacity to deceive. The Court therefore dismisses Plaintiffs' claims in Count III to the

extent they are based on Unilever's alleged misrepresentations.[10]

### B.     Plaintiffs' failure to disclose and warn allegations

In Count III, Plaintiffs also allege that once Unilever became aware of the "defect" in the

Hair Treatment and its tendency to cause hair loss, despite proper application, "consumers (such

as Plaintiffs) were entitled to disclosure of that fact because a significant risk of hair loss would

be a material fact in a consumer's decision-making process, and, without [Unilever's] disclosure

consumers would not necessarily know that there is such a risk." (R. 1, Compl. ¶ 94.) Plaintiffs

argue that Unilever's failures to disclose the defect in the Hair Treatment and to warn consumers

of the risk of significant hair loss associated with use of the Hair Treatment constitute deceptive

acts. (R. 34, Pls.' Resp. at 10.) Unilever argues that Plaintiffs' ICFA and ADTPA claims

grounded on Unilever's alleged concealment of material facts fail because Plaintiffs have failed

to allege that Unilever knew that the Hair Treatment posed a risk of hair loss when used

properly. (R. 25, Def.'s Mem. at 11) (citing *Jensen*, 862 N.E.2d at 1098; *Sam v. Beaird*, 685 So.

2d 742, 744 (Ala. Civ. App. 1996)).

Under the ICFA, "the concealment, suppression or omission of any material fact" is

unlawful. 815 Ill. Comp. Stat. 505/2. In an ICFA action grounded on an alleged concealment,

"plaintiffs must establish that the fact concealed was known to the seller at the time of

concealment." *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 14 (Ill. App. Ct. 1st Dist.

---

[10] Unilever also argues that Reid's ICFA claim is deficient because she fails to allege a causal
connection "between the alleged misrepresentations and her claimed damages." (R. 25, Def.'s
Mem. at 11) (citing *Ryan v. Wersi Elec. GmbH & Co.*, 59 F.3d 52, 53 (7th Cir. 1995); *Barbara's
Sales, Inc.*, 879 N.E.2d at 926). According to Unilever, although Reid "alleges that she would
not have purchased the [Hair Treatment] but for Unilever's supposed misrepresentations . . .
[she] does not allege loss causation." (*Id.* at 12) (internal citations omitted). Because the Court
has dismissed Reid's ICFA claim grounded in Unilever's alleged misrepresentations, the Court
declines to address this argument.

2001); *see also Connick*, 675 N.E.2d at 595 (reversing dismissal of ICFA claim based on the defendant's alleged concealment of material facts where plaintiffs alleged that the defendant was aware of safety problems with its product, that it failed to disclose those defects, and that plaintiffs would not have purchased the products if they had known of the defects); *White v. DamlerChrysler Corp.*, 856 N.E.2d 542, 547-49 (Ill. App. Ct. 1st Dist. 2006); *Wiegel v. Stork Craft Mfg., Inc.*, --- F. Supp. 2d ---, ---, No. 09 C 7417, 2013 WL 2243094, at *7 (N.D. Ill. May 21, 2013). As an Illinois Appellate Court has explained, "[u]nlike an action for misrepresentation under the [ICFA], where even innocent misrepresentations can support liability, an action for fraudulent concealment logically demands that defendants have prior knowledge of the information that they are alleged to have suppressed." *Miller*, 762 N.E.2d at 14.

Although the ADTPA does not have a similar provision explicitly making the concealment or omission of a material fact unlawful, § 8-9-5(27) makes it unlawful to engage "in any other unconscionable, false misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code. § 8-19-5(27). "As is evident from this language, the ADTPA is generally written to require some knowledge of false or deceptive conduct on the part of the wrongdoer." *Beaird*, 685 So. 2d at 744. Thus, under both the ICFA and the ADTPA, a plaintiff asserting a claim of an alleged concealment, suppression, or omission must allege that the defendant had knowledge of the fact that was allegedly concealed, suppressed, or omitted.

Claims brought pursuant to the ICFA and ADTPA are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *see also Greenberger*, 631 F.3d at 399 (Claims brought pursuant to the ICFA "are subject to the

same heightened pleading standards as other fraud claims; as such, they must satisfy the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure.") (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005)); *Beaird*, 685 So. 2d at 744 (noting that the ADTPA is "intended to replace the common law and statutory actions for fraud" in specifically designated situations). Rule 9(b) requires that the circumstances constituting fraud be stated "with particularity." Fed. R. Civ. P. 9(b). In order to plead fraud with particularity, Plaintiffs must allege "[t]he who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo*, 901 F.2d at 627. Nevertheless, knowledge may be alleged generally. Fed. R. Civ. P. 9(b).

Here, Plaintiffs allege that Unilever "knowingly concealed, suppressed and consciously omitted material facts to Plaintiffs." (R. 1, Compl. ¶ 89.) In support, Plaintiffs have alleged that Unilever did not disclose, either on the Hair Treatment's packaging or on Unilever's websites or other marketing materials, that the Hair Treatment "contains an ingredient or combination of ingredients" that places consumers at risk of "significant hair loss" upon proper application of the Hair Treatment. (*Id.* ¶¶ 1, 6.) According to Plaintiffs, Unilever failed to make these disclosures "even though [Unilever] knew, before or almost immediately upon introduction of the [Hair Treatment] in late 2011, that consumers were complaining that the [Hair] Treatment caused significant hair loss." (*Id.* ¶ 7.) According to Plaintiffs, "[a]s early as December 2011, consumer complaints appeared on the internet concerning serious adverse effects such as hair loss and chemical burns resulting from use of the [Hair Treatment]." (*Id.* ¶ 33.) In addition, Plaintiffs allege that not only did Unilever fail to properly warn consumers "but when it finally chose to 'recall' the [Hair Treatment] in May 2012, it told consumers the [Hair Treatment] was being 'discontinued' and was still safe to use." (*Id.* ¶ 8.)

Contrary to Unilever's argument, Plaintiffs have sufficiently alleged that Unilever acted with the requisite knowledge in failing to disclose the risks of using the Hair Treatment. Specifically, viewing the facts in the light most favorable to them, Plaintiffs have alleged that Unilever knew that the Hair Treatment could cause substantial hair loss as early as December 2011 when consumers began to post complaints on the internet about hair loss they experienced as a result of using the Hair Treatment. Thus, Plaintiffs have sufficiently alleged that Unilever had knowledge of the alleged defect at the time they purchased the Hair Treatment. *See Coss v. Playtex Prods.*, No. 08 C 50222, 2009 WL 2245657, at *5 (N.D. Ill. July 10, 2009) (finding that the plaintiff had sufficiently pleaded that the defendant had the requisite knowledge for an ICFA claim grounded on the alleged concealment or omission of a material fact where plaintiff alleged that the defendant's knowledge of a design defect was reflected in a patent criticizing the design of the allegedly defective product at issue); *Stella v. LVMH Perfumes & Cosmetics USA, Inc.*, 564 F. Supp. 2d 833, 836 (N.D. Ill. 2008) (declining to dismiss ICFA claim where the plaintiff alleged that the manufacturer knew or should have known that lead was an ingredient in lipstick it manufactured and that it failed to disclose this fact to consumers); *cf. Huddleston*, 459 U.S. at 387-90 n.30 ("[P]roof of scienter required in fraud cases is often a matter of inference from circumstantial evidence.").

Finally, Unilever also argues that the Complaint's exhibits demonstrate that Unilever did warn consumers about circumstances under which the Hair Treatment should not be used, and specifically warned that use of the Hair Treatment by some consumers could result in "hair breakage." (R. 25, Def.'s Mem. at 11; *see also* R. 1, Compl., Ex. B at 32.) The Hair Treatment's packaging and instructions state, "[u]se of this product on lightened hair (including highlights or high lift color processes) will result in hair breakage—regardless of how long ago the hair was

treated." (R. 1, Compl., Ex. B at 32, 35.) Plaintiffs argue that although Unilever warned consumers of "hair breakage," such a warning did not effectively warn consumers that hair loss would result under "any and all circumstances," and that such a warning does not suffice to also warn of "a significant risk of hair loss." (R. 34, Pls.' Resp. at 11.) This is a question of fact that is inappropriate to resolve on a motion to dismiss.

Thus, to the extent that Plaintiffs base their ICFA and ADTPA claims on alleged misrepresentations made by Unilever, the Court dismisses those claims. To the extent that Plaintiffs base their ICFA and ADTPA claims on Unilever's failure to disclose and warn of a defect in the Hair Treatment, the Court declines to dismiss those claims.

## VI.    Whether Plaintiffs have sufficiently pleaded a claim under the Uniform Deceptive Trade Practices Act

In Count IV, Plaintiffs allege violations of the Illinois UDTPA, 815 Ill. Comp. Stat. 510/1 *et seq.*, and the ADTPA, Ala. Code § 8-19-1 *et seq.* (R. 1, Compl. ¶¶ 98-103.) Plaintiffs allege that "[Unilever] has committed deceptive acts or practices within the meaning of [the] UDTPA by engaging in the acts and practices alleged, including but not limited to the failure to disclose the defect in the [Hair] Treatment and warn consumers of the risk of significant hair loss associated with its use." (*Id.* at ¶ 102.) The UDTPA, as adopted in both Illinois and Alabama, provides, *inter alia*, that a person engages in a deceptive act or practice when that person "represents that goods or services have . . . characteristics, ingredients, uses, [or] benefits . . . that they do not have." 815 Ill. Comp. Stat. 510/2(5); Ala. Code § 8-19-5(5). While the ADTPA provides for damages, Ala. Code § 8-19-10(a), the Illinois UDTPA only allows a plaintiff to recover injunctive relief. 815 Ill. Comp. Stat. 510/3; *Comtel Techs., Inc. v. Schwendener, Inc.*, No. 04 C 3879, 2005 WL 433327, at *9 (N.D. Ill. Feb. 22, 2005) ("The [Illinois] UDTPA does

not provide a cause of action for damages—its only remedy is injunctive relief.") (internal citations omitted).

### A.     Whether Reid has pleaded a claim for relief under the Illinois UDTPA

In their Complaint, Plaintiffs acknowledge that Unilever recalled the Hair Treatment on May 8, 2012, and advised retailers to immediately remove the Hair Treatment from their shelves and send the Hair Treatment back to Unilever. (R. 1, Compl. ¶¶ 8, 38.)  Plaintiffs also allege, however, that Unilever did not make a public announcement or publicly respond to complaints, but instead, posted a notice on its website stating that the Hair Treatment was "discontinued because of consumer 'confusion'" and continued to advise consumers that the Hair Treatment was safe to use as directed. (*Id.* ¶¶ 38-39, 48.)  As a result, Plaintiffs contend that "[Unilever] has never fully and appropriately recalled the [Hair Treatment]." (*Id.* ¶ 9.)

Unilever argues that Reid fails to state a claim under the Illinois UDTPA because she "seeks an award of damages," and she "has not pleaded any likelihood that it will recur, particularly given that the Product has been recalled." (R. 25, Def.'s Mem. at 12.)  In response, Reid contends that she has properly alleged "a threat of future actions in violation of the Illinois [UDTPA]." (R. 34, Pls.' Resp. at 13.)  In support, Plaintiff points to her allegation that Unilever has not "fully and appropriately recalled" the Hair Treatment and that it continues to fail to warn consumers about the dangers of using the Hair Treatment. (*Id.*)  Unilever replies by arguing that Reid has not sought the only remedy available under the Illinois UDTPA, injunctive relief. (R. 38, Def.'s Reply at 10.)

The Illinois UDTPA prohibits deceptive trade practices and unfair competition. *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 909 N.E.2d 848, 857 (Ill. App. Ct. 1st Dist. 2009). While the Illinois UDTPA "primarily focuses on acts between

33

competitors, a cause of action under [the Illinois UDTPA] can be stated and injunctive relief is obtainable by an individual consumer where that consumer can allege facts that he likely would be damaged by the defendant's conduct in the future." *Smith v. Prime Cable of Chi.*, 658 N.E.2d 1325, 1337 (Ill. App. Ct. 1st Dist. 1995); *see also Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1157 (Ill. App. Ct. 1st Dist. 1992) ("[A] consumer action is possible under the [Illinois UDTPA]."). To maintain such an action, a "consumer must allege facts which would indicate that he is likely to be damaged in the future." *Popp*, 613 N.E.2d at 1157 (internal quotation marks omitted) (quoting *Greenberg v. United Airlines*, 563 N.E.2d 1031, 1037 (Ill. App. Ct. 1st Dist. 1990)). "The problem inherent in such consumer actions is the inability to allege facts which would indicate that the plaintiff is 'likely to be damaged.' Ordinarily, the harm has already occurred, thus precluding a suit for injunctive relief." *Brooks v. Midas-Int'l Corp.*, 361 N.E.2d 815, 821 (Ill. App. Ct. 1st Dist. 1977).

Here, Reid has already made her purchase and is aware of the alleged defect in the Hair Treatment that poses a risk of hair loss. Armed with that knowledge, she can avoid using the Hair Treatment in the future. Therefore, since Reid cannot show a likelihood of future damage from Unilever's acts, her claim under the Illinois UDTPA fails. *See, e.g., Glazewski v. Coronet Ins. Co.*, 483 N.E.2d 1263, 1267 (Ill. 1985) (where the plaintiff knew of the problems, and as a result of that knowledge she could avoid damage in the future, plaintiffs were not eligible for injunctive relief and failed to state a cause of action under the Illinois UDTPA); *Prime Cable of Chi.*, 658 N.E.2d at 1337 (affirming dismissal of the plaintiffs' claim under the Illinois UDTPA where it was not reasonably likely for the plaintiffs to be damaged by the defendants' acts in the future). Therefore, the Court dismisses the Reid's Illinois UDTPA claim in Count IV.

**B.     Whether Lake has pleaded a claim for relief under the Alabama UDTPA**

Unilever next argues that Lake's ADTPA claim in Count IV is duplicative of the ADTPA claim in Count III and should therefore be dismissed. (R. 25, Def.'s Mem. at 13.) Plaintiffs argue that the Federal Rules of Civil Procedure "allow for a flexible system of pleading" and that Rule 8(d)(2) allows them to "assert more than one position." (R. 34, Pls.' Resp. at 13.) Unilever replies by pointing out that Plaintiffs allege "identical," rather than alternative, claims under "the identical statute—the ADTPA—based on a single set of facts." (R. 38. Def.'s Reply at 11.)

Generally, district courts are accorded "a great deal of latitude and discretion" to dismiss duplicative claims. *Serlin v. Arthur Anderson & Co.*, 3 F.3d 221 (7th Cir. 1993) (quoting *Ridge Gold Standard Liquors v. Joseph E. Seagram*, 572 F. Supp. 1210, 1213 (N.D. Ill. 1983)). A claim is duplicative if the parties, facts, and requested relief do not significantly differ. *Id.*; *Norfleet v. Stroger*, 297 F. App'x 538, 540 (7th Cir. 2008) ("[S]uits are not duplicative if the parties, claims, facts and requested relief are substantially different."); *Tucker Firm, LLC v. Alise*, No. 11-CV-1089, 2012 WL 252790, at *5 (N.D. Ill. Jan. 25, 2012) (dismissing a counterclaim alleging the same facts, claims, and requested relief); *Beringer v. Standard Parking O'Hare Joint Venture*, Nos. 07 C 5027, 07 C 5119, 2008 WL 4890501, at *4 (N.D. Ill. Nov. 12, 2008) ("As both counts involve the same operative facts, the same injury, and require proof of essentially the same elements, the court concludes that the two counts are duplicative."). Here, Plaintiffs allege identical facts and request the same remedy under the same statute. Accordingly, the Court concludes that the claims are duplicative and dismisses Lake's ADTPA claim in Count IV.

**VII.    Whether plaintiffs have sufficiently pleaded a claim under the Magnuson-Moss Act**

Unilever next argues that Plaintiffs have failed to allege a claim for breach of written and implied warranties under the Magnuson-Moss Act, for the same reasons that they fail to state a claim in Counts I and II, and that Count V should therefore be dismissed. (R. 25, Def.'s Mem. at 13-14; Def.'s Reply at 11.)  In Count V, Plaintiffs allege that because Unilever has breached the implied and express written warranties set forth in Counts I and II, it has also violated the Magnuson-Moss Act, 15 U.S.C. § 2301 *et seq.*. (R. 1, Compl. ¶¶ 104–08.)  The Magnuson-Moss Act is designed to protect consumers against deceptive warranty practices. *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 780 (7th Cir. 2011) (citing *Skelton v. Gen. Motors Corp.*, 660 F.2d 311, 313 (7th Cir. 1981)).  Although the Magnuson-Moss Act "does not require any manufacturer or seller to extend a warranty with its product, any 'written warranty' offered with a consumer product is subject to the [Magnuson-Moss Act's] regulatory requirements." *Skelton*, 660 F.2d at 314.  Furthermore, the Magnuson-Moss Act applies to all sales of consumer products costing more than a *de minimis* value in which a written warranty is given. 15 U.S.C. §§ 2302(e), 2303(d); *see also Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 241 n.1 (2d Cir. 1986).  Section 2310(d)(1) of the Magnuson-Moss Act also provides a federal private cause of action for damages and other legal and equitable relief to consumers who are "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the Magnuson-Moss Act] or under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1); *see also Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 522 (7th Cir. 2003).

**A.** **Plaintiffs' claim for breach of a written warranty under the Magnuson-Moss Act**

Unilever argues that Plaintiffs have failed to allege a claim for breach of a written warranty because the statements identified by Plaintiffs are mere "product descriptions" which do not constitute warranties under the Magnuson-Moss Act. (R. 25, Def.'s Mem. at 13-14; R. 38, Def.'s Reply at 11.) Unilever concedes that Illinois courts have recognized that "the elements necessary to prove a cause of action under the UCC for breach of express warranty are, in essence, the same under the [Magnuson-Moss Act]." (R. 25, Def.'s Mem. at 13) (quoting *Hasek v. DaimlerChrysler Corp.*, 745 N.E.2d 627, 639 (Ill. App. Ct. 1st Dist. 2001)). According to Unilever, as the express warranties upon which Plaintiffs base their claim under the Magnuson-Moss Act are identical to the express warranties alleged in Count I, their Magnuson-Moss Act claim fails for the same reasons their express warranty claims fail. Because the Court found that Plaintiffs sufficiently stated a claim for breach of express warranties in Count I, the Court declines to grant Unilever's motion to dismiss on this basis. (R. 25, Def.'s Mem. at 13-14.) While an argument might be made that the Magnuson-Moss Act requires a plaintiff to plead more facts than the Illinois UCC in support of a claim for breach of an express warranty, Unilever has not made such an argument. The Court "will not take it upon itself to construct legal arguments for a party." *Katz v. Orlick*, 89 F.3d 838 (7th Cir. 1996) (unpublished opinion) (citing *Smith v. Town of Eaton*, 810 F.2d 1469, 1471 (7th Cir. 1990)).

**B.** **Plaintiffs' claim for breach of an implied warranty under the Magnuson-Moss Act**

Unilever also argues that "Plaintiffs' inability to allege privity, and consequent failure to state a claim for relief under Count II of the Complaint . . . justifies dismissal" of their Magnuson-Moss Act claim for breach of an implied warranty. (R. 25, Def.'s Mem. at 13) (citing

*Voelker*, 353 F.3d at 525).  Plaintiffs fail to address the substance of Unilever's arguments.  (*See* R. 34, Pls.' Resp. at 14.)

As discussed above, Plaintiffs seek to recover for their personal injuries on a theory of breach of an implied warranty.  In *Voelker*, the Seventh Circuit held that "personal injury claims based on a breach of warranty are not cognizable under the Magnuson-Moss Act."  353 F.3d at 525 (citing *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1066 (5th Cir. 1984)).  In arriving at this conclusion, the Seventh Circuit distinguished between breach of implied warranty claims in which a plaintiff seeks to recover damages for personal injuries and those in which a plaintiff seeks only to recover for monetary injuries.  *Id.*  When determining whether the parties must be in privity for the latter type of claims, the Seventh Circuit held that the applicable state law governs.  *Id.* ("whether privity is a prerequisite to a claim for breach of implied warranty under the Magnuson-Moss Act . . . hinges entirely on the applicable state law.") (citing *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1014 (D.C. Cir. 1986); *Abraham*, 795 F.2d at 249).

By contrast, the issue of privity is of no consequence when a plaintiff seeks to recover for personal injuries based on a claim for breach of an implied warranty under the Magnuson-Moss Act because the Seventh Circuit unequivocally stated in *Voelker* that such "personal injury claims . . . are not cognizable under the Magnuson-Moss Act."  *Id.*  By virtue of the fact that Plaintiffs seek to recover for personal injuries under the Magnuson-Moss Act, they fail to state a claim under that Act for breach of an implied warranty.  *Voelker*, 353 F.3d at 525; *Gallo v. Homelite Consumer Prods.*, 371 F. Supp. 2d 943, 949 n.3 (N.D. Ill. 2005) (recognizing that "courts do not consider alleged personal injuries stemming from a breach of warranty" when

calculating whether plaintiffs have met the jurisdictional threshold of $50,000[11] required for a court to exert federal jurisdiction over Magnuson-Moss Act claims). Thus, the Court dismisses Plaintiffs' breach of implied warranty claim under the Magnuson-Moss Act in Count V.

## VIII.   Whether Plaintiffs have sufficiently pleaded a claim for unjust enrichment

In Count VI, Plaintiffs bring a claim for unjust enrichment under Illinois and Alabama State law. (R.1, Compl. ¶¶ 109-13.) Plaintiffs allege that Unilever has been "unjustly enriched in retaining the revenues derived from Class members' purchases of the [Hair] Treatment." (*Id.* ¶ 112.) Unilever argues that the Court should dismiss Count VI as to Lake because her claim is moot as Unilever refunded her fifteen dollars for her ten dollar purchase of the Hair Treatment. (R. 25, Def.'s Mem. at 14.) Unilever also urges the Court to dismiss the unjust enrichment claim as to both Plaintiffs because unjust enrichment does not apply where a specific contract exists under Illinois and Alabama State law. (*Id.*) Alternatively, Unilever contends that this claim should be dismissed because the Complaint fails to adequately plead a cause of action. (*Id.* at 14-15.)

### A.   Whether Lake's unjust enrichment claim is moot

Unilever argues that Lake's unjust enrichment claim is moot because she was refunded fifteen dollars for her ten dollar purchase of the Hair Treatment. (R. 25, Def.'s Mem. at 14) (citing *Hancock-Hazlett Gen. Const. Co. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986)). In

---

[11] A consumer who has been damaged by the failure of a supplier, warrantor, or service contractor to comply with the obligations set forth in the Magnuson-Moss Act may bring a suit for damages and other legal equitable relief in a federal district court if: (a) the amount in controversy of any individual claim is greater than $25; (b) the total amount in controversy for all claims is greater than $50,000; and (c) there are more than 100 named plaintiffs in the action. 15 U.S.C. § 2310(d)(3)(A)-(C). Here, both Reid and Lake aver that they have spent at least $100 on hair treatments following their use of the Hair Treatment. (R. 1, Compl. ¶¶ 57, 59.) In addition, Plaintiffs allege that the total amount in controversy is over $5,000,000 and that there are more than 100 putative class members. (*Id.* ¶ 12.)

response, Lake asserts that Unilever was unjustly enriched beyond the purchase price paid by Lake and that "further discovery will reveal the amounts that are properly owed to Plaintiff Lake and the putative Class and Alabama sub-class." (R. 34, Pls.' Resp. at 15.) According to Lake, she is "entitled to recover not only the purchase price paid but also all interest accrued, and fees and costs." (*Id.*)

To prevail on a claim of unjust enrichment in Alabama, a plaintiff must prove facts showing that the "defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1122-23 (Ala. 2003) (internal quotation marks omitted) (citing *Dickinson v. Cosmos Broad. Co.*, 782 So.2d 260, 266 (Ala. 2000)); *Hancock-Hazlett Gen. Const. Co.*, 499 So. 2d at 1387. Here, Lake has failed to plead that Unilever holds any money that belongs to her, and in fact pleads that Unilever refunded more than what she paid for the Hair Treatment. (R. 1, Compl. ¶¶ 51, 54.) Lake argues, however, that in addition to a full refund, she is entitled to recover accrued interest, fees, and costs. (R. 34, Pls' Resp. at 15) (citing *Wells Fargo Bank, N.A. v. Vergos*, Civil Action No. 11-00439-CB-N, 2012 WL 206169, at *3 (S.D. Ala. Jan. 24, 2012)). Plaintiffs' reliance on *Vergos*, 2012 WL 206169, at *3, is misplaced. There, a lender sued to recover on a defaulted loan. *Id.* at *1. The promissory note in *Vergos* included promises to repay the principal of and interest on the loan, plus the costs, expenses, and attorneys' fees that the lender incurred in collecting any amounts due under the loan. *Id.*. Thus, the court concluded that the lender was equitably entitled to recover these amounts under the theories of unjust enrichment and money had and received. *Id.* at *3. Here, however, Unilever did not execute any such promise to compensate Lake for accrue

interest, fees, and costs. Therefore, the Court dismisses Lake's unjust enrichment claim for failure to state a claim.

**B.     Whether Reid may assert a claim for unjust enrichment under Illinois law**

In Count VI, Reid alleges that Unilever has been "unjustly enriched in retaining the revenues derived from Class members' purchases of the [Hair] Treatment." (R. 1, Compl. ¶ 112.) According to the Complaint, the retention of such revenue "is unjust and inequitable because Unilever misrepresented the nature of the [Hair Treatment], misrepresented its ingredients, and knowingly marketed and promoted a dangerous and defective [p]roduct" that injured Plaintiffs because they would not otherwise have purchased the Hair Treatment. (*Id.*) Reid's unjust enrichment claim thus appears to incorporate the same conduct that forms the basis of her breach of express warranties claim in Count I, as well as the conduct that forms the basis of her statutory claims in Count III.

In Illinois, unjust enrichment is an equitable remedy that is available when no adequate remedy at law exists. *Wiegel*, --- F. Supp. 2d ---, ---, 2013 WL 2243094, at *7 (citing *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 1st Dist. 2005)). To state a cause of action for unjust enrichment, plaintiffs must "allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989) (citing *Drury v. Cnty. of McLean*, 433 N.E.2d 666, 670 (Ill. 1982)). An unjust enrichment claim may be predicated on either quasi-contract or tort. *Peddinghaus v. Peddinghaus*, 692 N.E.2d 1221, 1225 (Ill. App. Ct. 1st Dist. 1998) (citing *Wolff v. Ampacet Corp.*, 673 N.E.2d 745, 749 (Ill. App. Ct. 1st Dist. 1996)). In general, the remedy of unjust enrichment is not available when a specific contract governs the

parties' relationship. *People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992) (quoting *La Throp v. Bell Fed. Sav. & Loan Ass'n*, 370 N.E.2d 188, 195 (Ill. 1977). Nevertheless, where a "plaintiff's unjust enrichment claim is based on tort, instead of quasi-contract, the existence of a specific contract does not defeat his cause of action." *Peddinghaus*, 692 N.E.2d at 1225. Finally, whether unjust enrichment is an independent cause of action or whether it must be tied to an underlying claim in tort, contract, or statute is unsettled in Illinois. *Compare Raintree Homes, Inc. v. Vill. of Long Grove*, 807 N.E.2d 439, 445 (Ill. 2004) ("Here, plaintiffs have no substantive claim grounded in tort, contract, or statute; therefore the only substantive basis for the claim is restitution to prevent unjust enrichment."), *with Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 3rd Dist. 2009) ("[U]njust enrichment is not a separate cause of action that, standing alone, will justify an action for recovery."). In attempting to reconcile the apparent inconsistencies, the Seventh Circuit has suggested:

> Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust. What makes the retention of the benefit unjust is often due to some improper conduct by the defendant. And usually this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute.

*Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) *reh'g and suggestion for reh'g en banc denied* (Nov. 15, 2011). Thus, if an unjust enrichment claim is based on the same underlying conduct that forms the basis of a claim in contract, tort, or statute, "then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Id.*

In seeking to dismiss Reid's unjust enrichment claim, Unilever argues that under Illinois State law, unjust enrichment does not apply where a specific contract exists. (R. 25, Def.'s

Mem. at 14) (citing *Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 902 (7th Cir. 2006)). In making this argument, Unilever appears to contend that to the extent that Reid's unjust enrichment claim is based on the same conduct alleged in Plaintiffs' breach of express warranties claims in Count I, her unjust enrichment claim should be dismissed. In response, Reid argues that "[a]lthough an unjust enrichment claim is incompatible with the existence of a specific contract, there is no specific contract before the Court and Plaintiffs have not alleged a breach of contract claim." (R. 34, Pls.' Resp. at 14.) Contrary to Reid's argument, and as discussed above, her claims for breach of express warranties in Count I arises in contract. *Collins Co., Ltd. v. Carboline Co.*, 532 N.E.2d at 838. Again, Illinois State law is clear that a claim for unjust enrichment is not available where the claim rests on the breach of a contract. *See Shaw*, 461 F.3d at 900 (applying Illinois law and affirming dismissal of the plaintiff's unjust enrichment claim because it rested on the breach of an express contract.) Nevertheless, Reid argues that under Federal Rule of Civil Procedure 8(d)(2), she is allowed to plead alternative claims despite any inconsistencies between those claims. (R. 34, Pl.'s Resp. at 14) (citing *In re Bridgestone/Firestone, Inc. Tires Prods. Liability Litig.*, 155 F. Supp. 2d 1069, 1116 (S.D. Ind. 2001)). "[A] party may plead a claim for unjust enrichment in the alternative where the existence of a valid contract is questioned." *Hickman v. Wells Fargo Bank N.A.*, 683 F. Supp. 2d 779, 797 (N.D. Ill. 2010). Here, there is a dispute over the existence of a contract and it is uncertain whether Plaintiffs will prevail on their breach of express warranty claims in Count I. Furthermore, to the extent that Reid's unjust enrichment claim is based on the same conduct underlying what survives of her ICFA claim— specifically, Unilever's alleged failure to disclose and warn—it remains viable. *See Cleary*, 656 F.3d at 518; *Sirazi v. Gen. Mediterranean Holding, SA*, No. 12 C 0653, 2013 WL 812271, at *9 (N.D. Ill. Mar. 5, 2013) (finding "no basis to dismiss [an] unjust enrichment claim" where the

plaintiffs' underlying fraud claim survived the defendant's motion to dismiss). Thus, the Court declines to dismiss Reid's unjust enrichment claim on the grounds that it is not viable under Illinois law.

### C. Whether Reid has pleaded sufficient facts to state a claim for unjust enrichment

Unilever also argues that Reid's unjust enrichment claim should be dismissed because "the Complaint fails to adequately plead a cause of action." (R. 25, Def.'s Mem. at 15.) Again, to adequately plead a claim for unjust enrichment, a plaintiff must "allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc.*, 545 N.E.2d at 679. Reid alleges that she purchased the Hair Treatment in March 2012 for approximately eleven dollars and that her hair fell out after she applied the Hair Treatment. (R. 1, Compl. ¶ 49.) Reid then contacted Unilever in April 2012, and again in July 2012, but as of the date on which the Complaint was filed she had yet to receive a refund for her purchase. (*Id.* ¶ 58.) According to Reid, Unilever has been unjustly enriched by retaining the revenues it has derived from her purchase of the Hair Treatment. (*Id.* ¶ 112.) Reid further alleges that the retention of such revenue "is unjust and inequitable." (*Id.*) These allegations state a plausible claim for relief. Therefore, the Court declines to dismiss Reid's unjust enrichment claim. Therefore, the Court grants Unilever's motion to dismiss Lake's unjust enrichment claim in Count VI, but denies Unilever's motion to dismiss Reid's unjust enrichment claim in Count VI.

**MOTION TO LIMIT OR SUPERVISE UNILEVER'S COMMUNICATIONS**

On November 8, 2012, Plaintiffs separately moved to limit or supervise Unilever's communications and settlements with putative class members. (R. 30, Pls.' Mot. Limit Commc'ns.) Plaintiffs ask the Court to: (1) limit Unilever's future communications with potential class members by specifically prohibiting misleading communications altogether, (R. 31, Pls.' Mem. Limit Commc'ns at 18); (2) vacate all settlement releases obtained since the action commenced, (*id.* at 9, 16-17); (3) order that a corrective notice be issued, (*id.* at 9, 17); and (4) order Unilever to produce to Plaintiffs "copies of all [of] Unilever's communications and purported releases with putative class members, procured since the filing" of this action, (*id.* at 9, 17-18). In the main, Plaintiffs argue that "Unilever has engaged in efforts to settle claims of putative class members without notice to Plaintiffs' counsel and by providing information that is incomplete, false, and misleading." (R. 30, Pls.' Mot. Limit Commc'ns ¶ 2.) In support of their motion, Plaintiffs have also submitted the declarations, signed under penalty of perjury, of two customers whose hair was damaged as a result of using the Hair Treatment. (R. 30, Pls.' Mot. Limit Commc'ns, Santiago Decl. at 8-12; R. 30, Pls.' Mot. Limit Commc'ns, Wester Decl. at 18-20.)

On November 28, 2012, Unilever filed its opposition to Plaintiffs' motion to limit or supervise Unilever's communications. (R. 35, Def.'s Opp. Limit Commc'ns.) Unilever contends that Plaintiffs' motion should be denied because they have not satisfied their burden of proving coercion or abuse of potential class members. (*Id.* at 6-14.) In addition, Unilever argues that there is no basis on which to void the existing releases, especially in light of the fact that the class has not yet been certified. (*Id.* at 16.) Unilever next argues that because Plaintiffs have failed to establish that misconduct occurred, there is no basis for sending a corrective notice to

45

potential class members. (*Id.* at 14-15.) Finally, Unilever asserts that Plaintiffs' demand for discovery is premature. (*Id.* at 15-16.) In support of its opposition, Unilever has submitted a declaration, signed under penalty of perjury, of its claims specialist, Barbara Kivlehan. (R. 35-1, Kivlehan Decl. at 1-3.)

On December 6, 2012, Plaintiffs filed their reply in support of their motion to limit or supervise Unilever's communications. (R. 36, Pls.' Reply Limit Commc'ns.) On reply, Plaintiffs argue that "Unilever's communications [with potential class members] are clearly misleading, both in what is conveyed and, more importantly, what is not conveyed." (*Id.* at 5.) According to Plaintiffs, the notice that Unilever provided to potential class members regarding the instant action is insufficient because it "failed to provide putative class members with all of the necessary and material information they needed to make an informed decision regarding Unilever's [release]." (*Id.* at 6, 10.) Plaintiffs also assert that because "it is Unilever that seeks to obtain a full release of all claims against it, it must show its entitlement to do so; Unilever cannot simply shift the burden to putative class members." (*Id.* at 6-7.) The Court addresses each argument in turn.

## I.       Legal standard

Generally, either side has the right to communicate with putative class members. *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 759 (7th Cir. 2000) (citing *EEOC v. Mitsubishi Motor Mfg. of Am., Inc.*, 102 F.3d 869, 870 (7th Cir. 1996)). Nevertheless, the Supreme Court has held that under Federal Rule of Civil Procedure 23(d), a district court has the authority to restrict communications between a party and prospective class members. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). "The discretion to issue such orders has been vested with the trial courts because it is well-recognized that class actions present opportunities

46

for abuse as well as problems for courts and counsel in the management of cases." *Williams*, 204

F.3d at 759 (internal citations omitted); *see also Gulf Oil Co.*, 452 at 100 ("Because of the

potential for abuse, a district court has both the duty and the broad authority to exercise control

over a class action and to enter appropriate orders governing the conduct of counsel and

parties."). Such discretion, however, is not unlimited. *Gulf Oil Co.*, 452 at 100 (citing *Eisen v.*

*Carlisle & Jacquelin*, 417 U.S. 156 (1974)). In acknowledging the potential for abuse in class

actions, and simultaneously recognizing the rights of class representatives and their counsel to

communicate with potential class members, the Supreme Court has held that:

> [A]n order limiting communications between parties and potential class members
> should be based on a clear record and specific findings that reflect a weighing of
> the need for a limitation and the potential interference with the rights of the
> parties. . . . In addition, such a weighing—identifying the potential abuses being
> addressed—should result in a carefully drawn order that limits speech as little as
> possible, consistent with the rights of the parties under the circumstances.

*Id.* at 101-02; *Williams*, 204 F.3d at 759.

The moving party bears the burden of establishing "a specific record showing . . . the

particular abuses by which it is threatened." *Gulf Oil*, 452 U.S. at 102 (quoting *Coles v. Marsh*,

560 F.2d 186, 189 (3d Cir. 1977)). Although *Gulf Oil* concerned communications between

counsel for class representatives and potential class members, "its rationale has been found to

apply to communications between defendants and potential class members as well." *Ralph*

*Oldsmobile Inc. v. Gen. Motors Corp.*, No. 99 Civ. 4567(AGS), 2001 WL 1035132, at * 2

(S.D.N.Y. Sept. 7, 2001) (citing *Bublitz v. E.I. DuPont de Nemours & Co.*, 196 F.R.D. 545, 547

(S.D. Iowa 2000); *Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 675 n.1 (N.D. Ga. 1999)).

Furthermore, *Gulf Oil*'s recognition of a district court's power to restrict communications

between parties and potential class members has been found to apply even before a class is

47

certified. *Id.* (citing *Bublitz*, 196 F.R.D. 545; *Burrell v. Crown Cent. Petroleum, Inc.*, 176 F.R.D. 239, 242-43 (E.D. Tex. 1997)).

## II. Whether Plaintiffs have met their burden of establishing a specific record of abusive tactics

Before the Court may restrict Unilever's ability to communicate with potential class members, Plaintiffs must meet their burden of showing that Unilever has engaged in, or has threatened to engage in, coercive, misleading, or other abusive communications with the putative class. *See Camilotes v. Resurrection Health Care Corp.*, No. 10 C 366, 2012 WL 245202, at *4 (N.D. Ill. Jan. 25, 2012) (citing *Jones v. Nat'l Council of Young Men's Christian Ass'ns,* No. 09 C 6437, 2011 WL 1312162, at *6 (N.D. Ill. Mar. 31, 2011); *O'Brien v. Morse*, No. 02 C 50026, 2002 WL 1290392, at *2 (N.D. Ill. June 11, 2002)). Plaintiffs fail to meet this burden.

Plaintiffs contend that the materials and information that Unilever provided to potential class members "are inherently coercive and misleading" because they "fail to provide information about the class action, fail to identify class counsel, fail to provide any detail regarding the claims alleged, fail to explain class procedures, and fail to explain the consequences of a pre-certification settlement." (R. 31, Pls.' Mem. Limit Commc'ns at 12.) Plaintiffs rely on a case from the Northern District of California, *Cnty. of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237 (9th Cir. 2009) *rev'd* 131 S. Ct. 1342 (2011), for the proposition that the "mere mention of the existence of a class action is not enough to sufficiently apprise class members considering a monetary payment in lieu of participation in the case." (*Id.* at 14.) In Plaintiffs' view, Unilever's communications with potential class members "do not inform consumers of the benefits of litigating this case as a class action." (*Id.* at 13.) Plaintiffs also argue that Unilever's communications with potential class members are improper because Unilever makes "specific inquiries that influence the underlying litigation." (*Id.* at 14-15.)

In response, Unilever argues that Plaintiffs have not satisfied their burden of proving coercion or abuse of potential class members. (R. 35, Def.'s Opp. Limit Commc'ns at 8.) Unilever contends that it is undisputed that "following the filing and service of the lawsuit on Unilever in New Jersey, Unilever has carefully disclosed the name of the class action, together with the case number and the court, both in the text of the proposed releases that it sends to consumers and in the cover letter that accompanies them." (*Id.* at 9) (citing R. 35-1, Kivlehan Decl., ¶¶ 4-6.) Unilever contends that it is also undisputed "that each of Unilever's contacts with consumers of the [Hair Treatment] has begun with a call or an email from a consumer to the Unilever Consumer Services Group." (*Id.* at 8.) Thus, Unilever maintains that it has exercised its legal right to communicate with consumers, address their concerns, and obtain a release where both parties agree to reach a settlement. (*Id.* at 10.)

Coercion is defined as "[c]ompulsion by physical force or threat of physical force" or "[c]onduct that constitutes the improper use of economic power to compel another to submit to the wishes of one who wields it." Black's Law Dictionary 294-95 (9th ed. 2009). Courts have found that a party has the potential to engage in coercive tactics during class action litigation where there is a business relationship, such as an employer or employee relationship, between the parties. *See Kleiner v. First Nat'l Bank of Atl.*, 751 F.2d 1193, 1202 (11th Cir. 1985) ("[I]f the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive.") (citing Note, *Developments in the Law-Class Actions*, 89 Harv. L. Rev. 1318, 1600 (1976)); *see also Burrell*, 176 F.R.D. at 244 ("[T]he court recognizes that an ongoing business relationship, such as employee and employer, may cause communications between litigants to be coercive."). In *Kleiner*, for instance, in affirming the district court's order to limit communications with class

members, the Eleventh Circuit found that the defendant bank had engaged in coercive litigation tactics. 751 F.2d at 1202-03. There, after the class had already been certified, the defendant bank hastily designed and embarked upon a secret telephone campaign to solicit potential class members to opt out of the class, which campaign coincided with the trial judge's vacation. *Id.* at 1196. The Eleventh Circuit noted that the class consisted of the defendant bank's borrowers, "many of whom were dependent on the Bank for future financing." *Id.* at 1202. After hiring 175 loan officers to complete this endeavor, the defendant bank succeeded in contacting "a little over 3000 customers, nearly 2800 of whom decided to exclude themselves." *Id.* at 1198.

Similarly, in *Hampton Hardware, Inc. v. Cottler & Co., Inc.*, a hardware retailer that was a member of a cooperative hardware wholesaler filed a putative class action against the wholesaler. 156 F.R.D. 630, 630 (N.D. Tex. 1994). The defendant wholesaler sent potential class members, who were other member retailers, three letters asking the class members not to participate in the suit and warning of dire financial consequences to the wholesaler, and therefore its member retailers, should the potential class members participate in the action. *Id.* at 631-32. Relying on *Kleiner*, the district court found a potential for coercion. *Id.* at 633. The district court noted that the potential class members "must necessarily rely upon the defendant for dissemination of factual information regarding hardware goods and for lower prices in purchasing those goods. They are therefore particularly susceptible to believing the defendant's comments that the lawsuit will cost them money." *Id.* More recently, in *Ralph Oldsmobile*, a car dealer franchisee brought suit against the franchisor car manufacturer. 2001 WL 1035132, at *1. There, the district court held that a "finding of potential coercion" was warranted, even though there was no evidence of actual coercion, because the potential class members, the franchisee car dealers, depended on the defendant franchisor "for information, supplies, and credit." *Id.* at *4.

The district court noted that, "[l]ike the borrowers in *Kleiner* who had no other source of credit, the [franchisee car] dealers have no other source of [the franchisor car manufacturer's] vehicles." *Id.* The district court reasoned that this was important because the "continued success and, indeed existence" of the franchisor car dealers was dependent on the franchisor car manufacturer's good will. *Id.*

As in *Ralph Oldsmobile*, Plaintiffs have not presented any evidence of actual coercion. 2001 WL 1035132, at *4. The potential class members in this action are free to refuse to sign the release and may choose to forgo the refund offer that Unilever makes to them. Indeed, there is no evidence that Reid, Lake, or declarants Santiago and Wester, have signed the releases.

The July 31, 2012, letter that Unilever sent to Santiago provides, in pertinent part:

> [W]e are willing to offer you a check in the amount of $70.00. In order to complete our files, enclosed is a general release, which we request you sign and date. . . . Our receipt of the notarized release will conclude this matter and we will promptly forward your check.

(R. 30, Pls.' Mot. Limit Commc'ns, Santiago Decl., Ex. 1-A at 14.) The October 4, 2012, letter that Unilever sent to Wester states, in relevant part:

> While we do not acknowledge liability . . . we are willing to offer you a check in the amount of $110.00. For your consideration of this settlement proposal, we want to make sure you are aware that a class action about this product has been filed in the United States District Court for the Northern District of Illinois, Reid, et al. v. Unilever, Case No. 12-06058.
>
> Should you wish to accept our offer, in order to complete our files, enclosed is a general release, which we request you sign and date . . . Our receipt of the notarized release will conclude this matter and we will promptly forward your check.

(R. 30, Pls.' Mot. Limit Commc'ns, Wester Decl., Ex. 2-A at 22.) A reading of the letters that Unilever sent to Santiago and Wester demonstrates that Unilever did not use intimidation, force, or threats when communicating with putative class members. Unlike the letters at issue in

*Hampton Hardware*, 156 F.R.D. 631-32, Unilever's letters made no explicit or implicit threats of dire financial consequences to potential class members in the event they chose to forgo Unilever's offer.

Nor can the Court conclude that a finding of potential coercion is warranted here. *See Ralph Oldsmobile*, 2001 WL 1035132, at *1. Unlike the business relationships that were at issue in *Kleiner*, *Hampton Hardware*, and *Ralph Oldsmobile*, the parties' relationship here is not of the same nature as the business relationships therein at issue. None of the class members are dependent on Unilever for their financial livelihood in the same way that the potential class members were dependent on the defendants in those cases, and thus it cannot be said that the business relationship between Unilever and the potential class members is inherently coercive.

Even if the business relationships herein at issue were inherently coercive such that a finding of potential coercion was warranted, the Court must also have a clear record of the abusive litigation tactics taken by a Unilever. *See Burrell*, 176 F.R.D. at 244 ("where there is a relationship that is inherently coercive, the court need not make a finding that a particular abuse has occurred. However, the cases do not eradicate the requirement of a clear record of the *threatened* abuses.") (emphasis in original). Courts have found abusive litigation tactics to exist where the opposing party's communications simply fail to mention the class actions, resulting in the potential for unknowing waivers by the potential class members due to a lack of information, *see Ralph Oldsmobile*, 2001 WL 1035132, at *4, or where the communications attempt to prevent class members from participating in the class action through the use of implicit threats, *Hampton Hardware*, 156 F.R.D. at 632-33. Where there are no threats to the potential class members for participating in a class action, nor any evidence that a party misled the potential class members or discouraged their participation in the suit, courts have found that the moving

party has failed to meet its burden. *See Burrell*, 176 F.R.D. at 245 (denying motion to limit communications with class members where there was "no evidence that the company misled the employees . . . or that the company tried to discourage participation in the lawsuit"); *Dominguez v. Don Pedro Rest.*, No. 2:06 CV 241, 2007 WL 1650289, at *2 (N.D. Ind. June 1, 2007) (denying motion to limit class communications, in part, where there was no allegation that the defendant misrepresented facts to the potential class members).

Plaintiffs have not provided the Court with any such evidence. Although Plaintiffs contend that "Unilever failed to mention the class action" in its communications with potential class members, the record flatly contradicts this assertion. As Unilever's claims specialist attests, any communications with potential class members since August 6, 2012—the date on which Unilever's Consumer Services group was informed of the instant action—have disclosed the existence of the instant action and have included "the case name, the court in which it is pending, and the case number." (R. 35-1, Kivlehan Decl. ¶ 4.) The record before the Court supports Kivlehan's declaration. As Unilever correctly points out, the July 31, 2012 letter that Ms. Santiago received did not mention the instant suit "because the lawsuit did not exist when Unilever sent those materials." (R. 35, Def.'s Opp. Limit Commc'ns at 9.) By contrast, the October 4, 2012 letter that Wester received did mention the instant action.

The other purported failures that Plaintiffs rely upon in support of their motion, such as Unilever's purported failure to identify class counsel or explain class action procedures, (R. 31, Pls.' Mem. Limit Commc'ns at 12-13), are not the types of failures that courts have found constitute abusive litigation tactics and therefore lack merit. As Unilever points out, Unilever should not be required to "endorse and circulate advertising for the law firms that would like to represent this putative class." (R. 35, Def.'s Opp. Limit Commc'ns at 15.)

Finally, Plaintiffs also argue that Unilever's communications with potential class members are improper because "they make specific inquiries that influence the underlying litigation." (R. 31, Pls.' Mem. Limit Commc'ns at 14-15.) As a result, Plaintiffs contend that "Unilever's requests for information . . . are transactional, rather than information, in nature." (*Id.*) Specifically, Plaintiffs contend that Unilever's communications are improper because the "[q]uestions asked of class members pertain to their potential damages and the cause of the damage," and because "Unilever's representatives do not ask consumers whether they are represented by counsel before asking the aforementioned questions." (*Id.* at 15.) In support, Plaintiffs rely on an order from the Southern District of New York, *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 253 (S.D.N.Y 2005). In that action, however, the credit card company defendants unilaterally changed the terms of their cardholder agreements to include an arbitration clause for all credit card disputes after the class action commenced. *Id.* at 249. Each potential class member was a cardholder who received the change in terms notice. *Id.* at 251. The district court noted that each of the cardholders depended "on defendants for their credit needs," and as a result, the credit card companies' actions were potentially coercive and improper. *Id.* at 253. The district court then concluded that the credit card companies' "unsupervised communications were improper because they sought to eliminate putative class members' rights in this litigation." *Id.* at 254. By contrast, here there is no evidence that Unilever improperly sought to eliminate potential class members' rights in this action. Instead, Reid and Lake allege that they contacted Unilever after using the Hair Treatment and asked what Unilever intended to do as a result of the damage. (R. 1, Compl. ¶¶ 53, 58.) Similarly, Santiago also contacted Unilever on her own initiative. (R. 30, Pls.' Mem. Limit Commc'ns at 9, Santiago Decl. ¶ 9.) It was only after these initial contacts that Unilever sought additional information

about the damage caused by the Hair Treatment. Plaintiffs have not presented evidence to establish a clear and specific record that Unilever's communications were designed to simply eliminate any rights that potential class members have in this action. Furthermore, and perhaps to the displeasure of Plaintiffs' counsel, Unilever is entitled to settle cases with putative class members prior to class certification. *See Weight Watchers of Phila., Inc. v. Weight Watchers Int'l*, 455 F.2d 770, 773 (2d Cir. 1972) ("we are unable to perceive any legal theory that would endow a plaintiff who has brought what would have been a 'spurious' class action . . . with a right to prevent negotiation of settlements between the defendant and other potential members of the class who are of a mind to do this."). Nor have Plaintiffs established that Unilever's purported failure to ask potential class members if they are represented by counsel constitutes an abusive litigation tactic. *See Camilotes*, 2012 WL 245202, at * 7 ("The fact that Defendants did not tell the [putative class members] that they could review the declarations with an attorney is also insufficient to establish a clear record of abusive communications.") On the basis of the record before the Court, Plaintiffs have failed to meet their burden of establishing a clear and specific record that Unilever's communications with potential class members are coercive and misleading and undermine the purposes of Federal Rule of Civil Procedure 23. The Court therefore denies Plaintiffs' request to limit Unilever's communications with potential class members.

## II.     Plaintiffs' request that the Court vacate all releases Unilever has obtained since the instant action commenced

Plaintiffs next ask the Court to treat all releases obtained by Unilever as void to remedy Unilever's purported violations of Federal Rule of Civil Procedure 23. (R. 31, Pls.' Mem. Limit Commc'ns at 16.) As discussed above, Plaintiffs have not established a clear and specific record that Unilever's communications with potential class members undermined the purposes of Rule

23. Accordingly, the Court declines to grant Plaintiffs' request to vacate all settlements obtained by Unilever since this action was filed. Such an order is premature as Unilever's communications "are not so inherently inappropriate as to require such a drastic remedy." *Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758, 767-68 (N.D. Ohio 2010) (concluding that an order to rescind or void releases that defendant obtained from potential class members was premature) (citing *Ralph Oldsmobile*, 2001 WL 1035132, at *7); *see also Jones*, 2011 WL 1312162, at *5-*6 (denying plaintiffs' request, *inter alia*, to order that potential class members who provided defendant with releases be given the opportunity rescind them).

## III.  Plaintiffs' request that a corrective notice be issued

Plaintiffs also ask the Court to order Unilever to send potential class members "a curative notice that explains this case and the role of class counsel and the Court, and it should apprise potential class members of the pertinent procedural aspects of the class action designed to protect them." (R. 36, Pls.' Reply Limit Commc'ns at 13.) Plaintiffs argue that "[o]nly through such a notice will the deficiencies in the prior communications by Unilever be cured." (R. 31, Pls.' Mem. Commc'ns at 17.) Because Plaintiffs have failed to establish that Unilever's prior communications were deficient, however, there is no basis for sending to potential class members the corrective notices that Plaintiffs request. Thus, the Court denies Plaintiffs' request for an order compelling Unilever to send corrective notices to the putative class.

## IV.  Plaintiffs' request that Unilever produce all contacts and communications with the putative class to Plaintiffs' counsel

Plaintiffs further request that this Court issue an order directing Unilever to produce to Plaintiffs "copies of all [of] Unilever's communications and purported releases with putative class members, procured since the filing" of this action. (R. 31, Pls.' Mem. Limit Commc'ns at 18.) Unilever argues that Plaintiffs' request for discovery is premature. (R. 35, Def.'s Opp.

Limit Commc'ns at 15.) First, considering that the Court granted in part and denied in part Unilever's motion to dismiss, both parties may proceed with discovery as will be discussed below with respect to Plaintiffs' motion for approval to serve discovery. (R. 41, Pls.' Mot. Disc.)

Second, although the Court finds that Plaintiffs have not established a "specific record" showing that Unilever's communications with putative class members were coercive or misleading, Plaintiffs are entitled to copies of any communications and releases signed by potential class member. The communications and releases requested by Plaintiffs are subject to disclosure as discovery under the Federal Rules of Civil Procedure. Fed. R. Civ. P. 26(b)(1); *Camilotes*, 2012 WL 245202, at *7 (finding that plaintiffs were entitled to copies of potential class members' declarations); *see also Kuhl v. Guitar Ctr. Stores, Inc.*, No. 07 C 0214, 2008 WL 5244570, at *6 (N.D. Ill. Dec. 16, 2008) (ordering defendants to produce signed employee statements because they did "not contain any legal advice, litigation strategy, or confidential communications"); *Dominguez*, 2007 WL 1650289, at *3 (noting that signed affidavits are "subject to disclosure as discovery"). Thus, the Court orders Unilever to produce to Plaintiffs' counsel copies of all of its communications and releases with potential class members that it has procured since the filing of this action.

## MOTION FOR APPROVAL TO SERVE DISCOVERY

On February 22, 2013, Plaintiffs also moved for approval to serve their first requests for production of documents ("Plaintiffs' Requests") on Unilever. (R. 41, Pls.' Mot. Disc.) On March 14, 2013, Unilever filed its opposition to Plaintiffs' motion for approval of discovery. (R. 46, Def.'s Opp.) Unilever requested that the Court deny Plaintiffs' motion and instead defer discovery until the Court ruled on the pending motion to dismiss. (*Id.* at 4-12.) On March 21, 2013, Plaintiffs filed their reply. (R. 47, Pls.' Reply.) Because the Court has now ruled on the

motion to dismiss, and has not dismissed the Complaint in its entirety, the Plaintiffs' motion is now ripe for adjudication. In its opposition, Unilever renews its request to bifurcate discovery into two steps[12]—the first relating to class certification, and the second relating to the merits— and characterizes the scope of Plaintiffs' Requests as "particularly extreme." (R. 46, Def.'s Opp. at 2-3, 7.)

## I.    Whether bifurcation of discovery is proper

"[D]istrict courts have broad discretion in discovery matters." *James v. Hyatt Regency Chi.*, 707 F.3d 775, 784 (7th Cir. 2013) (citing *Kalis v. Colgate–Palmolive Co.*, 231 F.3d 1049, 1056 (7th Cir. 2000). This discretion extends to a district court's decision to bifurcate discovery. *Ocean Atl. Woodland Corp. v. DRH Cambridge Homes, Inc.*, No. 02 C 2523, 2004 WL 609326 (N.D. Ill. Mar. 23, 2004) (citing *Moriarty v. LSC Ill. Corp.*, No. 98 C 7997, 1999 WL 1270711, at *7 (N.D. Ill. Dec. 29, 1999); *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1171 (7th Cir. 1998); *Priority Records, Inc. v. Bridgeport Music, Inc.*, 907 F. Supp. 725, 734 (S.D.N.Y. 1995); *Am. Nurses Ass'n. v. State of Ill.*, No. 84 C 4451, 1986 WL 10382, at *2 (N.D. Ill. Sept.12, 1986)). Although the Federal Rules of Civil Procedure do not explicitly allow for bifurcated discovery, the advisory committee notes to Rule 23 recognize that bifurcation may be appropriate in the class action context. Fed. R. Civ. P. 23, Advisory Committee Notes, 2003 amendments. Specifically, the advisory committee notes provide: "It is appropriate to conduct controlled discovery into the 'merits,' limited to those aspects relevant to making the certification decision on an informed basis." *Id.* When ruling on motions to bifurcate class certification and merits discovery, courts consider the following factors:

---

[12] In the parties' joint initial status report, Unilever stated that "it would be efficient and appropriate in this case to bifurcate discovery on the class certification issues." (R. 27, Joint Status Report at 4.)

> (1) expediency, meaning whether bifurcated discovery will aid the court in making a timely determination on the class certification motion; (2) economy, meaning the potential impact a grant or denial of certification would have upon the pending litigation and whether the definition of the class would help determine the limits of discovery on the merits; and (3) severability, meaning whether class certification and merits issues are closely enmeshed.

*Harris v. comScore, Inc.*, No. 11 CV 5807, 2012 WL 686709, at *3 (N.D. Ill. Mar. 2, 2012) (internal quotation marks and citations omitted). The Manual for Complex Litigation advises that "[d]iscovery relevant only to the merits delays the certification decision and may ultimately be unnecessary." Manual for Complex Litigation (Fourth), § 21.14. Where merits bifurcation would result in significant duplication and expense, however, the Manual for Complex Litigation suggests that discovery proceed concurrently. *Id.* § 11.213.

Unilever argues that compliance with Plaintiffs' discovery requests "would be burdensome, and potentially wasteful, not only of private resources but also potentially of the Court's time." (R. 46, Def.'s Opp. at 7.) Turning to the factors set forth above, the Court first finds that bifurcated discovery will allow the Court to reach a decision on the issue of class certification more expeditiously than it otherwise would, as proceeding with merits discovery may delay the parties' submission of their briefs on the class certification issue. *See Harris*, 2012 WL 686709, at *3. Second, it is axiomatic that defining the class will make it easier to determine the limits of discovery on the merits. Third, while the Court recognizes that "[t]he boundary between a class determination and the merits may not always be easily discernible," *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130, U.A.*, 657 F.2d 890, 895 (7th Cir. 1981), it is possible to discern the general lines in this action. As the Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes*:

> Class certification is governed by Federal Rule of Civil Procedure 23. Under Rule 23(a), the party seeking certification must demonstrate, first, that:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class

Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b).

--- U.S. ---, ---, 131 S. Ct. 2541, 2548-49 (2011) (internal alterations and quotation marks omitted.) The inquiry into numerosity is whether "a class approach would be useful to avoid the practical problems of trying to join many named plaintiffs or otherwise clog the docket with numerous individual suits." *Eggleston*, 657 F.2d at 895. Thus, the certification process seeks to determine the approximate number of potential class members. *Harris*, 2012 WL 686709, at *3. Regarding commonality, the inquiry is whether there are common questions of fact or law. *Eggleston*, 657 F.2d at 895. Here, the commonality prong will likely turn on whether potential class members experienced hair loss after using the Hair Treatment. Third, typicality "requires a showing, not unrelated to commonality, that others suffer from similar alleged grievances." *Id.* at 896. The typicality prong here is likely to turn on whether Reid's and Lake's alleged injuries are similar to those of the potential class members. Fourth, the adequacy prong turns on whether the named Plaintiffs "will fairly and adequately protect the interests of the class members who are not personally involved in the litigation." *Id.* It is to these questions that Plaintiffs' class certification discovery must be tailored. While the Court recognizes that the class certification and merits issues may overlap in some respects, this alone is not enough to overcome the efficiency benefits to be gained from bifurcated discovery. Furthermore, bifurcation will not impede Plaintiffs' ability to gain access to future merits discovery as Unilever has asserted that it

is actively complying with the document preservation obligations imposed on it by law. (R. 46, Def.'s Opp. at 8.) Thus, after careful review of Plaintiffs' motion and Unilever's opposition, the Court finds that in the interest of convenience and judicial economy, bifurcating class certification from merits discovery is appropriate.

## II.     Whether Plaintiffs' requests for production are overly broad

The Court next turns to the specific requests for production of documents that Plaintiffs' seek to propound on Unilever. Federal Rule of Civil Procedure 26(b)(1), governing the scope of discovery, provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." Fed. R. Civ. P. 26(b)(1). Rule 26(b)(1) also allows the trial court for "good cause, [to] order discovery of any matter relevant to the subject matter involved in the action." *Id.* "Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

As discussed above, at this stage of the proceedings discovery should be focused on whether Plaintiffs will be able to meet Federal Rule of Civil Procedure 23's requirements for class certification. Unilever argues that the scope of Plaintiffs' discovery is "particularly extreme," because Plaintiffs purport to require production of documents related to products other than the Hair Treatment at issue, (Requests 23-24), documents generated outside the relevant time period, (Requests 21-22, 25), and documents related to any and all consumers who used the Hair Treatment, (Requests 47, 56-63, 71). (R. 46, Def.'s Opp. at 7.) Unilever contends that compliance with these requests "would require Unilever to produce thousands of documents, collected from offices in both the United States and abroad." (*Id.*)

The Court agrees with Unilever that some of Plaintiffs' requests are overbroad and unrelated to the issue of class certification. Specifically, the Court finds that Requests 21-25 are overly broad and unduly burdensome at this stage of the proceedings. The Court disagrees, however, that Requests 47, 56-63, and 71 are overly broad and unrelated to the issue of class certification. With respect to these requests, the Court finds that Unilever's communications with putative class members relating to consumer complaints about the Hair Treatment or its recall are relevant to the class certification issue.

Thus, the Court grants Plaintiffs' motion to serve their first request for production of documents in part. In the interest of promoting judicial efficiency, the Court orders that discovery be bifurcated between class certification and merits discovery and grants Plaintiffs' motion to serve Unilever with a request for production of documents relevant to the issue of class certification. To the extent that documents requested by Plaintiffs are relevant to both class certification and merits issues, Unilever must disclose such documents, despite the overlap.

## CONCLUSION

For the foregoing reasons, Unilever's motion to dismiss (R. 23) is GRANTED in part and DENIED in part. Specifically, the Court denies Unilever's motion as to Plaintiffs' breach of warranty claims in Counts I and II and grants it as to Plaintiffs' claims alleging violations of the Illinois and Alabama UDTPA in Count IV. The Court grants Unilever's motion as to Count III, to the extent that Plaintiffs base their ICFA and ADTPA claims on alleged misrepresentations. To the extent that Plaintiffs' claims in Count III are grounded on an alleged failure to disclose or warn, the Court denies Unilever's motion. The Court denies Unilever's motion as to Count V, to the extent that Plaintiffs base their Magnuson-Moss Act claim on a breach of express warranty, and grants the motion to the extent that Plaintiffs base their Magnuson-Moss Act claim on a

breach of an implied warranty. Finally, the Court grants Unilever's motion to dismiss Lake's unjust enrichment claim in Count VI, and denies the motion to dismiss Reid's unjust enrichment claim in Count VI.

Plaintiffs' motion to limit or supervise Unilever's communications with the putative class (R. 30) is GRANTED in part and DENIED in part. Specifically, the Court grants the motion only to the extent that Plaintiffs seek an order requiring Unilever to produce copies of its communications and purported releases with putative class members since the filing of the instant action. The Court denies the motion in all other respects.

Plaintiffs' motion for approval to serve discovery (R. 41) is GRANTED in part and DENIED in part. The parties shall immediately proceed with discovery on class certification issues.

The parties are directed to reevaluate their settlement positions in light of this opinion and to exhaust all efforts to settle this case. The parties shall appear for a status hearing on August 29, 2013 at 9:45 A.M.

ENTERED:

Chief Judge Ruben Castillo
United States District Court

Dated: August 7, 2013