# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SIDNEY REID, ALISHA BARNETT, DAWN DAMROW and FRAN PENNEL, on Behalf of Themselves and all Others Similarly Situated, | |
| Plaintiffs, | 1:12-cv-06058 |
| v. | Judge Ruben Castillo |
| UNILEVER UNITED STATES, INC., LEK, INC., and CONOPCO, INC. d/b/a UNILEVER HOME AND PERSONAL CARE USA, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS AND FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION COSTS AND EXPENSES AND INCENTIVE AWARDS TO NAMED PLAINTIFFS**

# TABLE OF CONTENTS

II.   OVERVIEW OF THE LITIGATION PRECEDING SETTLEMENT ..........................................5

   B.   The *Naiser* Lawsuit .......................................................................................................... 7

   C.   The *Wells* Lawsuit ........................................................................................................... 8

III.  THE STANDARD FOR JUDICIAL APPROVAL OF A CLASS ACTION SETTLEMENT .....9

IV.  THE SETTLEMENT CLASS SHOULD BE CERTIFIED FOR SETTLEMENT
PURPOSES ....................................................................................................................................12

    1.   The Class is So Numerous that Joinder is Impracticable ............................................. 12

    2.   The Class Shares Common Questions of Law and Fact ............................................... 13

    3.   Plaintiffs' Claims are Typical of the Claims of the Class ............................................ 15

    4.   Plaintiffs Will Fairly and Adequately Represent the Interests of the Class .................. 16

    5.   The Proposed Settlement Class Also Satisfies Rule 23(b)(3 ........................................ 17

  A.   Common Questions of Law and Fact Predominate .......................................................... 18

  B.   A Class Action is A Superior Method of Adjudication .................................................... 18

V.   THE SETTLEMENT SHOULD BE APPROVED ....................................................................19

    1.   Balancing the Strength of the Plaintiffs' Case on the Merits
Measured Against the Terms of the Settlement Supports Preliminary Approval. ............... 20

    2.   A Balancing of the Complexity, Length, and Expense of Continued Litigation Supports
Approval of the Settlement. ................................................................................................ 21

    3.   The Reaction of Class Members Supports Approval of the Settlement ......................... 22

    4.   The Two Objections to the Settlement Lack Merit and One Was Brought by a Serial
Objector ............................................................................................................................. 25

    5.   Class Counsel Endorses the Settlement, which is the Product of Extensive Arm's Length
Negotiations, Not Collusion ............................................................................................... 33

    6.   The Stage of the Proceedings and the amount of Discovery Completed ....................... 36

VI.  THE SETTLEMENT'S PLAN OF ALLOCATION IS FAIR AND REASONALBE AND
SHOULD BE APPROVED ............................................................................................................37

VII. CLASS COUNSEL'S EFFORTS RESULTED IN THE CREATION
OF A $10.250 MILLION COMMON FUND FOR THE BENEFIT
OF THE CLASS AND ITS REQUESTED ATTORNEY'S FEES ARE
REASONABLE AND SHOULD BE AWARDED BY THIS COURT .............................................39

A. The Court Should Apply the Percentage-Of-The-Fund Approach in Analyzing the Amount of Attorney's Fees to Award Class Counsel ............................................................................ 41

B. Class Counsel's Request for an Attorney's Fee Award of One-Third of the Total Common Fund Made Available to Class Members is Reasonable ........................................................... 42

C. Class Counsel's Extensive Work in Three Separate Class Actions Resulted in an Excellent Result for the Class ................................................................................................................... 44

D. The Lodestar Multiplier Cross-Check Further Confirms the Reasonableness of the Requested One-Third Attorney's Fee Award........................................................................... 45

VIII. THE REQUESTED REIMBURSEMENT OF COSTS AND EXPENSES IS FAIR AND REASONABLE AND SHOULD BE APPROVED .................................................46

IX. INCENTIVE AWARDS ARE WARRANTED FOR THE NAMED PLAINTIFFS...................47

# TABLE OF AUTHORITIES

## Cases

*In re Abbott Labs. Sec. Litig.*,
No. 92-C-3869 MEA, 1995 WL 792083 (N.D. Ill. July 3, 1995)............................................ 49

*Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc.*,
630 F.2d 1164 (7th Cir. 1980)................................................................................................... 10

*Air Lines Stewards & Stewardesses Ass'n v. Am. Airlines, Inc.*,
455 F.2d 101 (7th Cir. 1972)....................................................................................................... 9

*Am. Int'l Grp., Inc. v. ACE INA Holdings Inc.*,
Nos. 07 CV 2898, 09 C 2026, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ............................. 39

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997)........................................................................................................... *passim*

*Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*,
743 F.3d 243 (7th Cir. 2014)..................................................................................................... 48

*Anixter v. Home-Stake Prod. Co.*,
77 F.3d 1215 (10th Cir. 1996)................................................................................................... 23

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
No. 02 Civ. 5575, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ................................................. 41

*In re Apple Computer Sec. Litig.*,
No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ................ 23

*Armstrong v. Bd. of Sch. Dirs. Of Milwaukee*,
616 F.2d 305 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873
(7th Cir. 1998) .............................................................................................. 10, 11, 12, 40

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
789 F. Supp. 2d 935 (N.D. Ill. 2011) .............................................................................. *passim*

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litigation*,
792 F. Supp. 2d 1028 (N.D. Ill. 2011) ...................................................................................... 57

*Beecher v. Able*,
575 F.2d 1010 (2d Cir. 1978)..................................................................................................... 44

*In re Blech Sec. Litig.*,
No. 94 Civ. 7696 (RWS), 2002 WL 31720381 (S.D.N.Y. Dec. 4, 2002)................................. 52

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ................................................................................................................... 46

*Boone v. City of Phila.*,
  668 F. Supp. 2d 693 (E.D. Pa. 2009) ....................................................................... 57

*Bradburn Parent Teacher Store, Inc. v. 3M*,
  513 F. Supp. 2d 322 (E.D. Pa.2007) ........................................................................ 57

*Capsolas v. Pasta Res., Inc.*,
  No. 10-cv-5595 (RLE), 2012 WL 4760910 (S.D.N.Y. Oct. 5, 2012)....................................... 51

*Chavarria v. N.Y. Airport Serv., LLC*,
  875 F. Supp. 2d 164 (E.D.N.Y. June 25, 2012) ........................................................ 51

*In re Chinese-Manufactured Drywall Products Liability Litigation.*,
  MDL No. 2047, 2013 WL 499474 (E.D. La. Feb 7, 2013)...................................................... 34

*Cook v. Niedert*,
  142 F.3d 1004 (7th Cir. 1998)............................................................................ 54, 57

*In re Corrugated Container Antitrust Litig.*,
  643 F.2d 195 (5th Cir. 1981).............................................................................. 19

*In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990)
  ........................................................................................................ 58

*De La Fuente v. Stokley-Van Camp, Inc.*,
  713 F.2d 225 (7th Cir. 1993).............................................................................. 17

*In re Diet Drugs Prod. Liab. Litig.*,
  582 F.3d 524, 558 (3d Cir. 1991).......................................................................... 55

*In re Diet Drugs Prods. Liab. Litig. vs. American Home Products*,
  Nos. 1203, 99–20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) ...................................... 35

*Donovan v. Estate of Fitzsimmons*,
  778 F.2d 298 (7th Cir. 1985).............................................................................. 42

*EEOC v. Hiram Walker & Sons, Inc.*,
  768 F.2d 884 (7th Cir. 1985)............................................................................ 10, 11

*In re FEMA Trailer Formaldehyde Product Liability Litigation.*,
  MDL No. 2:07–MD–1873, 2012 WL 4513344 (E.D. La. Sept. 27, 2012) ................................ 33

*Gaskill v. Gordon*,
  160 F.3d 361 (7th Cir. 1998).............................................................................. 49

*Gaspar v. Linvatec Corp.*,
  167 F.R.D. 51 (N.D. Ill. 1996) ........................................................................... 14

*General Tel. Co. v. Falcon*,
  457 U.S. 147.............................................................................................. 18

*Glasser v. Volkswagen Of Am., Inc.*,
  645 F.3d 1084 (9th Cir. 2011) ............................................................ 38

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................ 19

*Goldsmith v. Tech. Solutions Co.*,
  No. 92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ......................................... 39, 50

*Goldsmith v. Tech. Solutions Co,*
  No. 92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ................................................. 49

*Great Neck Capital Appreciation Inc. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
  212 F.R.D. 400 (E.D. Wis. 2002) ...................................................... 11, 55

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
  142 F.R.D. 588 (S.D.N.Y. 1992) ........................................................ 44

*Hanrahan v. Britt*,
  174 F.R.D. 356 (E.D. Pa. 1997) ......................................................... 40

*Harman v. Lyphomed, Inc.*,
  945 F.2d 969 (7th Cir. 1991).......................................................... 48, 55

*In re Ikon Office Solutions, Inc., Sec. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000) ......................................................... 43

*In re Initial Public Offering Sec. Litig.*,
  721 F. Supp. 2d 210 (S.D.N.Y. 2010), *opinion clarified*, No. 21 MC 92, 2010 WL 5186791
  (S.D.N.Y. 2010) ..................................................................... 29, 30

*Isby v. Bayh*,
  75 F.3d 1195 (7th Cir. 1996)........................................................ *passim*

*Johns v. DeLeonardis*,
  145 F.R.D. 480 (N.D. Ill. 1992) ........................................................ 15

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998)....................................................... 15, 17

*In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*,
  280 F.R.D. 364 (N.D. Ill. 2011) .................................................. 29, 48, 57

*Kirchoff v. Flynn*,
  786 F.2d 320 (7th Cir. 1986)........................................................... 50

*Kurgan v. Chiro One Wellness Centers LLC*,
  Case No. 10–cv–1899, 2014 WL 642092 (N.D. Ill. Feb. 19, 2014) ........................................... 16

*Levitan v. McCoy*,
   No. 00 C 5096, 2003 WL 1720047 (N.D. Ill. Mar. 31, 2003) ...................................................... 13

*In re Linerboard Antitrust Litig.*,
   292 F. Supp. 2d 631 (E.D. Pa. 2003) ...................................................... 40

*In re Lithotripsy Antitrust Litig.*,
   No. 98C 8394, 2000 WL 765086 (N.D. Ill. June 12, 2000) .............................................. 49, 51

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ...................................................... 52

*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) ...................................................... 27

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*,
   834 F.2d 677 (7th Cir. 1987) ...................................................... 40

*McCoy v. Health Net, Inc.*,
   569 F. Supp. 2d 448 (D.N.J. 2008) .............................................. 28, 31

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) ...................................................... 20

*In re Mexico Money Transfer Litig.*,
   164 F. Supp. 2d 1002 (N.D. Ill. 2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001) ....................... 27, 39

*In re Motor Fuel Temperature Sales Practices Litig.*,
   271 F.R.D. 263 (D. Kan. 2010) ...................................................... 31

*In re Northfield Labs. Sec. Litig.*,
   No. 06 C 1493, 2012 WL 2458445 (N.D. Ill. June 26, 2012) .................................................. 48

*In re Oil Spill by Oil Rig "Deepwater Horizon"*,
   295 F.R.D. 112 (E.D. La. 2013) ...................................................... 35

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) .............................................. 31, 33

*Park v. Thompson Co.*,
   633 F. Supp 2d. 8 (S.D.N.Y. 2009) ...................................................... 30

*In re Pet Foods Prods. Liab. Litig.*,
   629 F.3d 333 (3d Cir. 2010) ...................................................... 31

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
   148 F.3d 283 (3d Cir.1998) ...................................................... 36

*In re Ready-Mixed Concrete Antitrust Litig.*,
   261 F.R.D. 154, 168 (S.D. Ind. 2009) ...................................................... 18

*Retired Chi. Police Ass'n v. City of Chi.*,
    7 F.3d 584 (7th Cir. 1993)................................................................................................. 18

*Retsky Fam. Ltd. v. Price Waterhouse L.L.P.*,
    No. 97–CV–7694, 2001 WL 1568856 (N.D.Ill. Dec. 10, 2001)............................................... 39

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002)............................................................................................ 25

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997)......................................................................................... 23

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992)........................................................................................... 15

*Ruiz v. Stewart Assocs., Inc.*,
    171 F.R.D. 238 (N.D. Ill. 1997) ........................................................................................ 17

*Scholes v. Stone, McGuire & Benjamin*,
    143 F.R.D. 181 (N.D. Ill. 1992) ........................................................................................ 13

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ............................................................................ 42, 43

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*,
    No. 3:09cv1293, 2012 WL 3589610 (D. Conn. Aug. 20, 2012) ............................................. 12

*In re Sumitomo Copper Litig.*,
    74 F. Supp. 2d 393, 400 (S.D.N.Y. 1999)............................................................................ 55

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001)........................................................................... 48, 50, 52, 56

*Shagringas Co.* v. *BP Products*, No. 06-CV-3621,
    (N.D. Ill. May 26, 1999).................................................................................................. 55

*Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388
    (N.D. Ill. May 7, 2012) .............................................................................................. 50, 52

*Smith v. Sprint Communications Co.,* 387 F.3d 612 (7th Cir. 2004)................................ 12, 31, 33

*Spann v. AOL Time Warner, Inc.*, No. 02 Civ. 8238 (DLC), 2005 WL 1330937
    (S.D.N.Y. June 7, 2005).................................................................................................. 51

*Spano v. Boeing Co.*, 633 F.3d 574, 585 (7th Cir. 2011) ................................................................ 15

*Spicer v. Chi. Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1268 (N.D. Ill. 1993) ...................... 58

*Stewart v. Rubin*, 948 F. Supp. 1077, 1087 (D.D.C. 1996), *aff'd*,
    124 F.3d 1309 (D.C. Cir. 1997) ....................................................................................... 41

*Sullivan v. DB Invs., Inc.*, 667 F. 3d 273 (3d Cir. 2011)................................................................. 31

*Summers v. UAL Corp. ESOP Committee*, No. 03 C 15327, 2005 WL 3159450
(N.D. Ill. Nov. 22, 2005) ........................................................................................... 44

*Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326 (7th Cir. 1969) ....................................... 14

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006) .......................... 22

*In re Trans Union Corp., Privacy Litig.*,
No. 00 C 4729, 2009 WL 4799954 (N.D. Ill. Dec. 9, 2009) ..................................................... 54

*Turner v. General Elec. Co.*, No. 2:05-cv-186, slip op. at 2 (M.D. Fla. Oct. 12, 2006) ................ 30

*Union Asset Mgmt. Holding, A.G. v. Dell, Inc.*, 669 F. 3d 632 (5th Cir. 2012) .......................... 31

*Van Horn v. Trickey*, 840 F.2d 604 (8th Cir. 1987) ...................................................................... 11

*Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482 (E.D. Cal. 2010) .................................... 51

*Vollmer v. Selden*, 350 F.3d 656   (7th Cir. 2003) ...................................................................... 29

*Wahl v. Midland Credit Mgmt., Inc.*, 243 F.R.D. 291 (N.D. Ill. 2007) ....................................... 20

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ............................................................ 15

*Warfarin Sodium Antitrust Litig.*, 391 F.3d 516   (3d Cir.2004) ................................................. 36

*Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291   (11th Cir. 1999) ................................... 47

*White v. NFL*, 822 F. Supp. 1389 (D. Minn. 1993) ..................................................................... 44

*Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026 (9th Cir. 1997) ................................... 47

*Williams v. Rohm & Hass Pension Plan*, 658 F.3d 629 (7th Cir. 2011) ...................................... 54

**Rules**

Fed. R. Civ. P. 23(a)(1) ................................................................................................................. 20

Fed. R. Civ. P. 23(a)(2) ............................................................................................................ 21, 22

Fed. R. Civ. P. 23(a)(3) ................................................................................................................. 23

Fed. R. Civ. P. 23(a)(4) ................................................................................................................. 24

Fed. R. Civ. P. 23(b)(3) ................................................................................................................. 20

**Treatises**

*Newberg on Class Actions* § 11.41 (4th ed. 2002) ..................................................................... 42

*Newberg on Class Actions* §11.48 (4th ed. 2002) ..................................................................... 32

*Newberg on Class Actions*, § 3.05, pp.3-25 3d ed ................................................................... 20

*Newberg on Class Actions*, Sec. 14:6, (4th ed. 2002) ............................................................... 47

## I.    PRELIMINARY STATEMENT

Plaintiffs submit this memorandum of law in support of their motion for final approval of the settlement of this class action (which the Court preliminarily approved on February 12, 2014), approval of the Plan of Allocation of settlement proceeds, award of attorneys' fees and reimbursement of litigation costs and expenses, and for incentive awards to the Named Plaintiffs.

After more than a year and a half of arm's length and hard fought negotiations and two separate mediation sessions conducted with the assistance of Hon. Wayne R. Andersen (Ret.), the Parties entered into a Settlement Agreement ("Settlement") on February 7, 2014.[1]  In exchange for dismissal of the 3 pending putative class actions and the releases set forth in paragraph 14 of the Settlement,[2] the Defendants have agreed to provide $10,250,000.00 to Dahl Administration LLC ("Dahl" or the "Settlement Administrator) for the establishment of two separate Settlement Funds, consisting of a "Reimbursement Fund" of two hundred and fifty thousand dollars ($250,000.00) and an "Injury Fund" of ten million dollars ($10,000,000.00).[3]  As explained more fully in

---

[1] A copy of the Settlement and its exhibits are attached as Exhibit A to the Memorandum of Law in Support of Joint Motion for Preliminary Approval of Settlement.  (DE #90).  Capitalized terms used therein shall have the same meanings as set forth in the Settlement.

[2] Those 3 actions are described collectively in the Settlement Agreement as the "Smoothing Kit Lawsuits", and are currently pending in the:   United States District Court for the Northern District of Illinois (*Reid, et al. v. Unilever United States, Inc., et al.*, Case No. 12-CV-6058, hereinafter the "Reid Lawsuit"); United States District Court for the Western District of Kentucky (*Naiser, et al. v. Unilever United States, Inc., et al.*, Case No. 13-CV-0395, hereinafter the "Naiser Lawsuit"), and United States District Court for the Northern District of California (*Wells, et al. v. Unilever United States, Inc., et al.*, Case No. 13-CV-04749, hereinafter the "Wells Lawsuit").

[3] The Settlement Class (or "Class") is defined as:   All persons who purchased or use the Smoothing Kit in the United States, before February 17, 2014, excluding:   (a) any such person who purchased for resale and not for personal or household use, (b) any such person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors, employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, and (d) any legal counsel or employee of legal

paragraph number 4 of the Settlement, the Reimbursement Fund will be available to any member of the Settlement Class who is seeking compensation, in the form of a one-time payment of $10.00 per person, for the purchase of the Smoothing Kit. The Injury Fund will seek to compensate any member of the defined Settlement Class who suffered bodily injury to his or her scalp as a result of using the Smoothing Kit, and did not timely request exclusion from the Settlement Class. The Honorable Nan R. Nolan (Ret.) has been appointed to serve as a Special Master to evaluate claims submitted to the Injury Fund, and make appropriate awards accordingly. Defendant Unilever has also agreed to, and is obligated to pay, all costs of notice, claims administration, and subject to Court approval, attorney's fees to Plaintiffs' Counsel (which were not discussed or negotiated in any fashion until after the Settlement was negotiated and executed)[4] along with litigation costs and expenses, and incentive awards to the Named Plaintiffs in the amount of $7,500.00, except Plaintiff Sidney Reid, who shall receive an incentive payment in the amount of $10,000.00.[5]

Success in this case was never guaranteed. Defendants vigorously litigated the multiple pending class action lawsuits that will be resolved if the Court grants final approval of the Settlement since inception. Indeed, Defendants have aggressively defended this litigation and expressed their belief that Plaintiffs could not prevail on the claims asserted. Class Counsel undertook representation of the Class members, and prosecuted all three pending class actions on a fully contingent basis. Along the way, Class Counsel expended substantial effort, time, and resources in order to zealously prosecute the interests of all Class members without any guarantee of being compensated for their services.

---

counsel for any Defendant, and (e) the presiding judges in the Smoothing Kit Lawsuits and their immediate family members.

[4] *See* Settlement, at ¶17.

[5] These incentive payments are subject to Court approval and are intended to compensate the Class Representatives for bringing the Smoothing Kit Lawsuits, and in consideration of the time and effort they expended in prosecuting these class actions.

Specifically, Class Counsel conducted a thorough and time-consuming legal and factual investigation of Plaintiffs' claims, which began well before the *Reid* lawsuit was filed. In addition to testing and evaluating the chemical composition of the Kit, in consultation with consultants and experts Class Counsel: (i) propounded FOIA requests to investigate the ingredients of hair care products and the reported adverse effects of these products; (ii) studied the use and impact of a formaldehyde releaser in the Kit; (iii) reviewed Unilever's corporate filings and numerous published scientific materials and journals; (iv) consulted with chemistry and medical experts to evaluate the impact of certain ingredients of the Kit on the scalp and human hair; (v) obtained publicly available information from the FDA and other sources regarding Unilever's decision to recall the Kit; (vi) spoke with more than 150 class members throughout the United States from whom we collected detailed information regarding the application, use and impact of the Product on class members; (vii) sought permission from this Court to serve Defendant Unilever with 89 separate written discovery requests, (DE #41); (viii) reviewed thousands of pages of material produced by Unilever, consisting of: extensive customer complaint call logs, spreadsheets, voice messages and call transcriptions, customer complaint forms, internal company material (including communications and correspondence) relating to the development of the product at issue, and scientific articles;[6] and (ix) deposed a principal scientist employed by Unilever who was responsible for product research, development and testing.

The $10.25 million Settlement provides the Class with a certain and substantial recovery without the inherent risk, delay, and expense of continued and uncertain litigation. Class Counsel are experienced in prosecuting class actions and have concluded that the settlement is a highly

---

[6] The manner in which Defendant Unilever provided the material required an extensive and time-consuming review. For instance, the customer call logs contained some 10,000 entries in fine print, and many of the approximately 4600 voice recordings that were produced exceeded 10 minutes in length.

favorable result for the Class. This conclusion is based on all of the circumstances present here, including the likelihood of obtaining a larger judgment after trial, the substantial risks, expense, and uncertainties of continued litigation, the relative strengths and weaknesses of the claims and defenses asserted, the legal and factual issues presented, and our past experience in litigating complex class actions. Importantly, even if Plaintiffs were successful at trial and on the inevitable post-trial appeals, the uncertain recovery would have been years down the road, if ever.

Further, Plaintiffs were actively involved in the prosecution of the litigation throughout its pendency, and they approved the terms of the Settlement. Consequently, Class Counsel is seeking approval of incentive payments to the Named Plaintiffs in the amounts of $7,500.00 (except Named Plaintiff Sidney Reid for whom an incentive payment of $10,000.00 is being sought), reimbursement of litigation costs and expenses to be paid by Defendant Unilever, and an award of attorney's fees in the amount of one-third of the total amount of the Settlement proceeds made available to Class members. Importantly, Defendant Unilever has agreed to pay Class Counsel an attorney's fee that is separate and distinct (and in addition to) the common benefit fund (totaling $10,250,000.00) that has been created for the benefit of Class members. As a result, any attorney's fee awarded by this Court to Class Counsel will have no effect on the benefits available, and ultimately paid to, Class Members.

As set forth more fully in the Declaration of Jeffrey D. Dahl (hereafter "Dahl Declaration" and attached as Exhibit A to H), subsequent to the entry of the preliminary approval order, a comprehensive notice program was implemented by Dahl, which involved the: (a) distribution of notice of the Settlement Agreement to the state attorneys general and the United States Attorney General in accordance with the Class Action Fairness Act; (b) sending of direct mail and email Notice to potential Settlement Class members for whom sufficient information could be identified

4

from the Parties' records; (c) implementation of Published Notice through the use of paid print media; (d) implementation of Web-based Notice using paid banner ads on targeted websites; (e) implementation of additional Web-based Notice using "keyword" searches displaying banner ads; (f) implementation of Social Media Notice ads targeting relevant interest areas; (g) issuing of a nationwide press release describing the Settlement; (h) creation of an informational settlement website through which potential Settlement Class members can obtain detailed information about the Settlement, access case documents, and download and file Claim Forms and supporting documentation; and (i) implementation of a toll-free telephone helpline.

The Class Notice also clearly informed Class members of their right to opt-out of the litigation. As of the conclusion of the opt-out period on May 28, 2014, fifty-one (51) Class members timely opted out of the settlement, and two have levied objections, which are addressed below and do not warrant a denial of final approval[7]. Support for the Settlement has been strong. Indeed, not only do Plaintiffs (and Class Counsel) fully endorse the Settlement, but even though Class members have until September 25, 2014 to submit claim forms, 2,555 Class Members have submitted claims as of June 8, 2014.

Plaintiffs and Class Counsel firmly believe that the Settlement is a highly favorable result for the Class under difficult and challenging circumstances and warrants the Court's final approval.

## II.    OVERVIEW OF THE LITIGATION PRECEDING SETTLEMENT

### A.    The *Reid* Lawsuit

Plaintiff, Sidney Reid, and former Named Plaintiff, Angel Lake, filed the *Reid* Lawsuit

---

[7] While sixty-two opt-out requests were received by the Settlement Administrator, ten (10) were duplicates and one (1) was untimely. 49 of the 51 Class members who submitted timely opt-out requests are represented by the same law firm, Christiansen Davis LLC.

against Unilever U.S. on behalf of themselves and a putative nationwide class on August 1, 2012, and the matter was assigned to the Honorable Ruben Castillo (hereinafter, the "Court") (DE #1). The Complaint asserted claims against Unilever U.S. for breach of warranty, violation of consumer fraud and deceptive trade practices statutes, and unjust enrichment, all arising out of the manufacture, advertising and sale of a product sold under the name "Suave Professionals 30-Day Keratin Smoothing Kit" (the "Smoothing Kit"). *Id.*

On September 10, 2012, Defendants filed a Motion to Dismiss the Complaint. (DE #23). On November 8, 2012, Plaintiffs filed a Motion to Limit or Supervise Defendants' Communications with Absent Class Members. (DE #30). On February 22, 2013, Plaintiffs filed a Motion for Approval to Serve Discovery. (DE #41). On August 7, 2013, the Court denied, in part, Unilever's Motion to Dismiss the Complaint, and granted, in part, Plaintiffs' Motion for Approval to Serve Discovery. (DE #52). Specifically, the Court: (a) denied Unilever's motion to dismiss claims for breach of warranty and consumer fraud to the extent those claims were grounded in an alleged failure to disclose or warn; (b) granted Unilever's motion to the extent the consumer fraud claims were based on the same alleged affirmative misrepresentations that formed the basis of claims asserting breach of warranty; (c) dismissed the Plaintiffs' claims alleging violations of the Illinois and Alabama deceptive trade practices acts; (d) dismissed the unjust enrichment claim of Plaintiff Lake but not of Plaintiff Reid; and (e) approved a majority of Plaintiffs' discovery requests. *Id.* On August 13, 2013, Lake voluntarily dismissed her claims. (DE #53). On September 23, 2013, Named Plaintiffs Reid, Barnett, Damrow and Pennell filed the First Amended Complaint. (DE #60). The Amended Complaint added Conopco, Inc. d/b/a Unilever Home and Personal Care USA ("Conopco") and Les Emballages Knowlton, Inc. ("LEK") as Defendants and replaced the previous proposed nationwide class with four proposed

single-state classes consisting of all residents of Alabama, Illinois, Nevada and Wisconsin who purchased the Smoothing Kit. *Id.* The Amended Complaint asserts claims for breach of warranty, violation of consumer fraud and deceptive trade practices statutes, negligence and/or gross negligence, strict liability and unjust enrichment. *Id.* Following the filing of the Amended Complaint, Unilever U.S. and Conopco filed Answers denying liability and raising a number of additional defenses, and the Parties commenced formal discovery. (DE #73, #74). On November 5, 2013, the Court entered an order staying the Reid Lawsuit for 60 days, until January 6, 2014, while the Parties worked to negotiate a global settlement of the Smoothing Kit class action Lawsuits. (DE #81). The stay was extended until February 13, 2014. (DE #86).

### B. The *Naiser* Lawsuit

On February 22, 2013, Plaintiffs Terri Naiser and Jonnie Phillips filed their complaint in the Jefferson Circuit Court of Kentucky against Unilever U.S., Conopco and LEK on behalf of themselves and a putative Kentucky class of purchasers of the Smoothing Kit. On March 14, 2013, Plaintiffs Naiser and Phillips filed a first amended complaint in the Jefferson Circuit Court. The first amended complaint asserts claims for breach of warranty, violation of the Kentucky Consumer Protection Act, negligence and/or gross negligence, strict liability and unjust enrichment, all arising out of the manufacture, advertising and sale of the Smoothing Kit. On April 11, 2013, Unilever U.S. and Conopco removed the Naiser Lawsuit to the United States District Court for the Western District of Kentucky (the "Kentucky Court"). On September 30, 2013, the Kentucky Court denied the then pending motion to dismiss the first amended complaint. Following the court's denial of their motions to dismiss, Unilever U.S. and Conopco filed answers denying liability and raising a number of additional defenses. On November 21, 2013, the Kentucky Court stayed the *Naiser* Lawsuit while the parties worked to negotiate a global

settlement of the Smoothing Kit Lawsuits.   On January 7, 2014, the Kentucky Court extended the stay until February 13, 2014.

### C.      The *Wells* Lawsuit

On October 11, 2013, Named Plaintiffs Josephine Wells and Catherine Reny filed an initial complaint against Unilever U.S., Conopco and LEK in the United States District Court for the Northern District of California (the "California Court").   The complaint proposed:   (a) a multistate class of all persons within the United States who purchased the Smoothing Kit for personal or household use, other than those persons who reside in Alabama, Illinois, Kentucky, Nevada or Wisconsin; and (b) an alternative class of California residents.   The complaint asserted claims for breach of warranty, violation of the Song-Beverly Consumer Warranty Act, violation of various state consumer protection and deceptive advertising statutes, negligence and/or gross negligence, strict liability and unjust enrichment, all arising out of the manufacture, advertising and sale of the Smoothing Kit.   On November 26, 2013 (following the submission of a joint stay of proceedings pending mediation), the California Court stayed the *Wells* Lawsuit while the parties worked to negotiate a global settlement of the Smoothing Kit Lawsuits.

### C.      The Preliminary Approval Order

On February 12, 2014, this Court entered an order granting preliminary approval of the Settlement reached between the Parties.   (DE# 96).   In the Preliminary Approval Order ("Order"), the Court specifically found that the proposed terms of the Settlement satisfied all of the elements of Federal Rule of Civil Procedure 23(a) and 23(b)(3) and that the proposed Settlement was sufficiently fair, reasonable, and adequate to allow dissemination of notice of the proposed settlement to Class members.

As a result, the Court *inter alia*:   (a) preliminarily certified a Class for settlement

purposes; (b) appointed the Named Plaintiffs as Class Representatives of the Settlement Class; (c) appointed Class and Liaison Counsel; (d) appointed Dahl to serve as the Settlement Administrator; (e) appointed the Hon. Nan R. Nolan (Ret.) of JAMS as Special Master to evaluate and make a final determination of claims submitted to the Injury Fund, Benefit Option C, and to review the Settlement Administrator's denial of claims made for Benefits Options A or B; (f) established a procedural framework for the final approval of the settlement by requiring the Parties to implement a comprehensive notice program; (g) set deadlines and procedures for requests for exclusion and objections to the settlement; and (h) scheduled a final approval hearing for July 9, 2014.

## III. THE STANDARD FOR JUDICIAL APPROVAL OF A CLASS ACTION SETTLEMENT

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise of a class action. In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the United States Supreme Court explained that, before approving a class action settlement, the District Court must first be satisfied that the elements of Rule 23(a) and 23(b) have been met. *Id*. at 621. Once the court has determined that the requirements of Rule 23(a) and 23(b) have been met, the court must then determine whether 23(e) has been satisfied by determining whether the settlement is fair, reasonable, and adequate.

Courts recognize that the essence of a settlement is compromise. Thus, even if "the relief afforded by the proposed settlement is substantially narrower than it would be if the suits were to be successfully litigated," this is no objection to a class settlement, since "the public interest may indeed be served by a voluntary settlement in which each side gives ground in the interest of avoiding litigation." *Air Lines Stewards & Stewardesses Ass'n v. Am. Airlines, Inc.*, 455 F.2d 101, 109 (7th Cir. 1972). As such, in determining whether to approve the Settlement, the Court

should be guided by the strong judicial policy "favor[ing] the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1195, 1196 (7th Cir. 1996) (citations omitted); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985); *see also Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc.*, 630 F.2d 1164, 1166-67 (7th Cir. 1980) ("Federal Courts look with great favor upon the voluntary resolution of litigation through settlement. . . . This rule has particular force regarding class action lawsuits.") (Citations omitted). Settlements of class actions particularly warrant this approach:

> In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. Of Milwaukee*, 616 F.2d 305, 313 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). (Internal citations and quotations omitted).

In deciding whether a class action settlement should be approved, courts must determine whether the proposed settlement is fair, reasonable, and adequate. *Isby*, 75 F.3d at 1196; *Hiram Walker*, 768 F.2d at 889. Further, a class action settlement must be evaluated in a light most favorable to settlement. *See Isby* 75 F.3d at 1199, quoting *Armstrong*, 616 F.2d at 315.

Because the object of settlement is to avoid, not confront, the determination of contested issues, the approval process should not be converted into an abbreviated trial on the merits. *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1987) ("the district court need not undertake the type of detailed investigation that trying the case would involve"). Therefore, the court should defer to the judgment of the litigants and their counsel and not substitute its own judgment for the judgment of the parties. As the Seventh Circuit has held:

> Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to the optimal settlement terms for the judgment of the litigants and their counsel.

*Armstrong*, 616 F.2d at 315.

Finally, a "strong presumption of fairness attaches to a settlement agreement when it is the result of this type of [arm's-length] negotiation." *Great Neck Capital Appreciation Inv. P'ship, L.P. v. Price WaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) (citing *Anderson v. Torrington Co.*, 755 F. Supp. 834, 838 (N.D. Ind. 1991)) (settlement reached after two-day mediation); *In re Sturm, Ruger & Co., Inc. Sec. Litig.*, No. 3:09cv1293, 2012 WL 3589610, at *4 (D. Conn. Aug. 20, 2012). The Settlement was negotiated at arms-length and was only reached with the substantial assistance of Judge Andersen following negotiations that spanned over 13 months and which included two full day sessions and numerous telephonic discussions. Moreover, the attorneys who conducted the negotiations on behalf of the Class are greatly experienced in complex, class actions. Class Counsel's decision, therefore, should be given deference. *Armstrong*, 616 F.2d at 315.

As explained more fully herein, when examined under the applicable criteria and given the circumstances present, the Settlement is a highly favorable result for the Class and warrants approval by the Court. Class Counsel believes that there are serious questions as to whether a more favorable result could or would be attained after continued litigation and the inevitable post-trial motions and appeals. The Settlement achieves a substantial and certain recovery for members of the Class and is unquestionably superior to the distinct possibility that, were this litigation to proceed to trial, there might not be any recovery. Analysis of the relevant factors demonstrates that the proposed settlement merits this Court's approval.

# IV. THE SETTLEMENT CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES

The Parties are seeking certification of the Class for settlement purposes and the fact that the Parties have reached a settlement is a relevant consideration in the class-certification analysis. *See Smith v. Sprint Commc'ns Co*., 387 F.3d 612, 614 (7th Cir. 2004); *Amchem Prods.*, 521 U.S. at 619. All of the Rule 23 requirements are easily met and therefore this Court should reaffirm its certification of the Settlement Class for Settlement purposes.

## 1. The Class is So Numerous that Joinder is Impracticable

A class must be so numerous as to make joinder of all parties "impracticable." Fed. R. Civ. P. 23(a)(1). Joinder is impracticable if it is extremely difficult or inconvenient. *See Levitan v. McCoy*, No. 00 C 5096, 2003 WL 1720047, at *3 (N.D. Ill. Mar. 31, 2003). Courts consider the number of class members and "common sense assumptions" to determine whether a proposed class satisfies the numerosity element. *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 184 (N.D. Ill. 1992) (internal quotation omitted) (certifying class between 129 and 300 members);

This Class consists of all persons in the United States who purchased or used the Smoothing Kit in the United States before February 17, 2014. Based on their independent investigation and information obtained from Defendants during the course of discovery and this litigation, Class Counsel reasonably estimates that between 225,000 and 260,000 units of the Smoothing Kit were sold, and there are thousands of Settlement Class members geographically dispersed across the United States.

The United States Court of Appeals for the Seventh Circuit has recognized that as few as 40 class members are sufficient to satisfy the "numerosity" requirement of Rule 23(a)(1). *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *see also, Newberg on Class Actions*, § 3.05, pp.3-25 3d ed. ("The difficulty in joining as few as 40 class

members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone."); *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 56–57 (N.D. Ill. 1996) (eighteen class members satisfied numerosity requirement); *Chandler v. S.W. Jeep–Eagle, Inc.*, 162 F.R.D. 302, 307–08 (N.D. Ill. 1995) (classes of fifty and one hundred fifty sufficiently numerous); *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (twenty-nine-member class is sufficient and collecting cases finding numerosity with fewer class members).  Plaintiffs are not required to specify the exact number of class members as long as they have made a good faith estimate.  *Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 164 F.R.D. 659, 662 (N.D. Ill. 1996).

Therefore, and particularly in light of the size and geographic dispersion of the Class, joinder of the Class Members is impracticable, and Rule 23's numerosity requirement is satisfied.

### 2. The Class Shares Common Questions of Law and Fact

Commonality requires a legal or factual question common to the class. Fed. R. Civ. P. 23(a)(2). It does not require all questions of law or fact to be identical "but merely that the class claims arise out of the same legal or remedial theory." *See Johns v. DeLeonardis*, 145 F.R.D. 480, 483 (N.D. Ill. 1992). A "single course of conduct that results in injury to the class as a whole" usually suffices.  *Id.*; *see also Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("'a common nucleus of operative fact is usually enough to satisfy'" Rule 23's commonality requirement.   Further, Rule 23(a)(2) does not demand that every member of the Class have an identical claim.   Rather, commonality will be found when the plaintiff demonstrates that class members have suffered the same injury, and that their claims depend on a common contention that is capable of class-wide resolution.   *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *see also Spano v. Boeing Co.*, 633 F.3d 574, 585 (7th Cir.

2011) (commonality found when there are one or more common questions of law or fact).

Plaintiffs' core allegations are that the Defendants created, marketed, manufactured, distributed and sold a Product throughout the United States that never should have been sold. Plaintiffs allege that Defendants failed to properly warn consumers of the risks and dangers attendant to the use of such a strong depilatory agent on their hair and scalp, even after they knew or should have known of its hazards. (AC #2).[8] Plaintiffs further allege that Defendants' uniform acts and omissions in connection with the development, marketing, sale and delivery of the Product, and its allegedly belated and incomplete recall of the Product, among other things, violated consumer protection laws designed to protect Plaintiffs and the Class, breached express and implied warranties to Plaintiffs and the Class, and constituted negligence. (AC #4). Defendants not only deny Plaintiffs' allegations, but also deny any and all liability in general.

In addition, all Class Members share other common legal and factual questions arising from the allegations in the Smoothing Kit Lawsuits, including but not limited to:

- Whether the Product contained the alleged defects and hazards;

- Whether Defendants failed to appropriately warn Class Members of the serious damage that could result from the use of the Product;

- Whether Defendants had actual or imputed knowledge of the Product's alleged defects and hazards, which were not disclosed to Plaintiffs or the Class;

- Whether Unilever promoted the Product with false or misleading misstatements of fact or material omissions;

- Whether the alleged conduct amounted to violations of the claims and causes of action asserted by Plaintiffs and the Class; and

- Whether Plaintiffs and the Class Members sustained damages resulting from Defendants' conduct, and if so, the proper measure of those damages and other

---

[8] Citations to "AC #__" refer to the numbered paragraphs of Plaintiffs First Amended Class Action Complaint filed on September 23, 2013, which has been recorded herein as DE #60.

appropriate relief.[9]

Consequently, because all of the Class Members' claims arise from the same core of operative facts, are founded on the same legal theories and common allegations, and their claims depend on a common contention that is capable of class-wide resolution, Rule 23(a)(2)'s commonality requirement is satisfied.

### 3. Plaintiffs' Claims are Typical of the Claims of the Class

Claims of the proposed Class Representatives must be typical of all Class Members' claims. Fed. R. Civ. P. 23(a)(3). However, typicality does not require that the claims of Class Members and the proposed Class Representatives be identical, only substantially similar. *Ruiz v. Stewart Assocs.*, *Inc.*, 171 F.R.D. 238, 242 (N.D. Ill. 1997). Rather, the "typicality" requirement of Rule 23(a)(3) is satisfied for many of the same reasons that the "commonality" requirement of Rule 23(a)(3) is met. *De La Fuente v. Stokley-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1993) ("A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory"); *Keele*, 149 F.3d at 595 (quotation omitted); *Kernats v. Comcast Corp.*, No. 09 C 3368, 2010 WL 4193219, at *4 (N.D. Ill. Oct. 20, 2010) (quotation omitted).

Plaintiffs (who are also the proposed Class Representatives) Sidney Reid, Alisha Barnett, Dawn Damrow, Fran Pennel, Terri Naiser, Jonnie Phillips, Josephine Wells, and Catherine Reny allege and must prove the same violations that all Class Members would have to prove. In particular, each Plaintiff alleged that she purchased the Smoothing Kit and suffered damage to her hair and scalp after using the Kit. Therefore, because: (1) Plaintiffs' claims and the claims of all Class Members arise out of the same alleged operative facts and conduct, are based on the same

---

[9] It is well-established that individualized damages calculations do not preclude class certification. *Kurgan v. Chiro One Wellness Centers LLC*, Case No. 10–cv–1899, 2014 WL 642092 (N.D. Ill. Feb. 19, 2014).

alleged theories, and will require the same kinds of evidence to prove those theories; and (2) Plaintiffs and all Class Members possess the same interests and suffered the same injuries, Rule 23(a)(3)'s typicality requirement is satisfied.

### 4. Plaintiffs Will Fairly and Adequately Represent the Interests of the Class

Representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The determination that the representative parties will "fairly and adequately protect the interests of the class" as required by Rule 23(a)(4) involve two considerations: (1) whether the plaintiffs' attorneys are properly qualified and experienced to conduct the litigation; and (2) whether the class representatives have any interests antagonistic to the class. *General Tel. Co. v. Falcon*, 457 U.S. 147,157, n.13 (1982); *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 168 (S.D. Ind. 2009) ("The adequacy standard involves two elements: one relates to the adequacy of the named plaintiffs' representation of the class and requires that there be no conflict between the interests of the representative and those of the class in general; the other relates to the adequacy of class counsel's representation.").

When Class Representatives and Class Members seek the common goal of pursuing the largest recovery for the Class, their interests do not conflict. *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) (citation omitted); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004) ("There is no conflict between the class representatives and the other class members. All share the common goal of maximizing recovery.")

Here, the Class Members' interests are well protected by the Plaintiffs, and the Plaintiffs have no interests that conflict with or are antagonistic to the interests of the Class. For instance,

all Class Members purchased or used the Product and have a common interest in pursuing the claims asserted in this litigation. Further, as set forth in the biographies of Class and Liaison Counsel previously attached to Memorandum of Law in Support of Joint Motion for Preliminary Approval of Settlement as Exhibit B, (DE #90), Plaintiffs' Counsel are qualified, experienced, and thoroughly familiar with complex class action litigation. Plaintiffs' Counsel have successfully prosecuted numerous class actions in jurisdictions throughout the United States, developed this case, researched and briefed significant areas of applicable law, have invested substantially in the prosecution of this litigation, diligently pursued and protected the interests of Class Members in three separate jurisdictions against heavy opposition, and the Settlement is the result of arms-length negotiations after ongoing litigation, involving multiple mediation sessions over the course of more than one year and the assistance of a well-regarded mediator, Judge Andersen.

Accordingly, Rule 23(a)(4)'s adequacy requirement is satisfied.

### 5. The Proposed Settlement Class Also Satisfies Rule 23(b)(3)

In addition to the requirements of Rule 23(a), Plaintiffs must demonstrate that: (1) questions of law and fact common to the members of the class predominate over any questions affecting only individual members; and (2) a class action is superior to the other available methods for the fair and efficient adjudication of the controversy. *See* Fed. R. Civ. P. 23(b)(3). Both of these requirements are satisfied in the present case, as the Court found when it granted preliminary approval on February 12, 2014. Nothing has arisen since the Court granted preliminary approval to indicate that class certification is not appropriate. On the contrary, the Settlement Agreement demonstrates why class treatment is appropriate. Given the number of individual lawsuits that would be required (in jurisdictions around the country) if a class were not certified, a class action presents a superior method to fairly and efficiently adjudicate all of the claims of the Class in this

case, within the meaning of Rule 23(b)(3).   Further, to the extent that any of the Class members wished to pursue any such individual claim, they were free to opt-out of the settlement under Rule 23(b)(3).

### A.     Common Questions of Law and Fact Predominate.

Rule 23's predominance requirement "is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (internal citations, alterations and quotation marks omitted).   Further, predominance has been demonstrated when a business practice harms class members in a consistent way, aside from individual questions. *See Wahl v. Midland Credit Mgmt., Inc.*, 243 F.R.D. 291, 299-300 (N.D. Ill. 2007) (form letters supported predominance); *Amchem Prods.*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

The chemical composition of the Product, along with the representations and alleged warranties regarding its use, safety, and purported effectiveness, along with Unilever's recall efforts, are central issues in this case that call for proof common to all Class Members.   Therefore, this case satisfies Rule 23'predominance requirement.

### B.     A Class Action is A Superior Method of Adjudication

Rule 23(b)(3) requires a class action to be superior to other methods of handling the litigation.   Plaintiffs easily meet Rule 23(b)(3)'s superiority requirement.   For example, any individual Class Member's interest in prosecuting an individual claim is far outweighed by the efficiency of the class mechanism.   Hundreds of thousands of Class Members dispersed throughout the United States purchased the Product during the Class Period.   As a result, resolving these claims in the context of a class action conserves judicial and private resources and

hastens recoveries for all Class Members.   *See Amchem Prods.*, 521 U.S. at 617 (noting that the Advisory Committee "sought to cover cases in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results" (internal quotation omitted)).

On the other hand, in the absence of a class action, thousands of individual plaintiffs would be forced to evaluate whether the time, burden, and expense associated with pursuing an individual action against enormous, and these well-funded, corporate Defendants was worthwhile.   For those Class members who purchased the Product, but either did not use it, or used it and did not suffer any damage, it is unlikely that they would file an individual lawsuit to seek compensation for reimbursement of the purchase price of the Product.   Be that as it may, if numerous individual actions were filed in jurisdictions across the country, inevitably such a multitude of litigation would result in the enormous (and avoidable) expenditure of party and judicial resources.

As such, utilization of the class action mechanism here is substantially superior to other available methods for the fair and efficient adjudication of this controversy.

## V.    THE SETTLEMENT SHOULD BE APPROVED

Courts in this Circuit consider the following factors in analyzing the fairness of a class action settlement:   (1) the strength of plaintiffs' case compared to the amount of the settlement; (2) the complexity, length, and expense of continued litigation; (3) the amount of opposition to the settlement; (4) the opinions of counsel; and (5) the stage of the proceedings and amount of discovery completed at the time of settlement.   *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) (citing *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)).

1.     **Balancing the Strength of the Plaintiffs' Case on the Merits Measured Against the Terms of the Settlement Supports Preliminary Approval.**

The strength of the Plaintiffs' case on the merits balanced against the amount offered in the Settlement supports final approval. *AT&T Mobility*, 789 F. Supp. 2d at 963-64. Under this factor, courts consider whether the proposed settlement is reasonable in light of the risks of proceeding with the litigation. *Id.* at 959, 961, 963-64. The $10.25 million recovery obtained for the benefit of the Class is well within the range of reasonableness in light of all of the legal, factual, and practical risks of continued litigation.

First, a successful resolution of this matter was never guaranteed. Since the inception of this litigation, Defendants have vehemently contested the allegations, claims and theories put forth by Plaintiffs. Even though Plaintiffs have defeated (in part) Defendants' motions to dismiss, Plaintiffs recognize that the future path of this litigation will be fraught with significant hurdles including causation, class certification (and any accompanying interlocutory appeal under Rule 23(f)), establishing liability, battles of experts, and proving damages. Further, even if this case proceeds to trial, and Plaintiffs prevail, Defendants certainly could appeal any judgment favorable to the Settlement Class, delaying further any possible recovery to the Settlement Class.[10] As such, Plaintiffs face significant risks of continuing this litigation that could materialize and prevent thousands of Class Members from recovering anything.

On the other hand, the Settlement completely eliminates the inherent uncertainty and risks associated with continuing this litigation and also provides an opportunity for thousands of Class

---

[10] However, even a successful jury verdict does not eliminate the risk to the class. *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997)(reversing $81 million jury verdict); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1233 (10th Cir. 1996)(overturning plaintiffs' verdict following two decades of litigation); *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608, at *4 (N.D. Cal. Sept. 6, 1991)($100 million jury verdict vacated on post-trial motions).

Members to seek and obtain a fair recovery for their claims. The Settlement contemplates the creation, funding, and disbursement of two distinct settlement funds consisting of a "Reimbursement Fund" of two hundred and fifty thousand dollars ($250,000.00) and an "Injury Fund" of ten million dollars ($10,000,000.00).

As described in Paragraph Number 4 of the Settlement, the Reimbursement Fund will be available to any member of the Settlement Class who purchased a Smoothing Kit, and who makes a claim against the Reimbursement Fund for a one-time payment of $10.00. The Injury Fund goes one step further and will seek to compensate Settlement Class Members who suffered bodily injury to his or her hair or scalp as a result of using the Smoothing Kit.

Thus, a balancing of the significant risks associated with continuing this litigation against the finality and tangible benefits provided to Class Members by the Settlement, demonstrates that the Settlement is sufficiently fair, reasonable, and adequate to warrant approval.

## 2. A Balancing of the Complexity, Length, and Expense of Continued Litigation Supports Approval of the Settlement.

In determining the fairness of a settlement, courts also consider the "likely complexity, length and expense of the litigation." *Isby*, 75 F.3d at 1199. There is no doubt that the three separate class actions that have been filed against Unilever (and which we would resolve if the Settlement is approved) involve complex factual, legal, and evidentiary issues.

In the absence of this Settlement, continued and prolonged litigation of three hard fought complex class actions against the Defendants, in three different jurisdictions, would likely have consumed many more years of the Parties' and the Court's resources. The expense of continuing the three separate class actions would be substantial and involve an enormous amount of document, ESI, and deposition discovery in order to prepare these cases for trial. Further, certainly the Parties would conduct significant (and expensive) expert discovery, which would

involve the preparation of multiple reports and taking of numerous expert depositions. And, inevitably, Defendants would file motions for summary judgment.

In short, the costs of discovery, experts, briefing and arguing class certification, preparing the pre-trial order, summary judgment motion practice, followed by trial and inevitable appeals in three separate class actions would have been substantial. Similarly, appeals of any summary judgment decision or final judgment (which, given the size and nature of the Plaintiffs' claims were almost guaranteed) virtually guarantee that this litigation would have continued without resolution or relief for many years in the absence of the Settlement. Finally, success at trial is by no means certain. As such, even if the Class were to recover larger judgments after trial, the additional delay imposed by post-trial motions and appeals, would deny the Class any recovery for years to come. *See AT&T Mobility*, 789 F. Supp. 2d at 961 ("Were the Class Members required to await the outcome of a trial and inevitable appeal . . . they would not receive benefits for many years, if indeed they received any at all.")

The Settlement allows the Class to avoid the significant (and unavoidable) delay, risk, and expense of continued class action litigation. Consequently, the Settlement provides a certain, immediate, and substantial tangible recovery to thousands of members of the Settlement Class, without additional significant risk, delay, expenditures of time, money, and judicial and Party resources. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284 (7th Cir. 2002) ("To most people, a dollar today is worth a great deal more than a dollar ten years from now.")

Accordingly, the Court should find that a balancing of the likely complexity, length and expense of the litigation against the tangible, immediate, and substantial benefits provided by the Settlement, weighs heavily in favor of approval.

### 3. The Reaction of Class Members Supports Approval of the Settlement.

In analyzing whether to approve the Settlement, the Court is to consider the Class's reaction to the settlement. *AT&T Mobility*, 789 F. Supp. 2d at 958. Following the Court's preliminary approval of the Settlement, a comprehensive notice plan was implemented which involved the : (a) sending of direct mail or email Notice to more than 8,600 potential Settlement Class members for whom sufficient information could be identified from the Parties' records; (b) implementation of published Notice through the use of paid print media in the form of a 1/3-page advertisement in *People* on March 28, 2014, in *US Weekly* on April 18, 2014, in *Ebony* on April 15, 2014, in *Essence* on May 9, 2014, and in *Glamour* on May 13, 2014 (the combined estimated readership of the five publications in which the Publication Notice appeared is 83,581,000); (c) creation of an informational Settlement website (www. Suave30DaySmoothingKitLawsuit.com) through which potential Settlement Class members can obtain detailed information about the Settlement, access case documents, and download and file Claim Forms and supporting documentation; (d) implementation of Web-based Notice using paid banner ads on targeted websites, which contained links to the Settlement website (over the course of the web-based notice campaign, the banner-style notices were placed on selected websites 87,772,856 times); (e) implementation of additional Web-based Notice using "keyword" searches displaying banner ads that were displayed 415,916 times in response to Google or Bing search engine users' queries; (f) implementation of Social Media Notice ads targeting relevant interest areas, which contained links to the Settlement website and which were displayed more than 70,000,000 times; (g) issuing of a nationwide press release describing the Settlement to be distributed by PR Newswire as a national release to approximately 5,815 newspapers, television stations, radio stations, and magazines, as well as approximately 5,400 websites, online databases, and search engines; and (h)

implementation of a toll-free telephone helpline so that Class members could call if they had any questions. *See* Dahl Declaration, ¶¶ 6 - 29.

The Notice advised Class Members of their right to object to the terms of the Settlement, Plan of Allocation, and request for attorney's fees and expenses and explained that this right needed to be exercised by May 28, 2014. Despite the incredible breadth and reach of this notice plan, only 2 class members have filed objections and 51 have timely elected to opt-out of the Settlement. *Id.* at ¶ 32 (noting that one Class member represented by Christiansen Davis, LLC submitted an opt-out that was untimely).

As addressed more fully below, the two objections are utterly without merit and one was brought by an attorney who has been found to be a "serial objector". Further, the fact that some Class members object to the Settlement does not by itself prevent the court from approving it. *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) (collecting cases in which courts approved settlements despite objections). On the contrary, a relatively small number of class member objections is "strong circumstantial evidence" of a settlement's fairness. *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020-21 (N.D. Ill. 2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001) ; *see also* 4 William B. Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11.48 (4th ed. 2002).

Given that the Class size is estimated to be between 225,000 – 260,000, and that only 53 total Class members have either opted out or objected to the Settlement, the Class member objection rate is *less than three-hundredths of 1%.* Specifically, the Class member objection rate in this matter ranges from a mere 0.0203 - 0.0235 percent, a minute amount which qualifies the Settlement for a presumption of fairness. *See McCoy v. Health Net, Inc.,* 569 F. Supp. 2d 448, 459-61 (D.N.J. 2008) (collecting cases, holding that a presumption of fairness applied to class

action settlement where objectors and opt-outs amounted to 0.066% of class, and noting that such empirical evidence is "convincing evidence of the Settlement's fairness and adequacy").

In sum, even though Class members still have more than fifteen (15) weeks to continue to submit claims, as of June 8, 2014, Class members have submitted 2,555 claims. These preliminary statistics indicate strong support for approval of the terms of the Settlement and, therefore an analysis of reaction of the Class to the Settlement further supports approval of the Settlement.

**4.      The Two Objections to the Settlement Lack Merit and One Was Brought by a Serial Objector**

Certainly, in egregious instances where class actions have been resolved in such a fashion that class members interests are truly not furthered, objectors can serve a useful "watchdog" role. However, courts have realized that in many cases objectors have appeared with manufactured objections with hopes not of improving a proposed settlement, but rather that class counsel will simply pay them a fee to withdraw the objections and go away. *Vollmer v. Selden*, 350 F.3d 656, 660, (7th Cir. 2003) ("In the context of intervening in a class action settlement, extortion would mean intervening not to increase the value of the settlement, but in order to get paid to go away. As the district court's order correctly suggested, this would be an improper purpose for intervening. This is, in part, because it would benefit only the intervenors at the expense of all other parties to the litigation.").

And so, this court has recognized that professional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients. *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. 364, 383 (N.D. Ill. 2011) (in weighing objection, noting that objector "is a frequent objector to class action settlements; he has objected to at least nine other class action settlements in

federal court in the past two years"); *In re Initial Public Offering Sec. Litig.*, 721 F. Supp. 2d 210 (S.D.N.Y. 2010), *opinion clarified*, No. 21 MC 92, 2010 WL 5186791 (S.D.N.Y. 2010).

Attorney Jeffrey Weinstein (counsel for objector Yolando Loyd Reed and hereafter "Weinstein") has been judicially recognized as being just such a "serial objector", whose objections to the Settlement should be summarily rejected. Weinstein appeared as counsel for an objector in *Park v. Thompson Co.*, 633 F. Supp 2d. 8, 10 (S.D.N.Y. 2009). In *Park*, Judge Pauley: (a) noted that Weinstein sought a fee award for a claimed 213.4 hours of work purportedly related to the objection and that Weinstein sought fees for himself at $500.00 per hour; (b) recognized that Weinstein "provided no billing records or statement of time expended," yet sought a multiplier "of at least 4"; (c) stated that Weinstein's "causal demand [of a multiplier of 'at least 4'] is imprecise and unreasonable as Weinstein's sparse fee application"; and (d) dramatically slashed Weinstein's fee request.

A year later, Judge Scheindlin issued an opinion in *In re Initial Public Offering Sec. Litig.*, in which she: (a) recognized that Weinstein was previously found to be, and is in fact, a "serial objector"; (b) found there was "evidence of bad faith or vexatious conduct by the Objectors"; (c) found that Weinstein appealed in "bad faith", refused to follow the court's order (by failing to respond to questions designed to determine whether Weinstein had a pattern or practice of objecting to class action settlements for the purpose of securing a settlement from class counsel), and engaged in sanctionable conduct; (d) ordered Weinstein to post a Rule 7 bond; and (e) concurred "with the numerous courts that have recognized that professional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients." *In re Initial Public Offering Sec. Litig.*, 721 F. Supp. 2d at 213. *See also Turner v. Gen. Elec. Co*., No. 2:05-cv-186, slip op. at 2 (M.D. Fla. Oct.

12, 2006), ECF No. 99 (ordering objector to post a bond after his counsel, Weinstein, "stated that he would withdraw his objection if Class Counsel made a donation to a charity he selected"); *McCoy,* 569 F. Supp. 2d at 473 (noting that "none of the Weinstein objections set forth a basis to set aside or modify the settlement" and that Weinstein's objection to $60,000.00 incentive payments to each named plaintiffs was in fact "groundless").[11]

Not only is Weinstein a serial objector whose contentions should be summarily rejected, but the attacks that he and the other objector in this matter (Ronald A. Marron who is appearing as counsel for Tina Martin) have asserted against the Settlement are legally and factually deficient for numerous reasons.

First, it is important to note that class certification is being sought for settlement purposes only. Weinstein ignores this fact, attempts to manufacture conflicts within the Class where none exist, and improperly relies on decisions in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997), *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999), and *Smith v. Sprint Communications Co.,* 387 F.3d 612 (7th Cir. 2004) which are clearly distinguishable and inapposite.

*Amchem* involved the consideration of a global settlement of "current and future asbestos-related claims" (with some exposure injuries having latency periods lasting more than 40 years) potentially encompassing millions of class members who "[were] or some day may be, adversely affected by past exposure to asbestos products manufactured by one or more of 20 companies" wherein the Court noted that asbestos containing products were manufactured and used for nearly sixty (60) years before the proposed settlement was reached, and there were predictions of hundreds of thousands of asbestos disease-related deaths. *Amchem Prods.*, 521

---

[11] Weinstein also appears as counsel for objectors in *Sullivan v. DB Invs., Inc.*, 667 F. 3d 273 (3d Cir. 2011), *In re Pet Foods Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010), *Union Asset Mgmt. Holding, A.G. v. Dell, Inc.*, 669 F. 3d 632 (5th Cir. 2012), and *In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263 (D. Kan. 2010).

U.S. at 597-98. Further, *Amchem* was never intended to be litigated. Instead, "within the space of a single day . . . the settling parties . . . presented to the District Court a complaint, an answer, a proposed settlement agreement, and a joint motion for conditional class certification." *Id.* at 601-02. And so, after recognizing that potentially millions of class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods and that some class members suffered no physical injury or have only asymptomatic pleural changes, while others developed deadly conditions, the Court determined that plaintiffs had not satisfied Rule 23's adequacy requirement because exposure-only plaintiffs (faced with a latency period potentially lasting decades) had interests that diverged from those which were presently injured. *Id.* at 627-29. Here, there are no conflicts among Class members, let alone any that rise to the level of severity noted in *Amchem*. *Any* Class member (even those claiming injuries), who purchased a Smoothing Kit can seek reimbursement. Further, unlike in *Amchem*, the product was only sold for a few months (not decades) and damage to scalp or hair appear immediately after application or within an extremely short period of time.

Like *Amchem*, in *Oritz* the Court was faced with an asbestos settlement fraught with problems. Indeed, the Court recognized that after decades of litigation, thousands of new tort claims each year, rapidly depleting funds, and a host of insurance coverage issues, defendant approached a group of plaintiffs' lawyers and reached a global settlement agreement which created a "limited fund", did not allow any class members the right to abstain, and which excluded approximately 45,000 inventory plaintiffs and the plaintiffs in then-pending unsettled cases estimated at more than 53,000. *Ortiz*, 527 U.S. at 823-24. The issue before the Court in Ortiz was the certification of mandatory settlement class on a limited fund theory under Federal Rule of Civil Procedure 23(b)(1)(B), which unlike here did not provide class members with any

opportunity to opt out of (or as Justice Souter stated "secede" from) the settlement.  *Id.* at 821, 837.  These factual and legal distinctions are critical, dispositive, and inapposite when considering the objections to Settlement currently before this Court.[12]

Second, the concept of utilizing a class action settlement to resolve and release personal injury claims is neither new, nor novel.  Indeed, over the years, there have been a number of significant settlements reached (and judicially approved) in various jurisdictions around the country that have provided meaningful (*e.g.*, just and fair) compensation to class members suffering personal injuries.  For example, in *In re FEMA Trailer Formaldehyde Product Liability Litigation.*, MDL No. 2:07–MD–1873, 2012 WL 4513344 (E.D. La. Sept. 27, 2012) plaintiffs asserted claims for personal injuries founded on formaldehyde exposure flowing from the installation, maintenance, refurbishment, and/or occupancy of Emergency Housing Units ("EHUs") provided by FEMA following Hurricanes Katrina and Rita.  Ultimately, a $42.6 million class action settlement was reached and judicially approved.  The Settlement Class was defined as all class members who suffered or experienced, as of the date of the final court approval of this class settlement, any discomfort, illness, sickness (medical, psychological or psychiatric), symptom, complaint, disability, or loss of any kind as a result of claimed formaldehyde exposure. The case is also noteworthy in that Judge Engelhardt's final approval order noted "Plaintiffs and the Class Members, on their behalf and on behalf of all other Releasors, acknowledge that they are releasing both known and unknown and suspected and unsuspected claims and causes of action, and are aware that they may hereafter discover legal or equitable claims or remedies or injuries or

---

[12] Weinstein's objections fare no better by attempting to rely *Smith v. Sprint Communications*, 387 F.3d 612 (7th 2004), a class action with a "troubled history" involving land owners' rights of way, "judge shopping", where intervenors (objectors) were land owners who had "already been certified as litigation classes in their respective states [and one had already established liability], and each was on the eve of trial when the district court" issued an injunction in connection with the settlement before the court that   prohibited "all competing class actions" from proceeding.

damages presently unknown or unsuspected or unmanifested (including but not limited to personal injury claims), or facts in addition to or different from those which they now know or believe to be true with respect to the allegations and subject matters in the complaint or other filings in any action or in any Pending Actions. Nevertheless, it is the intention of Plaintiffs and the Class Members to fully, finally and forever settle and release all such matters, and all claims and causes of action relating thereto, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any Pending Action)."

*In re Chinese-Manufactured Drywall Products Liability Litigation.*, MDL No. 2047, 2013 WL 499474 (E.D. La. Feb 7, 2013) is another similar example. The litigation concerned property damage and personal injuries caused by the presence of Chinese drywall in homes and other buildings. Ultimately, the court certified the settlement classes, and granted final approval of five interrelated and interdependent class action settlements. In so doing, the court acknowledged that many plaintiffs have alleged personal injuries related to the presence of Chinese drywall in their homes, and disagreed (with objectors) that the compensation funds provided in the settlements, taken together, were insufficient. A similar result was reached in *In re Oil Spill by Oil Rig "Deepwater Horizon"*, 295 F.R.D. 112 (E.D. La. 2013). As was widely publicized, following an enormous explosion and fire aboard the Deepwater Horizon oil drilling rig in the Gulf of Mexico, which resulted in a massive oil spill and clean-up effort, hundreds of cases asserting personal injury, economic loss and property damages claims were filed and centralized. Ultimately, Judge Barbier certified the settlement class and approved the Medical Settlement, which provided a range of benefits to Class Members, including compensation for physical injuries and medical consultation. In exchange for these benefits, Class Members released physical and bodily injury claims against BP and other entities involved in the Deepwater Horizon tragedy. *See also In re*

*Diet Drugs Prods. Liab. Litig.*, Nos. 1203, 99–20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) (granting motion to certify the class and approving of a nationwide class settlement of litigation involving claims regarding the adverse health effects (including valvular heart disease) flowing from the ingestion of two related prescription drugs—fenfluramine and dexfenfluramine – for weight loss management).

Third, Weinstein's argument that this Court should not grant final approval of the Settlement because "non-injury" claims could not be certified in a national litigation class is also misplaced. Weinstein boldly claims that certification of underlying economic claims would be inappropriate in a litigation class because the underlying claims "are based on state law" and there are "substantial differences between class members from different states in this case." Yet, remarkably Weinstein fails to articulate any such differences. However, even if he could, any such objection (or differences in state law) would not preclude Class certification for Settlement purposes or final approval of the Settlement because the "fact that the claims also implicate the laws of different states does not defeat predominance for the purpose of certifying a settlement class." *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d at 958 (N.D. Ill. 2011), citing *Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529–30 (3d Cir. 2004) ("Although there may be situations where variations in state laws are so significant so as to defeat . . . predominance even in a settlement class certification, this is not such a case. We agree . . . that the fact that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states in this matter does not defeat commonality and predominance"); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 315 (3d Cir. 1998) (rejecting "contention that predominance is defeated because the class claims are subject to the laws of the fifty states.")

Fourth, any objection that the Settlement (or either of the common settlement funds), is not enough (or that Plaintiffs' case is too strong) is simply a red herring that should be summarily rejected. *In re Toys "R" Us – Del., Inc. – Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 453 (C.D. Cal. 2014) (granting approval of class action settlement while recognizing that the "fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved"); citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998); *In re Initial Public Offering Sec. Litig.*, 243 F.R.D. 79, n.120 (S.D.N.Y. 2007) (same).

Fifth, the claims review process for certain kinds of claims by Judge Nolan sitting as a Special Master is eminently fair and does not violate due process. Indeed, such an approach furthers the common goal of ensuring that Class members choosing to participate in the Settlement receive fair and adequate compensation for their claims. *See In re Phenylpropanomine (PPA) Prods. Liab. Litig.*, 227 F.R.D. 553 (W.D. Wash. 2004) (granting final approval of class action settlement utilizing Special Master to decide claims); *Lowery v. City of Albuquerque*, No. CIV 09–0457, 2013 WL 1010384 (D.N.M. Feb. 27, 2013) (addressing objections and approving class action settlement that provided "for a Special Master to make the final determination of all class members' claims, specifically where a class member requests damages for mental and emotional distress, and pain and suffering. If claims exceed the class fund, the fund will be divided on a pro rata basis, to be determined by the percentage of any individual claim to the total amount of reasonable compensation that Special Master (sic) determines.") (Internal citation omitted.)

Sixth, while class members have standing to object to a proposed settlement, class membership does not automatically confer standing to challenge a fee award to class counsel. Rather, the objecting class member must be aggrieved by the fee award in a concrete way. For

instance, when attorney's fees are paid out of a common fund, from which both the class recovery and the fee award are paid, a class member who participates in the settlement generally has standing to challenge the fee award because any reduction in the fee award results in an increase to the class recovery. *Glasser v. Volkswagen of Am., Inc.*, 645 F.3d 1084, 1098 (9th Cir. 2011). In settlements such as the one before the Court where Class Counsel's attorney's fees are separately negotiated and funded by the Defendant, and not deducted from a common fund, class members do not have standing to challenge the award absent specific allegations that Class Counsel colluded with the defendant to bargain away benefits to the class in exchange for a better fee. *Id.* at 1098-99. Here, not only are there no specific credible allegations of collusion, but the record before the Court (as demonstrated throughout this submission) regarding the prolonged and hard-fought settlement negotiations that transpired with the able assistance, and under the watchful eye of Judge Andersen, is just the opposite.

5. **Class Counsel Endorses the Settlement, which is the Product of Extensive Arm's Length Negotiations, Not Collusion.**

This case has been vigorously prosecuted, defended, and settled by experienced and competent counsel for all Parties. Further, Plaintiffs' Counsel is well-known, experienced, and has significant class action litigation experience and believes that the Settlement is fair, reasonable, and adequate. A court may consider the judgments of the attorneys who prosecuted the litigation and are most familiar with the facts of the case. *See, e.g.*, *Isby*, 75 F.3d at 1200 (district court entitled to give consideration to the opinion of competent counsel that the settlement was fair, reasonable, and adequate); *Am. Int'l Grp., Inc. v. ACE INA Holdings Inc.*, Nos. 07 CV 2898, 09 C 2026, 2012 WL 651727, at *8 (N.D. Ill. Feb. 28, 2012) (recognizing that the "opinion of counsel is thus entitled to significant weight" when evaluating a settlement); *Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020 ("The court places significant weight on the unanimously

strong endorsement of these settlements by Plaintiffs' well-respected attorneys"); *Retsky Fam. Ltd. v. Price Waterhouse L.L.P.*, No. 97–CV–7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) (finding that the "opinion [of plaintiffs' counsel] that the settlement is fair, reasonable and adequate also favors approval of the settlement.")

Further, it is important to note that the Settlement was reached only after extensive arm's length negotiations and that there is usually an initial presumption that a proposed settlement is fair and reasonable when it was the result of arm's-length negotiations. *See* 4 William B. Rubenstein, Alba Conte, & Herbert B. Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002); *Goldsmith v. Tech. Solutions Co*., No. 92 C 4374, 1995 WL 17009594, at *3 n.2 (N.D. Ill. Oct. 10, 1995) ("it may be presumed that the agreement is fair and adequate where, as here, a proposed settlement is the product of arm's-length negotiations"). Settlements proposed by experienced counsel and which result from arm's-length negotiations are entitled to deference from the court. *See, e.g.*, *id.* at *10 n.2; *In re Linerboard Antitrust Litig*., 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("'A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery'") quoting *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997).

Along these lines, in the absence of evidence to the contrary, a court should presume as a matter of law that the parties conducted settlement negotiations in good faith and reached the resulting agreement without collusion. *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 834 F.2d 677, 681-82 (7th Cir. 1987); *Armstrong*, 616 F.2d at 325; *see also* 4 William B. Rubenstein, Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002). This presumption is certainly applicable and appropriate here.

Quite simply, there was no collusion in the case at hand. On the contrary, the parties, through experienced, fully-informed counsel, engaged in multiple mediation sessions over the course of thirteen months with the assistance of an experienced mediator who previously served as a U.S. District Judge in this District. Judge Andersen was instrumental in assisting the Parties by challenging the claimed strengths and exploring the weaknesses of the Parties' respective positions. The involvement of a mediator in the settlement process further entitles the parties to a presumption that the proceedings were free of collusion. *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02 Civ. 5575, 2006 WL 903236, at *6 (S.D.N.Y. Apr. 6, 2006) (noting that involvement of mediator in pre-certification settlement negotiations helped "ensure that the proceedings were free of collusion and undue pressure"). Furthermore, the Parties agreed to the terms of the Settlement before discussing attorney's fees, which is another critical factor weighing against a finding of collusion.

Against this backdrop, based on their extensive experience and expertise, Class Counsel has determined that the Settlement is in the Class's best interest after weighing the substantial and immediate benefits afforded by the Settlement against the numerous obstacles to a better (or, in fact any) recovery after continued hard-fought litigation on three separate fronts. Thus, the recommendations and opinion of experienced and qualified counsel that the Settlement is fair, reasonable, and adequate favor the Court's approval of the Settlement. *Stewart v. Rubin*, 948 F. Supp. 1077, 1087 (D.D.C. 1996), *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997) (stating "[a] court should defer to the judgment of experienced counsel who have competently evaluated the strength of the proof" when evaluating a settlement); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 587 (N.D. Ill. 2011) (the opinion of competent class counsel supports approval of a class action settlement); *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 308 (7th Cir. 1985).

### 6. The Stage of the Proceedings and the amount of Discovery Completed.

To ensure that a plaintiff had access to sufficient information to evaluate both its case and the adequacy of a settlement, courts in the Seventh Circuit consider the stage of the proceedings and the discovery taken. *AT&T Mobility*, 789 F. Supp. 2d at 958. Even before the initial Complaint was filed in this Court on August 1, 2012, Plaintiffs vigorously investigated, pursued, and analyzed their claims against the Defendants. Since then, Plaintiffs' counsel has filed two additional class actions in two other and separate jurisdictions in order to protect the interest of Class Members. Along the way, the Parties comprehensively briefed several motions, including those: challenging the sufficiency of the Complaint's allegations (in two different jurisdictions); seeking restrictions on communications with absent Class Members; and requesting approval to serve comprehensive formal discovery requests.

Regarding Plaintiffs' discovery efforts, on February 22, 2013, Plaintiffs sought permission from this Court to serve Defendant Unilever with 89 separate written discovery requests. (DE #41). As referenced earlier, on August 7, 2013, the Court issued an order, which permitted Plaintiffs to serve Defendant Unilever with a majority of their discovery requests. (DE #51). In response, Defendant Unilever produced thousands of pages of material, consisting of: extensive customer complaint call logs, spreadsheets, voice messages and call transcriptions, customer complaint forms, internal company material (including communications and correspondence) relating to the development of the product at issue, and scientific articles. The manner in which Defendant Unilever provided the material required an extensive and time- consuming review. For instance, the customer call logs contained some 10,000 entries in fine print, and many of the approximately 4600 voice recordings that were produced exceeded 10 minutes in length. Additionally, Plaintiffs' Counsel also had numerous lengthy discussions and meetings with

multiple experts; participated in two separate mediation sessions with the Defendants (during which the merits of the factual assertions and claims asserted were vigorously contested and debated); spoke with more than 150 injured users of the Product; deposed a principal scientist employed by Unilever who was responsible for product research, development and testing; and researched numerous significant legal issues presented by this case.

As such, Plaintiffs' and Class Counsel had sufficient information and opportunity to evaluate the appropriate contours of a fair settlement of this litigation. *Schulte,* 805 F. Supp. 2d at 587 (noting that even the absence of "formal discovery prior to the settlement does not preclude final approval").

## VI. THE SETTLEMENT'S PLAN OF ALLOCATION IS FAIR AND REASONALBE AND SHOULD BE APPROVED

Plaintiffs also seek approval of the Plan of Allocation of the Settlement proceeds set forth Paragraph 4 of the Settlement and in the Notice made available and distributed to Class Members. Assessment of a plan of allocation in a class action under Federal Rule of Civil Procedure 23 is "governed by the same standards of review applicable to the settlement as a whole" in that the plan must be fair and reasonable. *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) (internal citation omitted); *Summers v. UAL Corp. ESOP Committee*, No. 03 C 15327, 2005 WL 3159450, at *2 (N.D. Ill. Nov. 22, 2005) ("As with all aspects of class action settlements, we must ensure that any allocation plan is reasonable and equitable to all class members.").

Further, district courts have "broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members . . . equitably." *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978). An allocation plan need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class

counsel. *White v. NFL*, 822 F. Supp. 1389, 1420 (D. Minn. 1993); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992).

The objective of a plan of allocation is to provide an equitable basis upon which to distribute the settlement funds among eligible class members. Here, the Plan of Allocation was carefully designed, and agreed to by the Parties (after significant input from Judge Andersen), with one goal in mind – to fairly deliver equitable compensation to class members. Towards that end, the Settlement created two separate Settlement Funds, consisting of a "Reimbursement Fund" of two hundred and fifty thousand dollars ($250,000.00) and an "Injury Fund" of ten million dollars ($10,000,000.00). As explained more fully in paragraph number 4 of the Settlement, the Reimbursement Fund will be available to any member of the Settlement Class who is seeking compensation, in the form of a one-time payment of $10.00 per person, for the purchase of the Smoothing Kit. The Injury Fund will provide relief any member of the Settlement Class who suffered bodily injury to his or her scalp as a result of using the Smoothing Kit, defined as a "Covered Injury." Class members who incurred expenses for hair treatment but no longer have receipts for their expenditures are eligible to receive up to $40.00 per claimant for those expenses, under Benefit Option A. Class members who incurred such expenses but do have receipts, such as hairdresser or medical bills, are eligible to receive up to $800.00 per claimant for their expenses, under Benefit Option B. Class members who suffered significant bodily injury to their hair or scalp will be eligible for awards of up to $25,000.00 per Claimant as determined by the Court-appointed Special Master. Finally, the Court-approved Class Notice clearly informed Class members that they may be eligible to receive a settlement payment (i.e. distribution) from one or both funds. *See* Class Notice, attached to Dahl Declaration as Exhibit C.

Further, a critical component of the Settlement and its allocation and is the appointment of

long-serving former Magistrate Judge Nan R. Nolan (Ret.) as a Special Master to evaluate claims submitted to the Injury Fund, and determine the appropriate awards to be made to eligible Class members accordingly. The reasonable expenses associated with the allocation and administration of the Settlement proceeds will be paid by Defendant Unilever, separately and apart from the $10,250,000.00 funding the Reimbursement and Injury Funds.[13]

As such, the Plan of Allocation will result in a fair and equitable distribution of the proceeds among injured Class Members. Consequently, Class Counsel believes that the Plan of Allocation is fair, reasonable, and equitable to all Class members and should be approved.

## VII. CLASS COUNSEL'S EFFORTS RESULTED IN THE CREATION OF A $10.250 MILLION COMMON FUND FOR THE BENEFIT OF THE CLASS AND ITS REQUESTED ATTORNEY'S FEES ARE REASONABLE AND SHOULD BE AWARDED BY THIS COURT

It has been well established in the Seventh Circuit, and elsewhere, that fee awards based upon a percentage of a recovery are fair and reflect what could have been contracted for in the marketplace. Consumer protection cases, where counsel is retained on a contingent fee basis, are certainly no different. It is well established that when a representative party has created a "common fund" for, or has conferred a "substantial benefit" upon, an identifiable class, counsel for that party is entitled to an award of attorneys' fees from the fund. Attorneys who achieve a benefit for a class in the form of a "common fund" are entitled to be compensated for their services from the total amount of the settlement fund made available to class members, whether claimed or not. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480-81 (1980) (concluding that the attorneys for a successful class may recover a fee based on the entire common fund created for the class, even if some class members make no claims against the fund so that money remains in it that otherwise would be returned to the defendants); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423,

---

[13] If the amounts to be awarded exceed $10,250,000.00, they will be distributed under a pro rata formula.

437 (2d Cir. 2007) ("The entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class. An allocation of fees by percentage should therefore be awarded on this basis of the total funds made available, whether claimed or not"); 4 William B. Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*, Sec. 14:6, (4th ed. 2002) (stating that *Boeing* settled the issue of whether the benchmark common fund amount for fee award purposes is made up of the amount claimed by class members or the amount potentially available to class members by ruling that class counsel are entitled to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually claimed); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-98 (11th Cir. 1999) (upholding an attorney fee award based on the entire settlement fund though a portion reverted to the defendant); *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (holding that the district court abused its discretion by awarding attorneys' fees as one-third of the $10,000 claimed against the common fund rather than awarding one-third of the entire $4.5 million settlement fund in a case whether unclaimed funds revered to the defendant.)

After more than 2 years of hard fought investigation, successful prosecution of 3 separate class actions, and extensive arm's length negotiations, Class Counsel's efforts resulted in the creation of a $10,250,000.00 common fund for the benefit of the Class. Indeed, the Settlement executed by Defendant Unilever and its counsel states clearly (at ¶ 4) that "within 10 days after entry of the Final Approval Order, Unilever will provide $10,250,000.00 to the Settlement Administrator **for the establishment of two interest-bearing Settlement Funds**." (Emphasis added.)

Additionally, any award of attorney's fees in this matter is being paid by Unilever in addition to the $10,250,000.00 allocated for the benefit of Class members. Consequently, any

attorney's fees awarded to Class Counsel by this Court, will not impact, affect, or reduce the Settlement funds available or distributed to Class members in any way. Indeed, any award of attorney's fees (and reimbursement of litigation costs and expenses) rendered by this Court will be paid by Unilever and is separate and distinct from the $10,250,000.00 Settlement funds created to compensate Class members for their claimed damages.

<strong>A. The Court Should Apply the Percentage-Of-The-Fund Approach in Analyzing the Amount of Attorney's Fees to Award Class Counsel</strong>

When granting a fee award, a court must do its "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). District courts have discretion to award fees in common fund cases based on either the lodestar/multiplier or percentage-of-the-fund methods. *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014); *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991) ("[t]he decision of whether to use a percentage method remains in the discretion of the district court"); *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. at 379. However, the percentage-of-the-fund method has become the preferred methodology and approach for awarding fees in class actions in this Circuit. *In re Northfield Labs. Sec. Litig.*, No. 06 C 1493, 2012 WL 2458445, at *3 (N.D. Ill. June 26, 2012) (internal citation omitted) ("Such a payment from the settlement fund is based on the equitable notion that those who have benefitted from litigation should share in its costs."; *In re Abbott Labs. Sec. Litig.*, No. 92-C-3869 MEA, 1995 WL 792083, at *4 (N.D. Ill. July 3, 1995) (finding "[t]he percentage of recovery method is the simplest of the methods.") Indeed, this Court has recognized that "the Seventh Circuit strongly endorsed the percentage method of computing appropriate fee awards in class action common fund cases." *Goldsmith v. Tech. Solutions Co.,* No. 92 C 4374, 1995 WL 17009594, at

*7 (N.D. Ill. Oct. 10, 1995); *see also In re Lithotripsy Antitrust Litig.*, No. 98C 8394, 2000 WL 765086 at, *2 (N.D. Ill. June 12, 2000) ("[t]he 7th Circuit Court of Appeals, as well as a majority of other circuit courts have approved the use of the percentage of the fund method to award attorneys (sic) fees in class-action/common fund cases.")

The percentage-of-the-fund method in common fund cases is a means for the court to award fees "at a level that will approximate what the market would set." *Gaskill v. Gordon*, 160 F.3d 361, 362-63 (7th Cir. 1998). Furthermore, the percentage method is consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *See Silverman v. Motorola*, No. 07 C 4507, 2012 WL 1597388, at *4 (N.D. Ill. May 7, 2012) *aff'd*, 739 F.3d 956 (7th Cir. 2013) ("[F]ee request was reasonable and in line with privately-negotiated arrangements in similar cases"); *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the prevailing method of compensating lawyers for similar services is the contingent fee, then the contingent fee *is* the market rate.") (Emphasis in original and internal quotations omitted.) Along these lines, in the private marketplace, the "contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains." *Id.* at 325. Thus, Class Counsel requests that the Court apply the percentage-of-the-fund method.

**B.    Class Counsel's Request for an Attorney's Fee Award of One-Third of the Total Common Fund Made Available to Class Members is Reasonable**

A court must do its "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d at 718. Further, this Court has held that "[t]hirty three percent appears to be in line with what attorneys are able to command in the open market in arm's-length negotiations with their clients." *Goldsmith*, 1995 WL 17009594, at *8. In fact, this Court has

repeatedly awarded class counsel attorney's fees amounting to thirty-three percent in common fund cases. *See, e.g.*, *Goldsmith*, 1995 WL 17009594, at *8 (awarding 33.33 percent of the common fund); *In re Lithotripsy Antitrust Litig.*, 2000 WL 765086, at *2 (recognizing that "33.3% of the fund plus expenses is well within the generally accepted range of the attorneys' fee awards" in class actions.)[14]

As such, it is clear that attorney's fee awards of one-third of the common fund created fall within the range of accepted (and common) awards in this Circuit. Furthermore, an attorney's fee award of one-third is consistent with awards nationwide. *See, e.g., Capsolas v. Pasta Res., Inc.*, No. 10-cv-5595 (RLE), 2012 WL 4760910, at *8 (S.D.N.Y. Oct. 5, 2012) (granting fee request of one-third of common fund in class action settlement); *Chavarria v. N.Y. Airport Serv., LLC*, 875 F. Supp. 2d 164, 179 (E.D.N.Y. June 25, 2012) (one-third fee award); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 493 (E.D. Cal. 2010) (one-third fee award); *Spann v. AOL Time Warner, Inc.*, No. 02 Civ. 8238 (DLC), 2005 WL 1330937, at *9 (S.D.N.Y. June 7, 2005) (one-third fee award); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (one-third fee award); *In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) (one-third fee award).

---

[14] *See also George v. Kraft Foods Global, Inc.*, No. 1:08-cv-3799, slip op. at 2 (N.D. Ill. June 26, 2012), ECF No. 344 (finding a fee award of one-third of the settlement fund was consistent with the market rate); *In re BP Propane Indirect Purchaser Antitrust Litigation* (N.D. Ill. February 10, 2010) (Plaintiff's counsel awarded 33% of the Settlement Fund); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. July 29, 2011) (finding attorney's fees in the amount of one-third of the settlement fund to be reasonable); *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 598, 600 (7th Cir. 2005) (affirming a fee award of 30%); *Retsky Family Ltd. P'ship v. Price Waterhouse, LLP*, No. 97 C 7694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) (awarding one-third of common fund); *Rehm v. Eagle Fin. Corp.*, No. 96 C 2455 1998 U.S. Dist. LEXIS 20015 (N.D. Ill. Dec. 8, 1998) (same); *Gaskill v. Gordon*, 942 F. Supp. 382, 388 (N.D. Ill. 1996) *aff'd*, 160 F.3d 361 (7th Cir. 1998) (awarding 38% of common fund); *First Interstate Bank of Nevada, N.A. v. Nat'l Bank of Chi.*, No. 80 C 6401, slip op. at 2 (N.D. Ill. Feb. 12, 1988) (awarding 39% of common fund).

As such, this Court should similarly employ a percentage-of-the-fund approach and award Class Counsel an attorneys' fee award amounting to one-third of the total common fund ($10.25 million) made available for the benefit of the Class.

### C. Class Counsel's Extensive Work in Three Separate Class Actions Resulted in an Excellent Result for the Class

When establishing the market rate for legal fees in a common fund case, the Court should also consider "… the risk of nonpayment a firm agrees to bear…the quality of its performance … the amount of work necessary to resolve the litigation, and … the stakes of the case. *In re Synthroid*, 264 F.3d at 721). *See also Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388, at *3 (N.D. Ill. May 7, 2012) (finding the risk of nonpayment was significant where Class Counsel "litigated this case aggressively for four and one-half years, on a fully contingent basis …").

Here, success was never guaranteed. Rather, Class Counsel vigorously prosecuted three separate class actions in different jurisdictions against well-funded Defendants represented by experienced counsel with no guarantee of any recovery for the Class or themselves. Along the way, Class Counsel incurred out-of-pocket litigation expenses that were necessary to properly prosecute this action, also without any guarantee of repayment. Operating under such high-risk conditions, Class Counsel nonetheless:   (a) prepared initial and amended pleadings; (b) prepared oppositions to motions to dismiss filed in two different jurisdictions; (c) briefed a motion to limit communications with class counsel and a request to serve Defendant with comprehensive discovery requests (which were in large part approved by this Court and served); (d) conducted discovery; (e) participated in two separate mediation sessions with Judge Andersen over the course of more than a year and participated in extensive settlement negotiations with the Defendants; (f) successfully briefed an opposition to a motion to lift injunction and expedite the opt-out process;

and (g) appeared before the Court several times. In addition, Class Counsel negotiated all Settlement documents including the Settlement Agreement, Claim Forms, and Notice, worked with the Settlement Administrator and Special Master, and fielded numerous calls from Class members regarding the status of the litigation and the Settlement.

The quality of Class Counsel's extensive foregoing professional services is illustrated by the successful prosecution of multiple class actions and the positive result achieved for the Class. As further support for the quality of Class Counsel's services, the Court reviewed their respective credentials when it appointed them Class Counsel when granting preliminary approval of the Settlement currently before the Court.[15]    (DE #96)

Thus, the risks undertaken by Class Counsel in prosecuting these actions, without any guarantee of success or payment, justify the requested attorney's fee award in the amount of one-third of the total common fund made available to Class members.

### D. The Lodestar Multiplier Cross-Check Further Confirms the Reasonableness of the Requested One-Third Attorney's Fee Award

This court is not required to perform a lodestar multiplier cross-check to confirm the reasonableness of the requested fee. *Williams v. Rohm & Hass Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) cert. denied, 132 S. Ct. 1911 (2012) (stating "consideration of a lodestar check is not an issue of required methodology" and that District Court's application of lodestar cross check will be reviewed pursuant to an abuse of discretion standard). Be that as it may, courts often apply a lodestar-multiplier "cross-check" to gauge the reasonableness of the percentage award. *In re Trans Union Corp., Privacy Litig.*, No. 00 C 4729, 2009 WL 4799954, at *17 (N.D. Ill. Dec. 9, 2009) (One purpose of the lodestar cross check is to "determine whether the fee is within some reasonable multiple of the lodestar."). *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("we

---

[15]  Plaintiffs' Counsel is also requesting that the Court reaffirm its appointment of Class and Liaison Counsel.

have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach".)   As of June 10, 2014, Plaintiffs' Counsel (including professionals at their respective firms) have spent a total of 3,714.20 hours of professional time in this action.   *See* Exhibits 2 to 6.[16]   The total lodestar value of this time is $2,087,643.00.   *Id*.   Thus, the requested one-third fee award of the Settlement Fund would represent a modest lodestar multiplier of 1.64.   The requested lodestar multiplier is in the lower end of the range of multipliers that have been previously approved in this District and should be awarded by the Court.   *See Harmon v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991) (multipliers anywhere between 1.0 and 4.0 have been approved); *see also Shagringas Co.* v. *BP Products*, No. 06-CV-3621 (N.D. Ill. May 26, 1999) (JBZ), ECF No. 182 (awarding lodestar multiplier of 2.7); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 400 (S.D.N.Y. 1999) (awarding loadstar multiplier of 2.5); *In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 558, n.42 (3d Cir. 1991) (finding that a multiplier, in a lodestar crosscheck, in the range of "2.6, 3.4, or somewhere in that neighborhood . . . is not problematically high.   It is either below or near the average multiplier . . .").

## VIII.   THE REQUESTED REIMBURSEMENT OF COSTS AND EXPENSES IS FAIR AND REASONABLE AND SHOULD BE APPROVED

Under the common fund doctrine, attorneys who generate a benefit for the class are entitled to the reimbursement of reasonable litigation expenses pursuant to a market-based approach.   *See Great Neck Capital Appreciation Inc. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 412 (E.D. Wis. 2002) ("The paying arms-length market typically reimburses lawyers for expenses . . ."), citing *In re Synthroid*, 264 F.3d at 722.   Further, Defendant Unilever has agreed to

---

[16]   The aggregate lodestar reflected in Exhibits 2 to 6 includes time and expenses reported through June 10, 2014.   Class Counsel's work continues and the additional time and expenses to be incurred, for all firms will be included in a supplement to be filed with the Court on or before July 9, 2014.

pay Class Counsel for litigation costs and expenses incurred in connection with the prosecution of this and the related matter, which are approved by this Court. *See* Settlement, ¶ 17.

In securing the $10.250 million Settlement Fund for the Class, Class Counsel and the other Plaintiffs' Counsel working on this case incurred reasonable and necessary costs and expenses totaling $30,001.81. (*See* Exhibits 2 to 6) As such, Class Counsel and requests that the Court award Class Counsel reimbursement of such litigation costs and expenses accordingly.

## IX. INCENTIVE AWARDS ARE WARRANTED FOR THE NAMED PLAINTIFFS

Finally, Class Counsel also requests that the Court approve incentive awards to Named Plaintiffs Alisha Barnett, Dawn Damrow, Fran Penell, Terri Naiser, Jonnie Phillips, Josephine Wells and Catherine Reny $7,500.00, and to Named Plaintiff Sidney Reid $10,000.00, which Defendant Unilever has agreed to pay and which were separately negotiated after the Parties agreed on key terms of the Settlement (*see* Settlement, ¶ 5), for their efforts in bringing the Smoothing Kit Lawsuits, and in consideration of the time and effort they expended in prosecuting these class actions. As the Seventh Circuit has explained, "[i]ncentive wards are justified when necessary to induce individuals to become named representatives." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001). When determining whether to grant an incentive award, a court considers: "The actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). Each Named Plaintiff easily meets these criteria.

Moreover, courts regularly approve incentive awards for class representatives. *See*, *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*, 280 F.R.D. at 383 (approving incentive award of $25,000.00 in the aggregate for the five class representatives, while finding

$6,358.80 to be the average individual incentive award), *In re AT&T Mobility Wireless Data Servs. Sales Tax Litigation*, 792 F. Supp. 2d 1028, 1041-42 (N.D. Ill. 2011) (awarding incentive awards in the amount of $5,000 to each named plaintiff finding named plaintiffs' "role in reviewing, considering, and approving the Settlement Agreement and fee application, and especially their willingness to take a more-active role if necessary, warrants a $5,000 reward."), *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 715 (E.D. Pa. 2009) (court approved $15,000 awards for each class representative finding that "[t]hese awards, though high, are justified by the benefit provided to the absent class members."); *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 342 (E.D. Pa.2007) (approving the requested incentive award of $75,000); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (approving two incentive awards of $55,000 and three incentive awards of $35,000).

The Parties agree that subject to approval by the Court, the Named Plaintiffs have earned the incentive awards in the amounts listed above for their service to the Class in bringing and prosecuting the Smoothing Kit Lawsuits. *See* Settlement, ¶ 5. Named Plaintiffs "made substantial contributions to the development of the case." *Spicer v. Chi. Bd. Options Exch.*, *Inc.*, 844 F. Supp. 1226, 1268 (N.D. Ill. 1993).[17] By coming forward to prosecute their claims on behalf of the class, Named Plaintiffs placed their reputations on the line. Throughout the litigation, they were readily available to assist Class Counsel with the effective prosecution of the case. Additionally, each Named Plaintiff assisted in discovery and thoroughly responded to document requests or provided assistance and the basis for achieving the nationwide Settlement. Named Plaintiffs also evaluated and approved the global nationwide Settlement for the Class'

---

[17] *In Spicer*, this Court granted plaintiffs' petition for an incentive award of $10,000.00 for each named plaintiff finding "plaintiffs provided valuable services which benefitted the class as a whole." *Id.*

benefit. Consequently, Class Counsel respectfully requests that the Court award the Named Plaintiffs the incentive awards as requested above.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court enter an Order: (i) reaffirming its certification of the Class for Settlement purposes; (ii) reaffirming appointment of Named Plaintiffs as Class Representatives; (iii) reaffirming the appointment of Peter Safirstein and Christopher S. Polaszek of Morgan & Morgan, and Jana Eisinger of the Law Office of Jana Eisinger, PLLC as Class Counsel, and Marvin Miller as Liaison Counsel; (iv) approving the Settlement; (v) awarding attorneys' fees in the amount of $3,416,632.50, which represents one-third of the gross Settlement amount made available to the Class; (vi) awarding reimbursement of litigation costs and expenses of $30,000.81; and (vii) approving the following Incentive Awards to be paid by Defendant Unilever to Named Plaintiffs in recognition of their exceptional service to the Class in the following amounts: $7,500.00 each to Alisha Barnett, Dawn Damrow, Fran Penell, Terri Naiser, Jonnie Phillips, Josephine Wells and Catherine Reny, and $10,000.00 to Sidney Reid.


DATED: June 11, 2014                    Respectfully submitted,

                                        By:    _/s/_ Marvin A. Miller
                                               Marvin A. Miller

                                        **MILLER LAW LLC**
                                        Lori A. Fanning
                                        Andrew Szot
                                        115 S. LaSalle Street
                                        Chicago, Illinois 60603
                                        Telephone: (312) 332-3400
                                        Facsimile: (312) 676-2676
                                        Email:  mmiller@millerlawllc.com
                                        Email:  lfanning@millerlawllc.com

Email:  aszot@millerlawllc.com

Peter Safirstein
Elizabeth S. Metcalf
**Morgan & Morgan, P.C.**
28 W. 44th St., Suite 2001
New York, NY   10036
Telephone: (212) 564-1637
Facsimile: (212) 564-1807
Email:  psafirstein@forthepeople.com
Email:  emetcalf@forthepeople.com


Christopher S. Polaszek
**Morgan & Morgan, P.A.**
One Tampa City Center
201 N. Franklin St., 7th Fl.
Tampa, FL 33602
Telephone: (813) 314-6484
Email:  cpolaszek@forthepeople.com


**Law Office of Jana Eisinger, PLLC**
11 West Prospect Avenue
Mount Vernon, New York 10550
Telephone: (914) 418-4111
Facsimile: (914) 455-0213
Email:  jana.eisinger@gmail.com

*Counsel for Plaintiffs*