IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | |
|---|---|
| SIDNEY REID, ALISHA BARNETT, DAWN DAMROW and FRAN PENELL, on Behalf of Themselves and all Others Similarly Situated,<br><br>    Plaintiffs,<br> v.<br><br>UNILEVER UNITED STATES, INC., LEK, INC., and CONOPCO, INC. d/b/a UNILEVER HOME AND PERSONAL CARE USA,<br><br>    Defendants. | Case No. 12 CV 6058<br>Hon. Ruben Castillo |

### UNILEVER'S RESPONSE TO OBJECTIONS AND MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Defendants Unilever United States, Inc. and Conopco, Inc. d/b/a Unilever Home and Personal Care USA (collectively, "Unilever") hereby submit this Response to the Objections filed by Tina Martin and Yolanda Reed, and urge that the Court approve the class settlement.

As Plaintiffs explain in their Memorandum of Law in Support of Motion for Final Approval (Dkt. 126, hereafter "Pl. Final Approval Mem."), courts in this Circuit consider the following factors in assessing the fairness of a class action settlement: (1) the strength of Plaintiffs' case compared to the amount of the settlement; (2) the complexity, length and expense of continued litigation; (3) the amount of opposition to the settlement; (4) the opinions of counsel and (5) the stage of the proceedings and amount of discovery completed at the time of the settlement. Pl. Final Approval Mem. at 19; *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2007). Plaintiffs' Final Approval Memorandum analyzes each of these factors, and properly concludes based on those factors that the proposed class action settlement is

fair, reasonable, and adequate. *See* Pl. Final Approval Mem. at 9-11, 19-39; *Synfuel Techs., Inc.*, 463 F.3d at 653. Unilever submits this separate memorandum in support of final approval of the class action settlement in order to further address two issues that have been raised by objectors Tina Martin and Yolanda Reed: (1) the strength of Plaintiffs' case, and (2) the alleged "conflict between class members with and without injuries." Objections Regarding Proposed Settlement (Dkt. 112) filed by objector Yolanda Reed (hereafter, "Reed Obj.") at 3; Objection of Tina Martin to Approval of Proposed Class Action Settlement (Dkt. 116) (hereafter, "Martin Obj.") at 4-6. As set forth below, these objections are without merit. Accordingly, Unilever respectfully requests that the objections be overruled and that the Court enter the Order Granting Final Approval of Class Action Settlement and Final Judgment.[1]

## LEGAL DISCUSSION

### I. THE SUBSTANTIAL WEAKNESSES AND RISKS OF LITIGATING PLAINTIFFS' CLAIMS SUPPORT APPROVAL OF THE SETTLEMENT.

Purported class member Tina Martin has filed an Objection to the settlement asserting that it is "unfair to the prospective class in view of the strength of Plaintiffs' case, the gravity of Defendants' conduct and the likelihood that punitive damages would be awarded had the lawsuit been litigated." Martin Obj. at 14. Significantly, Ms. Martin has not provided any evidence to support her claim that she is in fact a member of the proposed Settlement Class. Although she states in her Objection that, "[p]ursuant to paragraph 22 of the Court's February 12, 2014 Order Granting Preliminary Approval of Class Action Settlement, Objector is filing herewith a

---

[1] Although Unilever submits that the class action settlement should be finally approved, it opposes the award of attorneys' fees sought by Class Counsel, for the reasons that will be set forth in its separate Memorandum of Law in Opposition to Plaintiffs' Petition for Award of Attorneys' Fees (the "Fee Memorandum"). The proposed filing date for the Fee Memorandum is the subject of the parties' June 26, 2014 Joint Motion for Extension Pursuant to Rule 54.3(g), in light of the ongoing negotiations and proposed mediation on Class Counsel's fee request.

2

declaration that states full name, current address, and facts establishing her status as Class members [sic]" (Martin Obj. at 14), no such declaration has been filed. In any event, Ms. Martin's conclusory assertions ignore the substantial weaknesses of Plaintiffs' claims, the strength of Unilever's defenses and the very real risk that litigation would have resulted in no recovery at all for class members.

As an initial matter, Ms. Martin's objection is without merit in its contention that the settlement funds represent insufficient compensation because Unilever sold a product "intended for use on the human scalp" that contained "hair-removing chemical agents (corrosive depilatories)." Martin Obj. at 5; *see also id.* at 8 (referring to Plaintiffs' allegations that thioglycolic acid is "a corrosive depilatory agent"). That factual assertion is untrue. Had this case proceeded to litigation on the merits, the evidence would have shown that the product's active ingredient, ammonium thioglycolate, is *not* a "corrosive depilatory," but a chemical that has been safely used in hair perming products for decades. *See, e.g.*, Defendant's Reply Memorandum in Support of Its Motion to Dismiss Plaintiffs' Class Action Complaint (Dkt. 38) at 4; Independent Assessment and Opinion of the Safety of Suave KERATIN INFUSION 30 Day Smoothing Kit Intended for Consumer Use by William E. Dressler (April 25, 2012), attached hereto as Exhibit A, at 2-4. The active ingredient in hair removal products (such as Nair) is not ammonium thioglycolate but potassium thioglycolate, a different chemical compound (with a completely different pH). *See, e.g.*, *id.* The evidence would also have shown that independent review by the U.S. Cosmetic Ingredient Review has confirmed the safety of ammonium thioglycolate in the concentration present in the Product. *See* Exhibit A at 2.

Unilever would also have presented convincing evidence at trial that it not only took extensive precautions to ensure the safety of the Product before it was launched, but that the

Product did, in fact, produce the marketed smoothing effects. Unilever conducted multiple rounds of consumer testing before it put the Product on the market, including a national consumer test conducted only months before the Product went into production. Such evidence would have posed a significant obstacle to Plaintiffs' consumer fraud and warranty law claims, their personal injury claims, and their claim for punitive damages.

Furthermore, the Product as marketed by Unilever included extensive instructions for proper use, and explicitly warned consumers not to use the Product under any of the following circumstances:

- [Y]ou have previously reacted to products containing thioglycolates, which are often found in hair perming products.

- Your scalp is irritated or damaged.

- Your hair is currently permed or chemically straightened with a perm type product, only a root touch up can be done.

- Your hair is highlighted or bleached. This treatment also must not be used with double processed or high lift color. . . . Use of this product on lightened hair (including highlights or high lift color processes) will result in hair breakage – regardless of how long ago the hair was treated.

- Your hair is treated with hennas or color restorers (metallic dyes). You have chemically relaxed or straightened your hair with relaxers containing lye (sodium hydroxide) or hydroxides of lithium, potassium, or guanidine.

- Your hair is highly damaged, extremely dry, brittle, or breaking.

*See* Ex. B to First Amended Class Action Complaint (Dkt. 60). Information provided to Unilever's Consumer Services group by individuals who had experienced an adverse result from use of the Product revealed that the vast majority of such consumers either failed to heed these warnings, by using the Product when they should not have done so, or failed to follow the Product instructions, *e.g.*, by using the Product on dry hair, or by failing to apply the second, neutralizing step of the process.

Had this case proceeded to litigation on the merits, Unilever would have presented evidence, including expert testimony, that the Product could not have caused the damages claimed by Plaintiffs if they had heeded the warnings set forth on the Product packaging and followed the instructions for use. (Indeed, the evidence would have shown that after Unilever began receiving complaints related to the Product, its scientists conducted additional lab testing to try to understand whether and how the Product could be causing the kinds of injuries that consumers were claiming to have suffered, but were unable to recreate those injuries even when it applied the Product to bleached and damaged hair.) Unilever would also have presented evidence, including expert testimony, that the Product could not under any circumstances have caused the types of bald spots that some Plaintiffs displayed, which are more indicative of pre-existing medical conditions, such as alopecia areata and tinea capitis.

Given these facts, Plaintiffs would have faced significant challenges in establishing either that the Product was defective (a necessary element of every one of their claims), or that the Product had caused the personal injuries that they claimed. And Ms. Martin offers no basis for her assertion that Unilever "knowing[ly] and intentionally concealed the dangers of the Product" or otherwise acted in way that could support Plaintiffs' claim for punitive damages. Martin Obj. at 8; *see also Brown v. Overhead Door Corp.*, No. 06 C 50107, 2008 WL 5539388, at *1 (N.D. Ill. Dec. 11, 2008) (punitive damages only appropriate "where the defendant's conduct is willful or outrageous due to evil motive or a reckless indifference to the rights of others").

Finally, Unilever was prepared to present evidence at trial that the Product produced the desired smoothing effects for the vast majority of consumers. Unilever received numerous testimonials from consumers who liked the Product, including compelling videos documenting the favorable effects of the Product and the consumers' positive reactions. Indeed, even after the

5

Plaintiffs filed, resolved, and notified potential class members of the allegations presented in this lawsuit, the Settlement Administrator has received several communications praising the Product. *See* Opt-Out Letter from Christina Balesh, attached hereto as Exhibit B; Opt-Out Letter from Marie McGhee, attached hereto as Exhibit C. Another individual, who submitted a claim for reimbursement, provided a cover letter stating how much she "loved the product." Letter from Natalie Petro, attached hereto as Exhibit D. That reaction is consistent with the experience of Unilever's Consumer Services group, whose operators received numerous calls following the recall of the Product from consumers who loved the Product and were trying to find it so that they could use it again. This evidence would potentially have been fatal to Plaintiffs' warranty claims, which require Plaintiffs to establish that the Product failed to satisfy Unilever's representations. *See* Dkt. 25 at 7 (Plaintiffs must show that "Product did not conform to [Unilever's] affirmations" to prevail on warranty claims).

Contrary to Ms. Martin's claims, the settlement reflects a careful assessment of the risks of establishing liability and damages as well as Plaintiffs' potential to prevail on their claims. Unilever would have contested all of Plaintiffs' claims for relief, with a high likelihood of success. Ms. Martin's Objection that the settlement is inadequate in light of the strength of Plaintiffs' claims is without merit and should be overruled.

**II. THERE IS NO CONFLICT BETWEEN THE NAMED PLAINTIFFS AND CLASS MEMBERS WHO CLAIM ONLY FROM THE REIMBURSEMENT FUND.**

Objector Yolanda Reed argues that the Court should disapprove the settlement because there is an alleged "conflict of interest within the class." Reed Obj. at 3. Specifically, Ms. Reed contends that there are "two distinct groups in the settlement class" – one group of people who were injured, and may collect from the Injury Fund, and one group of people who were not injured, and may collect only from the Reimbursement Fund. *Id.* Ms. Reed further contends that

because each of the class representatives claims to have suffered personal injury as a result of using the Product, they are not adequate representatives of the class members who are eligible only for payment from the Reimbursement Fund. *Id.* Ms. Reed argues that the inadequacy of the class representatives to represent the interests of reimbursement-only class members is proven by the size of the Reimbursement Fund, which she contends provides inadequate compensation to reimbursement-only class members. As explained below, these objections are wholly without merit and should be overruled.

As an initial matter, Ms. Reed's objection ignores the fact that each of the class representatives in this case asserted claims for breach of warranty that sought as damages "the amount of the purchase price of the Product," along with any consequential damages that may have resulted from the purchase. *See* Amended Compl. (Dkt. 60), ¶ 95. Furthermore, under the Settlement Agreement every class member – including the class representatives – is eligible to make a claim for a $10 payment from the Reimbursement Fund.

Courts and commentators agree that, under these circumstances, there is no inherent conflict that renders the class representatives inadequate. As the leading treatise on class actions states:

> [P]laintiffs who have suffered large damages as compared to those of the class, or who have individual claims over and above those of the class, are not placed in conflict with the class for this reason. For example, in products liability cases, class representatives who have personal injury claims may properly represent a class of persons who have only breach of warranty or contract claims, so long as the class representatives also share those claims.

Newberg on Class Actions § 3:60.

For example, in *In re Pet Foods Products Liability Litigation*, 629 F.3d 333 (3d Cir. 2010), the settlement class included both members who had purchased allegedly contaminated pet food, but who suffered no other injury (the "Purchase Claims"), and members whose pets had

7

become ill or died after consuming the contaminated pet food (the "Injury Claims"). In approving settlement, the district court rejected objectors' arguments that because all of the class representatives asserted Injury Claims, they were not adequate representatives of class members who had only Purchase Claims. On appeal, the Third Circuit agreed that there was no conflict or adversity among the class representatives and class members that would render the class representatives inadequate.[2] *Id.* at 344-48. The court emphasized that, because the class representatives "all have Purchase claims," the remedial interests of class members with only Purchase Claims were represented by the class representatives. *Id.* at 345.

The court also rejected the very argument made by Ms. Reed here – that the settlement fund's allocation of a larger percentage of the settlement to class members with Injury Claims than to class members with Purchase Claims demonstrated a conflict between the groups. *Id.* at 347. Rather, the court found, "the different allocations reflect that relative value of the different claims." *Id.* As the court observed, "varied relief among class members with differing claims in class settlements is not unusual," and such differences in settlement value "do not, without more, demonstrate conflicting or antagonistic interests within the class."[3] *Id.* at 346; *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272-73 (3d Cir. 2009) (finding that variations in relief among different groups of class members was "simply a reflection of the extent of the injury that certain class members incurred" and "[did] not clearly suggest that class members had

---

[2] The Third Circuit affirmed the district court's certification of the settlement class, but remanded the case for further consideration of the fairness and adequacy of the amount allocated to the Purchase claims. The district court on remand confirmed its original determination that the settlement as to the Purchase claims was fair and adequate. *In re Pet Foods Prods. Liab. Litig.*, No. 07-2867 (NLH), 2011 WL 1322878, at *4 (D.N.J. April 5, 2011).

[3] The Third Circuit also explained why *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), on which Ms. Reed purports to rely, was inapposite to the case before it. *In re Pet Prods. Liab. Litig.*, 629 F.3d at 344. That analysis is equally applicable here.

antagonistic interests."); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146-48 (8th Cir. 1999) (rejecting argument that the fact that settlement would result in different awards to different class members demonstrated a conflict of interest within the class).

Ms. Reed's arguments regarding the adequacy of the Reimbursement Fund allocation are similarly unavailing. First, Ms. Reed asserts that the total amount of the Fund ($250,000) is inadequate because it is "a mere 2% of the total recovery." Reed Obj. at 4. But Ms. Reed offers no explanation for why comparison of the amount of the Reimbursement Fund to the amount of the Injury Fund is an appropriate way to determine the adequacy of the Reimbursement Fund, nor does she cite any authority to support her position that this ratio is of any relevance.

Furthermore, the evidence before the Court establishes the adequacy of the Reimbursement Fund for the purposes set forth in the Settlement Agreement. Plaintiffs in this case have estimated, based on information they obtained from Unilever in discovery, that somewhere between 225,000 and 260,000 kits were sold. *See* Pl. Final Approval Mem. at 12. Ms. Reed has not challenged those figures.[4] Based on the complaints filed by Plaintiffs in the three consolidated class actions, the average retail price of the Product can be conservatively estimated at approximately $13.33, resulting in total retail sales in the range of $2,991,261 to $3,585,770.[5] The $250,000 Reimbursement Fund amount thus represents somewhere between 6.97% and 8.36% of the total retail sales of the Product. Given typical reimbursement claim rates in consumer class settlements, these ratios support the conclusion that the $250,000

---

[4] Objector Martin asserts that the numbers actually sold could be significantly higher, but that assertion is nothing more than speculation. *See* Martin Obj. at 6.

[5] The average of the purchase prices alleged by each of the class representatives is approximately $13.33 (using $15 for Frank Pennel, who alleged that she paid somewhere between $10 and $20), with the $10.97 purchase price shown in the Wal Mart advertisement attached to each of the complaints as an additional data point. Unilever's own records show that the average purchase price was actually $12.

9

Reimbursement Fund provides fair settlement compensation for likely claimants. *See, e.g.*, *Pappas v. Naked Juice Co. of Glendora, Inc.*, No. 11-cv-08276-JAK-PLA (C.D. Cal.), Order re Plaintiffs' Motion for Final Approval of Class Settlement (Dkt. 184, Jan. 2, 2014), attached hereto as Exhibit E (granting final approval to class settlement in which 573,952 valid claims were filed, representing 2.67% of the total estimated class size) and the related Defendant Naked Juice Co. of Glendora, Inc.'s Response to Objections and Statement in Support of Final Approval of Proposed Class Action Settlement (Dkt. 168, Nov. 25, 2013), attached hereto as Exhibit F, at 10 (estimating class size as 21.5 million individuals). *See also Taylor v. JVC Americas Corp.*, No. 07-4059 (D.N.J.), Plaintiff's Memorandum in Support of Final Approval of Class Action Settlement (Dkt. 58, Ex. 1, Oct. 19, 2009), attached hereto as Exhibit G, at 2, 7 (1,313 valid claims received, representing 6.91% of total estimated class size) and the related Order and Final Judgment (Dkt. 64, Nov. 4, 2009), attached hereto as Exhibit H (granting final approval).

The adequacy of the Reimbursement Fund is further buttressed by the claim filings to date. As of June 17, 2014, a total of 2,489 claims seeking the $10 reimbursement payment had been filed. Ten times that number of claims would be required to exhaust the Reimbursement Fund. Objector Martin offers no reason to believe that anything near that number – much less substantially exceeding it – will be filed.

Second, Ms. Reed challenges the $10 reimbursement payment provided by the Settlement Agreement as insufficient. Reed Obj. at 7. But that argument presumes that the appropriate measure of damages for breach of warranty claims such as those asserted here is the entire purchase price paid by the claimant. It is not. As the Seventh Circuit has stated, "[i]n general, the measure of damages for breach of warranty is the difference between the value of the goods

accepted and the value they would have had if they had been as warranted." *Corbin v. Coleco Indus., Inc.*, 748 F.2d 411, 414 (7th Cir. 1984); *see also* Williston On Contracts § 66:52 (stating that the measure of damages for breach of warranty is the difference between value of goods as accepted and the value had they been as warranted, and that "if some use can be made of the goods notwithstanding the breach of warranty, they clearly have some value, and the buyer's damages may not be computed on the basis of the contract price").

In this case, the Product performed just as warranted for the vast majority of class members. Thus, had this case been litigated on its merits, those individuals would not have been entitled to any recovery at all. *See, e.g.*, *In re General Motors Type III Door Latch Litigation*, Nos. 98 C 5836, MCL 1266, 2001 WL 103434 (N.D. Ill. Jan. 31, 2001) (granting summary judgment in favor of defendant on claims for breach of warranty based on allegedly defective door latch because plaintiffs whose vehicles had not manifested the alleged defect had not shown evidence of diminished value).[6] In addition, the settlement allows even class members who do not have proof-of-purchase receipts (likely to be the vast majority) to obtain a $10 reimbursement payment based upon their certification that they bought the product. Settlement Agreement (Dkt. 90, Ex. 1) at 6-7. Absent the settlement, it is very unlikely that those class members could recover anything at all.

Ultimately, Ms. Martin's objection to the sufficiency of the $10 reimbursement payment boils down to a claim that the settlement could have been "better" for reimbursement-only class

---

[6] Even in the case of individuals for whom the straightening aspect of the Product did not work as warranted, the Product had some value, because the kits included a leave-in conditioner that had not been alleged to be defective and that could continue to be used by those individuals. *See* Ex. B to Amended Compl. (Dkt. 60). In addition, those individuals are eligible to receive an additional payment of up to $40 without receipts, or $800 with receipts, to reimburse expenses they incurred as a result of their use of the Product. If they suffered serious personal injuries they can also seek compensation for those injuries of up to $25,000 by submitting a claim against the Injury Fund under Option C.

members, which is not a valid ground for rejecting the settlement. *See, e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter, or snazzier, but whether it is fair, adequate and free from collusion."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011) (overruling objection to class settlement agreement that amount awarded to class members should be increased as "tantamount to complaining that the settlement should be 'better,' which is not a valid objection"). Viewed as a whole, the settlement – including the $10 reimbursement payment – is fair, adequate and reasonable, and it should be approved.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' Final Approval Memorandum, Unilever respectfully requests that this Court enter the Order Granting Final Approval of Class Action Settlement and Final Judgment.

Dated: June 27, 2014

Respectfully submitted,

/s/ Paula J. Morency
Paula J. Morency
Sondra A. Hemeryck
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606

Counsel for Defendants
Unilever United States, Inc. and
Conopco, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ Paula J. Morency
Paula J. Morency